## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

GREGORY CLAWGES, JEFFREY LEACH,     )
BRIAN MITCHELL, KURT TAYLOR,     )
ANTONIO BROWN, SHASTA MORGAN,     )
MADELYN LEASURE, and RAECHEL REES,     )    **Case No.: 1:25-cv-4090**
individually, and on behalf of all others     )
similarly situated,     )
    )
    *Plaintiffs*,     )
    )    **Collective and**
v.     )    **Class Action Complaint**
    )
RED ROBIN INTERNATIONAL, INC.,     )
    )    **JURY TRIAL DEMANDED**
    *Defendant.*     )

## COLLECTIVE AND CLASS ACTION COMPLAINT

Plaintiffs Gregory Clawges, Jeffrey Leach, Brian Mitchell, Kurt Taylor, Antonio Brown, Shasta Morgan, Madelyn Leasure, and Raechel Rees, individually, and on behalf of all others similarly situated, by and through their undersigned attorney, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all matters, bring this putative collective and class action against Defendant Red Robin International, Inc. ("Defendant" or "Red Robin") seeking all available relief under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 and 531 *et. seq*., the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105, *et seq*., the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115, *et seq*., the Missouri Minimum Wage Law ("MMWL"), Mo. Rev. Stat. § 290.500, *et seq*., and the Washington Minimum Wage Act ("WMWA"), RCW 49.46, *et seq*., and allege as follows:

## INTRODUCTION

1.    Plaintiffs and Collective and Class Members are current and former Assistant/Service Managers (salary), Kitchen Managers (salary), Assistant General Managers (salary), and General Managers (salary) (hereinafter collectively "Salaried Managers"), as well as

Shift Supervisors (hourly) and Associate Managers (hourly) (hereinafter collectively "Hourly Managers"), who worked and work for Red Robin. [1]

2.      As identified in two (2) other unpaid overtime lawsuits, a nationwide collective action in New York and a statewide class action in California - both of which had class or collective action settlements approved, Red Robin has historically used and continues to use a lean staffing model at its restaurants to extract long hours from salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers, even though they spend most of their days performing physically demanding non-exempt work, such as prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders.

3.      Because Red Robin has historically allocated insufficient staff hours to each restaurant, while simultaneously requiring salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers to perform the full gamut of customer service-related tasks, Plaintiffs and Collective and Class Members are misclassified as "exempt" because they are forced to spend the majority of their working time performing the same non-managerial tasks being performed by non-exempt workers.

4.      Red Robin's long-standing policy and practice of requiring salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers to replace hourly staff in performing non-exempt work has morphed in recent years to also include Red Robin's

---

[1] Upon information and belief, Red Robin's salaried "Assistant Managers" are now referred to as "Service Managers."

salaried General Managers. This company-wide policy and practice is due to numerous factors, exacerbated by the Covid-19 pandemic, that centers around Red Robin's insatiable desire to use the reduction of labor hours/costs as the primary mechanism to remain profitable and pay out millions of dollars in executive and board member compensation, even in the face of rising hourly wage rates and food costs.

5.      A review of Red Robin's Quarterly Sales Calls shows a clear company-wide policy and practice since at least 2012 of consistently squeezing hourly labor in order to maintain profit levels, especially in the "Back of House," so as to not affect dine-in customer reviews. Red Robin consistently uses the terms "labor productivity" and "labor efficiency" to describe this policy and practice of performing the same or more physical labor job duties with less hourly employees hours and more Salaried Managers hours.

6.      Red Robin has implemented extensive electronic systems to allow corporate control over restaurant-level labor hours in real time, significantly reducing General Managers' control over and time spent creating hourly staff schedules, and increasing corporate control of overtime hours, including: (1) in 2012, Red Robin implemented a new Labor Management System; (2) in 2015, Red Robin implemented the Watson Labor Management System; (3) in 2017, Red Robin implemented the Maestro system; and (4) in 2022, Red Robin implemented the "HotSchedules" platform.

7.      On July 14, 2017, a class action lawsuit, *Vigueras v. Red Robin*, was filed in California on behalf of servers, hosts, waiters, cooks, kitchen staff, bussers, and bartenders, alleging violations of their meal and rest periods under California state laws.

8.      On August 2, 2018, a collective and class action lawsuit, *Outlaw v. Red Robin*, was filed in New York on behalf of Kitchen Managers and Assistant Managers, alleging unpaid overtime under the FLSA and New York state laws.

9.      On June 19, 2020, Red Robin moved for court approval of an $8.5 million settlement for class members in *Vigueras v. Red Robin*.

10.     On July 7, 2020, a magistrate judge in *Outlaw v. Red Robin* recommended notice be provided to the putative collective action members.[2] Between October 30, 2020 and March 18, 2021, hundreds of individuals opted into the *Outlaw v. Red Robin* lawsuit; each was paid individually by offer of judgment for their FLSA claims.

11.     In the fourth quarter of 2020, Red Robin then announced it had implemented a new "management labor model," that replaced many Salaried Managers, who had consistently worked more than 60 to 70 hours per week, with Hourly Managers, who were prohibited from working more than 40 hours per week. Red Robin's CEO noted: "The flexibility of moving two salary manager positions to one to three hourly shift supervisors also allows us to convert historically fixed labor costs and generate annual savings of approximately $14 million." The CEO further noted they had "enhanced operations resulting in over $2 million of annual savings in terms of back of house labor." These labor "savings" meant Red Robin's remaining Salaried Managers, including their General and Assistant General Managers, were required to cover those missing labor hours by performing even more non-managerial, physical labor tasks.

---

[2] The Magistrate Judge found Red Robin "maintains uniform job descriptions for all kitchen managers and assistant managers throughout its restaurants." The Magistrate Judge stated: "But even more significant is the evidence that Defendant has a company-wide policy of limiting overtime work, a standardized training regimen, centralized accounting, payroll and human resources/personnel systems that allows [Red Robin] to maintain consistency and uniformity throughout its locations and track each restaurant's record. Plaintiff has also identified [Red Robin's] centralized system of staffing all its restaurant manager2 positions using a single online platform and utilizing corporate talent recruiters to track, maintain, and make restaurant manager staffing recommendations, rather than at the level of individual restaurants." The Magistrate Judge noted, "Lastly, the individual declarations of Plaintiff and the six opt-in Plaintiffs cover the practice of unpaid overtime work in restaurants located in six different states. … While the additional declarations from 12 individuals reflect the same practice in restaurants spanning nine additional states." Those states were Illinois, Pennsylvania, Washington, Virginia, Wisconsin, California, Texas, Georgia, Minnesota, Tennessee, Idaho, and New Mexico.

12.     On April 27, 2022, a class action lawsuit, *Miller v. Red Robin*, was filed in California on behalf of Kitchen Managers, Assistant Managers, and Assistant General Managers alleging unpaid overtime under California state laws.

13.     On July 5, 2022, Red Robin moved for court approval of a $2.95 million settlement for state law class members in *Outlaw v. Red Robin*. This settlement amount was in addition to the offers of judgment previously paid to the hundreds of FLSA opt-in collective action members.

14.     Red Robin then replaced its executive leadership: G.J. Hart was hired as CEO in September, Todd Wilson was hired as CFO in November, and Sarah Mussetter was hired as CLO in December. In January of 2023, that executive leadership group, in response to the California lawsuit *Miller v Red Robin*, announced Red Robin's "North Star" five-point strategic plan, which would "represent a return to an industry standard staffing model and the staffing model Red Robin used for many years to generate great success." This was purportedly going to "[t]ransform [Red Robin] to an operations focused restaurant company" by (1) empowering decision making by operators at the unit level, (2) incentivizing and rewarding operators to drive business growth and results, and (3) restructuring support organization. This plan was also going to "evaluate vendors for need, performance, and competitive costs" and "implement ongoing process to reduce costs through actions that uphold our commitment to a great guest experience."

15.     However, the "North Star" plan also included "restructure[ing] both [Red Robin's] restaurant support center and operations leadership." Red Robin alleged these changes would "better support our single unit operators by removing bureaucracy and speeding decision making." In actuality, this restructuring created a system where Red Robin's Regional Operations Directors, rather than the General Managers they supervised, actively controlled the day-to-day functions of restaurant-level activities. [3]

---

[3] Red Robin's multi-unit field operations leaders are their "Regional Operations Directors," who

16.     Salaried General Managers are directly supervised by Red Robin's Regional Operations Directors, who also are and have been known as Regional Managers, who daily review each restaurant-level staffing levels through Red Robin's electronic labor management systems. The Regional Operations Directors consistently communicate daily with General Managers directing them to reduce their staffing levels for the day, so they do not incur overtime or "run out" of allotted labor hours for the week. Additionally, control of off-premise services, such as to-go orders, catering, and Donatos pizza – which are significantly if not solely prepped, cooked, packaged, and delivered by Salaried Managers, including Red Robin's General Managers – was shifted from General Managers' control to Regional Operations Directors control. Further, Regional Operations Directors were actively reviewing General Manager's janitorial and maintenance costs, directing them to assume the physical labor duties previously performed by outside vendors.

17.     On December 1, 2023, Red Robin moved for court approval of a $3.2 million settlement for class members in *Miller v. Red Robin*.

18.     To accomplish their "North Star" plan, by the end of 2023, Red Robin "completed the roll-out of its field leadership performance-based compensation program that includes a base salary plus a performance bonus linked to restaurant-level operating profit, which the Company expects to drive an ownership mentality and meaningful results in traffic, sales, and profitability consistent with the Company's financial plans."

19.     Prior to this compensation change, Red Robin's General Managers received a base salary between approximately $70,000 and $95,000, plus bonuses based on restaurant-level profits after costs they could control (labor, supplies, cost of food, etc.). Red Robin's North Star plan

---

were previously titled as and continue to be colloquially known as "Regional Managers."

reduced *all* General Managers'[4] yearly base salary to a flat $65,000, with bonuses based on their restaurant-level operating profit after *all* costs, even those outside their control (rent, major repair and maintenance,[5] salaried managers compensation, etc.).[6] This change was not intended to benefit Red Robin's Salaried Managers; it was intended to increase corporate profits through what Red Robin's Regional Operations Directors would refer to as the "every dollar" approach. "Every dollar" that Red Robin's Salaried Managers, especially its General Managers, trimmed from their current restaurant-level operating costs would increase their bonus – and the bonus of their Regional Operations Director, who was actively controlling all aspects of daily operations at the restaurant-level. However, by 2023, there wasn't any fat left to be trimmed from Red Robin's restaurant-level operating costs. Red Robin's corporate leadership controlled almost all of a restaurant's fixed costs: lease amount, menu items and prices, food supply chain, and salaried management compensation. Red Robin's Salaried Managers really only had two areas where they could cut costs – and importantly both required Salaried Managers, especially General Managers, to significantly increase the amount of time they spent performing non-managerial, physical labor tasks: (1) labor budget and (2) vendors they controlled. When Salaried Managers reduced their labor budget, they sent home staff who were paid hourly, but that did not decrease the need for those hourly staff; instead, Regional Operations Directors required Salaried Managers, including

---

[4] In 2023, Red Robin also changed the General Managers' title to "Managing Partner," despite not significantly altering their job duties. To reduce confusion, General Managers, now "Managing Partners," will be referred to only as "General Managers" for the purpose of this Complaint, especially since the individual Plaintiffs consistently refer to title as General Manager, not Managing Partner.

[5] Major repair and maintenance would include things like replacement of air conditioning and heating units or pavement of parking lots.

[6] As of November 11, 2025, General Managers all share a flat $65,000 flat salary, while Assistant General Managers can have salaries as high was $82,000; per their job description, General Managers, Assistant General Managers, Assistant/Service Managers, Associate Managers, and Kitchen Managers all "[s]hare in the financial success of [their] restaurant with an uncapped bonus program."

General Managers, to work more hours to cover the loss of hourly line preps, cooks, hostesses, bussers, servers, and bartenders. When Salaried Managers reduced costs associated with vendors they controlled, Salaried Managers, especially General Managers, eliminated outside vendors such as snow removal companies, lawncare and landscaping companies, window/outside power washing companies, and equipment repair companies, but that did not end the need for those services; instead, Regional Operations Directors required Salaried Managers, including General Managers, to shovel snow, fix their own broken stoves, repair leaking roofs, and wash windows instead.

20.     In 2025, Red Robin announced Dave Pace as their new CEO. Red Robin introduced the "First Choice" plan, with would "build on the foundations established under the North Star plan." Red Robin noted a "270 basis point improvement year-over-year in restaurant level operating profit margin entirely driven by 300 basis points of labor improvement."

21.     These labor improvements, or "efficiencies," are the direct result Red Robin's Salaried Managers, including their General Managers, spending most of their days performing physically demanding non-exempt work, such as prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders – but not receiving any overtime compensation, since Red Robin misclassifies all of its Salaried Managers across the board as "exempt" under the FLSA.

22.     Additionally, both (1) Salaried Managers and (2) hourly Shift Supervisors, Associate Managers, and Assistant/Service Managers (hereinafter "Hourly Managers") at times earned hundreds of dollars per day in tips/gratuities directly from customers based on the service they

directly and solely provided, such as through to-go orders, catering orders, Donatos pizza orders, bartending, and serving tables; however, Red Robin's policies and practices prohibit tips/gratuities earned by and owed to Salaried and Hourly Managers to be paid to those Salaried and Hourly Managers. Rather, the tips/gratuities earned by Salaried and Hourly Managers were either kept by Red Robin or shifted to those Salaried and Hourly Manager's Front of House co-workers, such as bartenders, hosts, and servers. Red Robin also failed to reimburse Salaried and Hourly Managers for the use of their personal vehicles to deliver catering orders or obtain supplies from other restaurant locations. As a result, Salaried and Hourly Managers were denied tips/gratuities they earned and reimbursement of employee expenses owed to them under the Federal Labor Standards Act, Illinois Wage Payment and Collection Act, and Washington Minimum Wage Act.

## NATURE OF THE ACTION

23.     This lawsuit seeks to recover as a nationwide collective action under the FLSA unpaid overtime compensation and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried Managers for Red Robin nationwide. This is the FLSA Unpaid Overtime Collective Action.

24.     This lawsuit seeks to recover as a nationwide collective action under the FLSA tips unlawfully withheld and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried and Hourly Managers for Red Robin nationwide. This is the FLSA Withheld Tips Collective Action.

25.     This lawsuit seeks to recover for an Illinois class under the IMWL unpaid overtime compensation and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried Managers for Red Robin in the State of Illinois. This is the Illinois Unpaid Overtime Class.

26.     This lawsuit seeks to recover for an Illinois class under the IWPCA tips unlawfully

withheld, unpaid employee expense reimbursements for employment duties, and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried and Hourly Managers for Red Robin in the State of Illinois. This is the <u>Illinois Withheld Tips and Reimbursement Class</u>.

27.    This lawsuit seeks to recover for a Missouri class under the MMWL unpaid overtime compensation and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried Managers for Red Robin in the State of Missouri. This is the <u>Missouri Unpaid Overtime Class</u>.

28.    This lawsuit seeks to recover for a Washington class under the WMWA unpaid overtime compensation and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried Managers for Red Robin in the State of Washington. This is the <u>Washington Unpaid Overtime Class.</u>

29.    This lawsuit seeks to recover for a Washington class under the WMWA tips unlawfully withheld and other penalties for Plaintiffs and their similarly situated co-workers who have worked as Salaried and Hourly Managers for Red Robin in the State of Washington. This is the <u>Washington Withheld Tips Class.</u>

30.    Red Robin, a chain of casual dining restaurants focusing mainly on gourmet burgers, bottomless fries, and craft brews, operates nearly five hundred (500) restaurants across the United States and Canada, including approximately seventeen (17) locations in Illinois, eight (8) locations in Missouri, thirty-seven (37) locations in Washington, and fifteen (15) locations in Oregon – all of which employ multiple Hourly and Salaried Managers.

31.    Because Red Robin requires its restaurants nationwide to maintain lean staffing of its hourly workers, Salaried Managers consistently spend the vast majority of their working time performing the same physical labor and customer service-related duties as non-exempt, hourly-paid

workers.

32.    Throughout the relevant period it has been Red Robin's company-wide policy to uniformly classify all of its Salaried Managers, including those in Illinois, Missouri, and Washington, as exempt from state overtime provisions and not to pay them any overtime wages.

33.    Red Robin regularly requires Salaried Managers nationwide to work in excess of eight (8) hours per workday and forty (40) hours per workweek.  However, because Red Robin classifies Salaried Managers nationwide, including in Illinois, Missouri, and Washinton, as exempt, it fails to pay them any overtime compensation for hours worked over eight (8) in a workday or forty (40) in a workweek.

34.    Red Robin prohibits tips/gratuities earned by and owed to Illinois Salaried and Hourly Managers to be paid to those Salaried and Hourly Managers. Rather, the tips/gratuities earned by Salaried and Hourly Managers were either retained by Red Robin or shifted to the Salaried and Hourly Manager's hourly co-workers.

35.    Red Robin requires Salaried and Hourly Managers to use their personal vehicles when delivering catering orders or obtaining supplies from other restaurant locations, but fails to reimburse them for mileage and other costs.

36.    By the conduct described in this Collective and Class Action Complaint, Red Robin has violated the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 and 531 *et. seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1, *et seq*, the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115, *et seq.*, the Missouri Minimum Wage Law ("MMWL"), Mo. Rev. Stat. § 290.500, *et seq.*, and the Washington Minimum Wage Act ("WMWA"), RCW 49.46, *et seq*.

37.    Plaintiffs bring this action on behalf of themselves and all other current and former as follows:

a. For the FLSA Unpaid Overtime Collective Action, Salaried Managers employed nationwide by Red Robin since September 29, 2022;

b. For the FLSA Withheld Tips Collective Action, Salaried and Hourly Managers employed nationwide by Red Robin since September 29, 2022;

c. For the Illinois Unpaid Overtime Class, Salaried Managers employed by Red Robin in Illinois since September 29, 2022;

d. For the Illinois Withheld Tips and Reimbursements Class, Salaried and Hourly Managers employed by Red Robin in Illinois since September 29, 2015;

e. For the Missouri Unpaid Overtime Class, Salaried Managers employed by Red Robin in Missouri since September 29, 2022;

f. For the Washington Unpaid Overtime Class, Salaried Managers employed by Red Robin in Washington since September 29, 2022; and

g. For the Washington Withheld Tips Class, Salaried and Hourly Managers employed by Red Robin in Washington since September 29, 2022.

38.     In order to remedy Red Robin's violations of the FLSA, IMWL, IWPCA, MMWL, and WMWA, Plaintiffs bring this action pursuant to Federal Rule of Procedure 23.

## THE PARTIES

**Plaintiff Gregory Clawges**

39.     Plaintiff Gregory Clawges is an individual citizen residing in St. Louis County, Missouri. Plaintiff Clawges began his employment with Red Robin in 2016. Plaintiff Clawges was employed by Red Robin as a General Manager at the Des Peres, Missouri location from approximately May 2021 until July 2023.

40.     Plaintiff Clawges worked in excess of forty (40) hours per workweek, without receiving overtime compensation or other appropriate compensation as required by state and federal laws. Plaintiff Clawges received tips/gratuities that were withheld by Red Robin, in

violation of federal laws. Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b). *See* Ex. A.

**Plaintiff Jeffrey Leach**

41.     Plaintiff Jeffrey Leach is an individual citizen residing in St. Charles County, Missouri. Plaintiff Leach began his employment with Red Robin in July 2021 in the O'Fallon, Missouri location, where he worked as an Associate Manager (hourly position). Plaintiff Leach was employed by Red Robin as an Associate Manager (hourly position) in the Dardenne Prairie, Missouri location from February 2023 until August 2023. Plaintiff Leach was employed by Red Robin as an Assistant General Manager in the O'Fallon, Missouri location from August 2023 until February 2024. Plaintiff Leach was employed by Red Robin as a General Manager in the O'Fallon, Missouri location from February 2024 until May 2025.

42.     Plaintiff Leach worked in excess of forty (40) hours per workweek, without receiving overtime compensation or other appropriate compensation as required by state and federal laws. Plaintiff Leach received tips/gratuities that were withheld by Red Robin, in violation of federal laws. Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b). *See* Ex. B.

**Plaintiff Brian Mitchell**

43.     Plaintiff Brian Mitchell is an individual citizen residing in St. Louis County, Missouri. Plaintiff Mitchell began his employment with Red Robin in 2013. Plaintiff Mitchell was employed by Red Robin as a Kitchen Manager at the Chesterfield, Missouri location from approximately November 2023 until June 2025.

44.     Plaintiff Mitchell worked in excess of forty (40) hours per workweek, without receiving overtime compensation or other appropriate compensation as required by state and federal laws. Plaintiff Mitchell received tips/gratuities that were withheld by Red Robin, in

violation of federal laws. Plaintiff has consented in writing to be a party to this action, pursuant to

29 U.S.C. § 216(b). *See* Ex. C.

**Plaintiff Kurt Taylor**

45.     Plaintiff Kurt Taylor is an individual citizen residing in St. Clair County, Illinois.

Plaintiff Taylor was employed by Red Robin as an Associate Manager (hourly position) at the

Fairview Heights, Illinois location from January 2021 until November 2024.

46.     Plaintiff Taylor received tips/gratuities that were withheld by Red Robin, in

violation of federal laws. Plaintiff Taylor was denied tips/gratuities he earned in violation of the

Illinois Wage Payment and Collection Act. Plaintiff has consented in writing to be a party to this

action, pursuant to 29 U.S.C. § 216(b). *See* Ex. D.

**Plaintiff Antonio Brown**

47.     Plaintiff Antonio Brown is an individual citizen residing in St. Louis County,

Missouri. Plaintiff Brown began his employment with Red Robin by training in Fairview Heights,

Illinois from July to August 2023. Plaintiff Brown was employed by Red Robin as an Assistant

General Manager at the Richmond Heights, Missouri location from September 2023 to March

2024.

48.     Plaintiff Brown worked in excess of forty (40) hours per workweek, without

receiving overtime compensation or other appropriate compensation as required by state and

federal laws. Plaintiff Brown received tips/gratuities that were withheld by Red Robin, in violation

of federal laws. Plaintiff Brown was denied tips/gratuities he earned, in violation of the Illinois

Wage Payment and Collection Act. Plaintiff has consented in writing to be a party to this action,

pursuant to 29 U.S.C. § 216(b). *See* Ex. E.

**Plaintiff Shasta Morgan**

49.     Plaintiff Shasta Morgan is an individual citizen residing in Pierce County,

Washington. Plaintiff Morgan began her employment with Red Robin in 2004. Plaintiff Morgan was employed by Red Robin as an Assistant General Manager at the Auburn, Washington location from 2021 to September 2023.

50.     Plaintiff Morgan worked in excess of forty (40) hours per workweek, without receiving overtime compensation or other appropriate compensation as required by state and federal laws. Plaintiff Morgan received tips/gratuities that were withheld by Red Robin, in violation of federal laws. Plaintiff Morgan was denied tips/gratuities she earned, in violation of the Washington Minimum Wage Act. Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).  *See* Ex. F.

**Plaintiff Madelyn Leasure**

51.     Plaintiff Madelyn Leasure is an individual citizen residing in Kitsap County, Washington. Plaintiff Leasure began her employment with Red Robin in 2021 in the Lacey, Washington location, where she worked as a host, server, and to-go specialist. Plaintiff Leasure was employed by Red Robin as a Shift Supervisor (hourly position) in the Lacey, Washington location from February 2023 until June 2023. Plaintiff Leasure was employed by Red Robin as a Shift Supervisor (hourly position) in the Olympia, Washington location from June 2023 until June 2025.

52.     Plaintiff Leasure received tips/gratuities that were withheld by Red Robin, in violation of federal laws. Plaintiff Leasure was denied tips/gratuities she earned, in violation of the Washington Minimum Wage Act. Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).  *See* Ex. G.

**Plaintiff Raechel Rees**

53.     Plaintiff Raechel Rees is an individual citizen residing in Multnomah County, Oregon. Plaintiff Rees began her employment with Red Robin in 2014 in the Portland, Oregon location, where she worked as a server and bartender. Plaintiff Rees was employed by Red Robin as

a Shift Supervisor (hourly position) in the Portland, Oregon location from June 2018 until August 2025.

54.    Plaintiff Rees received tips/gratuities that were withheld by Red Robin, in violation of federal laws. Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).  *See* Ex. H.

**Defendant Red Robin International, Inc.**

55.    Defendant Red Robin International, Inc. is a corporation organized and existing under the laws of Nevada, with a principal place of business at 10000 E Geddes Avenue, Suite 500, Englewood, Colorado 80112-3680. Red Robin may be served through its registered agent: Corporation Service Company, 1900 W Littleton Blvd, Littleton, CO 80120.

56.    Red Robin Gourmet Burgers, Inc. is a publicly traded corporation reporting $1.25 billion in revenues, and directly or indirectly owns the outstanding capital stock or membership interests in Red Robin International, Inc. and its other subsidiaries.

57.    Defendant's executive leadership team, including its President/Chief Executive Officer/Director, Executive Vice President/Chief Financial Officer, Chief Legal Officer, Chief People Officer, and Senior Vice President Operations; on-site critical employees; test kitchen; and Restaurant Support Center are located its principal place of business in Englewood, Colorado.

58.    At all times relevant herein, Defendant has been an employer within the meaning of Illinois, Missouri, and Washington state laws and Section 3(d) of the FLSA (29 U.S.C. § 203(d).

59.    At all times relevant herein, Defendant has maintained control, oversight, and direction over Plaintiffs and the Collective Action and Class Members, including over the training, accounting, timekeeping, payroll, human resources/personnel, and other employment practices that applied to them. Defendant has a centralized system of staffing all its restaurant manager positions using a single online platform. Defendant had a company-wide policy of limiting overtime work that

applied to Plaintiffs and the Collective Action and Class Members. Defendant has benefited from the work performed by Plaintiffs and similarly situated co-workers.

60.    Defendant issued paychecks to Plaintiffs and all similarly situated co-workers during their employment.

61.    Pursuant to Defendant's nationwide policy, pattern, and practice, it did not pay Plaintiffs and other similarly situated Salaried Managers proper overtime wages for hours they worked for Defendant in excess of forty (40) hours in a workweek.

62.    Pursuant to Defendant's nationwide policy, pattern, and practice, it denied Hourly and Salaried Managers tips/gratuities they earned.

63.    Pursuant to Defendant's nationwide policy, pattern, and practice, it denied Hourly and Salaried Managers reimbursement of employee expenses owed to them.

## JURISDICTION AND VENUE

64.    This Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 and 1332.

65.    Further, this Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1332(a), (d) and 1367.

66.    Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is in this District, a substantial part of the events giving rise to the claims occurred in this District, and Defendant operates store locations in this District.

## FLSA UNPAID OVERTIME COLLECTIVE ACTION ALLEGATIONS

67.    Pursuant to 29 U.S.C. §§ 207 and 216(b), Plaintiffs seek to prosecute their FLSA claims as a Collective Action on behalf of all persons who are or were formerly employed by Red Robin nationwide as Salaried Managers within the United States at any time from September 29, 2022 to the entry of judgment in this case.

68.     Red Robin is liable under the FLSA for, *inter alia*, failing to pay premium overtime wages to Plaintiffs and other similarly situated employees for all hours over 40 worked in any given workweek.

69.     Upon information and belief, there are likely hundreds of similarly situated current and former Salaried Managers who have not been paid premium overtime wages in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join. Thus, notice should be sent to the Collective Action Members pursuant to 29 U.S.C. § 216(b).

70.     The similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

## FLSA WITHHELD TIPS COLLECTIVE ACTION ALLEGATIONS

71.     Pursuant to 29 U.S.C. §§ 203 and 216(b), Plaintiffs seek to prosecute their FLSA claims as a Collective Action on behalf of all persons who are or were formerly employed by Red Robin as Salaried and Hourly Managers within the United States at any time from September 29, 2022 to the entry of judgment in this case.

72.     Red Robin is liable under the FLSA for, *inter alia*, prohibiting Plaintiffs and other similarly situated employees nationwide from keeping tips earned directly from customers based on the service that they directly and solely provided.

73.     Red Robin is liable under the FLSA for, *inter alia*, either retaining these tips itself or allocating these tips to servers, hosts, bartenders, cooks, and other hourly co-workers.

74.     Upon information and belief, there are likely hundreds of similarly situated current and former Salaried and Hourly Managers who have not been paid the tips they earned in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join. Thus, notice should be sent to the Collective Action Members pursuant

to 29 U.S.C. § 216(b).

75.    The similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

## ILLINOIS UNPAID OVERTIME CLASS ALLEGATIONS

76.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to represent is composed of and defined as:

> All employees who are currently or have been employed by Defendant Red Robin in the State of Illinois for workweeks during which those individuals work or worked as Assistant/Service Managers, Assistant General Managers, Kitchen Managers, and General Managers (collectively, "Salaried Managers") at any time from September 29, 2022 through final disposition of this action.

77.    **Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the Illinois class is at least forty (40) individuals.  Although the precise number of putative class members is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendants and the members of the Class are ascertainable from Defendants' records.

78.    **Typicality:**  The claims of Plaintiffs for damages, penalties, and restitution are typical of all proposed Class Members.  Red Robin's practice of misclassifying Salaried Managers was identical or nearly identical in nature throughout the nation, including in the States of Illinois, Missouri, and Washington.  Plaintiffs and the proposed Class suffered common injuries as a result of Red Robin's conduct.

79.    **Adequacy:**  Plaintiffs are members of the proposed Class.  Plaintiffs suffered actual harm and damages as a result of Red Robin's misclassification of them as exempt employees,

which means they are entitled to unpaid overtime compensation. Plaintiffs have been informed of their duties as class representatives and have committed to serving in that capacity as adequate representatives. Plaintiffs' interests in the pursuit of the case are not averse to the interest of other Class Members, and Plaintiffs are aware of no conflicts of interest that are capable of destroying their adequacy to pursue the claims made herein. Plaintiffs are informed and believe that they have selected competent proposed Class Counsel experienced in handling both the procedural and substantive aspects of the case as a class action. Plaintiffs will fairly protect the interests of the members of the proposed Class, have no interests antagonistic to Class Members, and will vigorously pursue this suit via attorneys who are competent, skilled, experienced in litigating class action matters, and well-acquainted with class action process and procedure.

80.     **Superiority:** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy, since joinder of all Class Members is impracticable. Given that this case involves a large number of Class Members with relatively small claims, the burden and expense of individual litigation would make it virtually impossible to seek individual redress for the wrongs done to them. If separate actions were brought or required to be brought by each individual Class Member, the resulting multiplicity of lawsuits would also cause undue burden and expense for the Court and the parties and create the risk of inconsistent rulings.

81.     **Existence and Predominance of Common Questions of Fact and Law:** There are common questions of law and fact as to the members of the Class, which predominate over questions affecting only individual members of the Class including, without limitation:

a.  whether Red Robin violated the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. 105/1, *et seq*.;

b.  whether Red Robin failed to compensate the Class Representatives and the Class Members for hours worked in excess of 8 hours per workday and 40 hours per

workweek;

c.   whether Red Robin misclassified the Class Representatives and Class Members as exempt employees;

d.   whether Red Robin failed to pay all wages due to the Class Representatives and Class Members at the time they ended their employment with Red Robin;

e.   whether Red Robin failed to keep true and accurate time and pay records for all hours worked by the Class Representatives and the Class Members, and other records required by the Illinois Minimum Wage Law;

f.   whether Red Robin's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

g.   the nature and extent of class-wide injury and the measure of damages for those injuries.

82.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

**ILLINOIS WITHHELD TIPS AND REIMBURSEMENTS CLASS ALLEGATIONS**

83.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to represent is composed of and defined as:

> All employees who are currently or have been employed by Defendant Red Robin in the State of Illinois as Assistant/Service Managers, Assistant General Managers, Kitchen Managers, and General Managers (collectively, "Salaried Managers"), and Shift Supervisors and Associate Managers (collectively "Hourly Managers") who were not paid the tips/gratuities they earned or reimbursed employee expenses at any time from September 29, 2015 through final disposition of this action.

84.    **Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the size of the Illinois class is at least forty (40) individuals.  Although the precise number of putative class members is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendants and the members of the Class are ascertainable from Defendants' records.

85.    **Typicality:**  The claims of Plaintiffs for damages, penalties, and restitution are typical of all proposed Class Members.  Red Robin's practice of prohibiting Salaried and Hourly Managers from being paid their earned tips/gratuities and failing to reimburse Salaried and Hourly Managers for employee expenses, such as using their personal vehicles to deliver catering or obtain supplies from other locations, was identical or nearly identical in nature throughout the nation, including in the States of Illinois, Missouri, and Washington.  Plaintiffs and the proposed Class suffered common injuries as a result of Red Robin's conduct.

86.    **Adequacy:**  Plaintiffs are members of the proposed Class.  Plaintiffs suffered actual harm and damages as a result of Red Robin's practice of prohibiting Salaried and Hourly Managers from receiving their earned tips/gratuities and failing to reimburse Salaried and Hourly Managers for employee expenses, such as using their personal vehicles to deliver catering or obtain supplies from other locations.  Plaintiffs have been informed of their duties as class representatives and have committed to serving in that capacity as adequate representatives.  Plaintiffs' interests in the pursuit of the case are not averse to the interest of other Class Members, and Plaintiffs are aware of no conflicts of interest that are capable of destroying their adequacy to pursue the claims made herein.  Plaintiffs are informed and believe that they have selected competent proposed Class Counsel experienced in handling both the procedural and substantive aspects of the case as a class action.  Plaintiffs will fairly protect the interests of the members of the proposed Class, have no interests antagonistic to Class Members, and will vigorously pursue this suit via attorneys who are

competent, skilled, experienced in litigating class action matters, and well-acquainted with class action process and procedure.

87.     **Superiority:** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy, since joinder of all Class Members is impracticable.  Given that this case involves a large number of Class Members with relatively small claims, the burden and expense of individual litigation would make it virtually impossible to seek individual redress for the wrongs done to them.  If separate actions were brought or required to be brought by each individual Class Member, the resulting multiplicity of lawsuits would also cause undue burden and expense for the Court and the parties and create the risk of inconsistent rulings.

88.     **Existence and Predominance of Common Questions of Fact and Law:**  There are common questions of law and fact as to the members of the Class, which predominate over questions affecting only individual members of the Class including, without limitation:

  a. whether Red Robin violated the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115, *et seq*.;

  b. whether Red Robin failed to pay the Class Representatives and the Class Members the tips/gratuities they earned;

  c. whether Red Robin failed to reimburse the Class Representatives and the Class Members for employee expenses, such as use of their personal vehicle to deliver catering orders and obtain supplies from other locations;

  d. whether Red Robin failed to pay all wages due to the Class Representatives and Class Members at the time they ended their employment with Red Robin;

  e. whether Red Robin failed to keep true and accurate records for tips/gratuities earned and employee expenses by the Class Representatives and the Class Members, and other records required by the Illinois Wage Payment and Collection Act;

f.   whether Red Robin's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

g.   the nature and extent of class-wide injury and the measure of damages for those injuries.

89.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

## MISSOURI UNPAID OVERTIME CLASS ALLEGATIONS

90.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to represent is composed of and defined as:

> All employees who are currently or have been employed by Defendant Red Robin in the State of Missouri for workweeks during which those individuals work or worked as Assistant/Service Managers, Assistant General Managers, Kitchen Managers, and General Managers (collectively, "Salaried Managers") at any time from September 29, 2022 through final disposition of this action.

91.    **Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the size of the Missouri class is at least forty (40) individuals. Although the precise number of putative class members is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendants and the members of the Class are ascertainable from Defendants' records.

92.    **Typicality:** The claims of Plaintiffs for damages, penalties, and restitution are typical of all proposed Class Members. Red Robin's practice of misclassifying Salaried Managers was identical or nearly identical in nature throughout the nation, including in the States of Illinois, Missouri, and Washington. Plaintiffs and the proposed Class suffered common injuries as a result

of Red Robin's conduct.

93.    **Adequacy:**  Plaintiffs are members of the proposed Class.  Plaintiffs suffered actual harm and damages as a result of Red Robin's misclassification of them as exempt employees, which means they are entitled to unpaid overtime compensation.  Plaintiffs have been informed of their duties as class representatives and have committed to serving in that capacity as adequate representatives.  Plaintiffs' interests in the pursuit of the case are not averse to the interest of other Class Members, and Plaintiffs are aware of no conflicts of interest that are capable of destroying their adequacy to pursue the claims made herein.  Plaintiffs are informed and believe that they have selected competent proposed Class Counsel experienced in handling both the procedural and substantive aspects of the case as a class action.  Plaintiffs will fairly protect the interests of the members of the proposed Class, have no interests antagonistic to Class Members, and will vigorously pursue this suit via attorneys who are competent, skilled, experienced in litigating class action matters, and well-acquainted with class action process and procedure.

94.    **Superiority:** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy, since joinder of all Class Members is impracticable.  Given that this case involves a large number of Class Members with relatively small claims, the burden and expense of individual litigation would make it virtually impossible to seek individual redress for the wrongs done to them.  If separate actions were brought or required to be brought by each individual Class Member, the resulting multiplicity of lawsuits would also cause undue burden and expense for the Court and the parties and create the risk of inconsistent rulings.

95.    ***Existence and Predominance of Common Questions of Fact and Law:*** There are common questions of law and fact as to the members of the Class, which predominate over questions affecting only individual members of the Class including, without limitation:

a.    whether Red Robin violated the Missouri Minimum Wage Law ("MMWL"), Mo.

Rev. State. § 290.500, *et seq*.;

b.   whether Red Robin failed to compensate the Class Representatives and the Class Members for hours worked in excess of 8 hours per workday and 40 hours per workweek;

c.   whether Red Robin misclassified the Class Representatives and Class Members as exempt employees;

d.   whether Red Robin failed to pay all wages due to the Class Representatives and Class Members at the time they ended their employment with Red Robin;

e.   whether Red Robin failed to keep true and accurate time and pay records for all hours worked by the Class Representatives and the Class Members, and other records required by the Missouri Minimum Wage Law;

f.   whether Red Robin's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

g.   the nature and extent of class-wide injury and the measure of damages for those injuries.

96.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

## WASHINGTON UNPAID OVERTIME CLASS ALLEGATIONS

97.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to represent is composed of and defined as:

All employees who are currently or have been employed by Defendant Red Robin in the State of Washington for workweeks during which those individuals work or worked as Assistant/Service Managers, Assistant General Managers, Kitchen Managers, and

General Managers (collectively, "Salaried Managers") at any time
from September 29, 2022 through final disposition of this action.

98.     **Numerosity:** The members of the Class are so numerous that joinder of all members

is impracticable.  Upon information and belief, the size of the Washington class is at least forty

(40) individuals.  Although the precise number of putative class members is unknown, the facts on

which the calculation of that number depends are presently within the sole control of Defendants

and the members of the Class are ascertainable from Defendants' records.

99.     **Typicality:**  The claims of Plaintiffs for damages, penalties, and restitution are

typical of all proposed Class Members.  Red Robin's practice of misclassifying Salaried Managers

was identical or nearly identical in nature throughout the nation, including in the States of Illinois,

Missouri, and Washington.  Plaintiffs and the proposed Class suffered common injuries as a result

of Red Robin's conduct.

100.     **Adequacy:** Plaintiffs are members of the proposed Class.  Plaintiffs suffered actual

harm and damages as a result of Red Robin's misclassification of them as exempt employees,

which means they are entitled to unpaid overtime compensation.  Plaintiffs have been informed of

their duties as class representatives and have committed to serving in that capacity as adequate

representatives.  Plaintiffs' interests in the pursuit of the case are not averse to the interest of other

Class Members, and Plaintiffs are aware of no conflicts of interest that are capable of destroying

their adequacy to pursue the claims made herein.  Plaintiffs are informed and believe that they have

selected competent proposed Class Counsel experienced in handling both the procedural and

substantive aspects of the case as a class action.  Plaintiffs will fairly protect the interests of the

members of the proposed Class, have no interests antagonistic to Class Members, and will

vigorously pursue this suit via attorneys who are competent, skilled, experienced in litigating class

action matters, and well-acquainted with class action process and procedure.

101.    **Superiority:** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy, since joinder of all Class Members is impracticable.  Given that this case involves a large number of Class Members with relatively small claims, the burden and expense of individual litigation would make it virtually impossible to seek individual redress for the wrongs done to them.  If separate actions were brought or required to be brought by each individual Class Member, the resulting multiplicity of lawsuits would also cause undue burden and expense for the Court and the parties and create the risk of inconsistent rulings.

102.    **Existence and Predominance of Common Questions of Fact and Law:**  There are common questions of law and fact as to the members of the Class, which predominate over questions affecting only individual members of the Class including, without limitation:

a.    whether Red Robin violated the Washington Minimum Wage Act ("WMWA"), RCW 49.46, *et seq*.;

b.    whether Red Robin failed to compensate the Class Representatives and the Class Members for hours worked in excess of 8 hours per workday and 40 hours per workweek;

c.    whether Red Robin misclassified the Class Representatives and Class Members as exempt employees;

d.    whether Red Robin failed to pay all wages due to the Class Representatives and Class Members at the time they ended their employment with Red Robin;

e.    whether Red Robin failed to keep true and accurate time and pay records for all hours worked by the Class Representatives and the Class Members, and other records required by the Washington Minimum Wage Act;

f.    whether Red Robin's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

g.    the nature and extent of class-wide injury and the measure of damages for those

injuries.

103.    Plaintiffs bring this action on behalf of themselves and all others similarly situated,

as a class action pursuant to Federal Rule of Civil Procedure 23.

## WASHINGTON WITHHELD TIPS CLASS ALLEGATIONS

104.    Plaintiffs bring this action on behalf of themselves and all others similarly situated,

as a class action pursuant to Federal Rule of Civil Procedure 23. The Class that Plaintiffs seek to

represent is composed of and defined as:

> All employees who are currently or have been employed by
> Defendant Red Robin in the State of Washington for workweeks
> during which those individuals work or worked as Assistant/Service
> Managers, Assistant General Managers, Kitchen Managers, and
> General Managers (collectively, "Salaried Managers") and Shift
> Supervisors and Associate Managers (collectively "Hourly
> Managers") at any time from September 29, 2022 through final
> disposition of this action.

105.    **Numerosity:** The members of the Class are so numerous that joinder of all members

is impracticable.  Upon information and belief, the size of the Washington class is at least forty

(40) individuals.  Although the precise number of putative class members is unknown, the facts on

which the calculation of that number depends are presently within the sole control of Defendants

and the members of the Class are ascertainable from Defendants' records.

106.    **Typicality:**  The claims of Plaintiffs for damages, penalties, and restitution are

typical of all proposed Class Members.  Red Robin's practice of keeping or allocating to other

employees the tips/gratuities owed to Salaried and Hourly Managers was identical or nearly

identical in nature throughout the nation, including in the States of Illinois, Missouri, and

Washington.  Plaintiffs and the proposed Class suffered common injuries as a result of Red Robin's

conduct.

107.    **Adequacy:**  Plaintiffs are members of the proposed Class.  Plaintiffs suffered actual harm and damages as a result of Red Robin's practice of prohibiting Salaried and Hourly Managers from receiving their earned tips/gratuities.  Plaintiffs have been informed of their duties as class representatives and have committed to serving in that capacity as adequate representatives. Plaintiffs' interests in the pursuit of the case are not averse to the interest of other Class Members, and Plaintiffs are aware of no conflicts of interest that are capable of destroying their adequacy to pursue the claims made herein.  Plaintiffs are informed and believe that they have selected competent proposed Class Counsel experienced in handling both the procedural and substantive aspects of the case as a class action.  Plaintiffs will fairly protect the interests of the members of the proposed Class, have no interests antagonistic to Class Members, and will vigorously pursue this suit via attorneys who are competent, skilled, experienced in litigating class action matters, and well-acquainted with class action process and procedure.

108.    **Superiority:** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy, since joinder of all Class Members is impracticable.  Given that this case involves a large number of Class Members with relatively small claims, the burden and expense of individual litigation would make it virtually impossible to seek individual redress for the wrongs done to them.  If separate actions were brought or required to be brought by each individual Class Member, the resulting multiplicity of lawsuits would also cause undue burden and expense for the Court and the parties and create the risk of inconsistent rulings.

109.    **Existence and Predominance of Common Questions of Fact and Law:**  There are common questions of law and fact as to the members of the Class, which predominate over questions affecting only individual members of the Class including, without limitation:

a.   whether Red Robin violated the Washington Minimum Wage Act ("WMWA"),

RCW 49.46, *et seq*.;

    b.    whether Red Robin failed to pay all tips/gratuities earned to the Class Representatives and the Class Members;

    c.    whether Red Robin misclassified the Class Representatives and Class Members as exempt employees;

    d.    whether Red Robin failed to pay all wages due to the Class Representatives and Class Members at the time they ended their employment with Red Robin;

    e.    whether Red Robin failed to keep true and accurate time and pay records for all hours worked by the Class Representatives and the Class Members, and other records required by the Washington Minimum Wage Act;

    f.    whether Red Robin's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

    g.    the nature and extent of class-wide injury and the measure of damages for those injuries.

110.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

## FACTUAL ALLEGATIONS

111.    Red Robin maintains company-wide control, oversight, and discretion over the operations of its restaurants, including its employment practices with respect to Plaintiffs, the Collective Action Members, and the Illinois, Missouri, and Washington Class Members.

112.    Red Robin has a standardized training regimen, as well as centralized accounting, payroll and human resources/personnel systems that allow Red Robin to maintain consistency and uniformity throughout its restaurant locations and track each restaurant's record.

113.    Red Robin maintains uniform job descriptions for all General Managers, Assistant

General Managers, Assistant/Service Managers, Kitchen Managers, Associate Managers, and Shift Supervisors. Red Robin also has a centralized system of staffing all its restaurant-level Hourly and Salaried Manager positions using a single online platform and utilizing corporate talent recruiters to track, maintain, and make restaurant manager staffing recommendations, rather than at the level of individual restaurants.[7]

114.   Throughout their employment with Red Robin, Plaintiffs and Collective Action and Class Members, consistent with Red Robin's company-wide policies, practices, and patterns, regularly work or worked more than eight (8) hours per workday and forty (40) hours per workweek.

115.   Red Robin is aware that Plaintiffs and Collective Action and Class Members regularly work or worked more than eight (8) hours per workday and forty (40) hours per workweek, yet Red Robin has failed to pay them any overtime compensation for any hours worked over eight (8) in a workday or forty (40) in a workweek pursuant to Red Robin's company-wide policy, practice, and pattern of limiting overtime work.

116.   Throughout their employment with Red Robin, Plaintiffs and Collective and Class members, consistent with Red Robin's company-wide policies, practices, and patterns, regularly earned hundreds of dollars per day in tips/gratuities directly from customers based on the service they directly and solely provided.

117.   Red Robin is aware that Plaintiffs and Collective Action and Class Members earn these tips/gratuities, but prohibited its Hourly and Salaried Managers from keeping those tips/gratuities pursuant to Red Robin's company-wide policy, practice, and pattern; instead, Red Robin assumed those tips or shifted them to the Hourly and Salaried Manager's Front of House

---

[7] See *https://redrobin.wd1.myworkdayjobs.com/en-US/RedRobin_Careers*.

co-workers, such as bartenders, hosts, and servers pursuant to Red Robin's company-wide policy, practice, and pattern.

118.    Throughout their employment with Red Robin, Plaintiffs and Collective and Class members, consistent with Red Robin's company-wide policies, practices, and patterns, regularly were required to use their personal vehicles to deliver catering orders or obtain supplies from other restaurant locations.

119.    Red Robin is aware that Plaintiffs and Collective Action and Class Members used their personal vehicles for these employee expenses, but failed to provide any employee expense reimbursements pursuant to Red Robin's company-wide policy, practice, and pattern.

120.    Since at least September 29, 2022, ("the FLSA Unpaid Overtime Collective Action Period"), Plaintiffs and the nationwide Collective Action Members performed the same primary job duties: prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders, but were not paid any overtime compensation for any hours worked over eight (8) in a workday or forty (40) in a workweek.

121.    Since at least September 29, 2022, ("the FLSA Withheld Tips Collective Action Period"), Plaintiffs and the nationwide Collective Action Members at times earned hundreds of dollars per day in tips/gratuities directly from customers based on the service they directly and solely provided, such as through to-go orders, catering orders, bartending, and/or serving tables, which Red Robin prohibited them from as keeping pursuant to Red Robin's company-wide policy, pattern, and practice that prohibited any Salary or Hourly Manager retain any tip/gratuity,

irrespective of the circumstances under which the tip/gratuity was earned.

122.    Since at least September 29, 2022, ("the Illinois Unpaid Overtime Class Period"),
Plaintiff Brown and the Illinois Class Members performed the same primary job duties: prepping
the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables,
hosting/seating customers, speaking with guests, serving drinks, delivering custom checks,
processing payments, bartending, cleaning, delivering food, performing general customer service
duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders,
cooking catering orders, packing to-go orders, and delivering catering orders, but were not paid
any overtime compensation for any hours worked over eight (8) in a workday or forty (40) in a
workweek.

123.    Since at least September 29, 2015, ("the Illinois Withheld Tips and
Reimbursements Class Period"), Plaintiffs Brown and Taylor and the Illinois Class Members were
denied reimbursement of employee expenses, including use of their personal vehicles to deliver
catering or obtain supplies from other restaurant locations, and at times earned hundreds of dollars
per day in tips/gratuities, such as through to-go orders, catering orders, bartending, and/or serving
tables, which Red Robin prohibited them from as keeping pursuant to Red Robin's company-wide
policy, pattern, and practice that prohibited any Salary or Hourly Manager retain any tip/gratuity,
irrespective of the circumstances under which the tip/gratuity was earned.

124.    Since at least September 29, 2022, ("the Missouri Unpaid Overtime Class Period"),
Plaintiffs Clawges, Leach, and Mitchell and the Missouri Class Members performed the same
primary job duties: prepping the food line, cooking during dine-in hours, preparing/plating food,
washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks,
delivering custom checks, processing payments, bartending, cleaning, delivering food, performing
general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders,

prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders, but were not paid any overtime compensation for any hours worked over eight (8) in a workday or forty (40) in a workweek.

125.    Since at least September 29, 2022, ("the <u>Washington Unpaid Overtime Class Period</u>"), Plaintiff Morgan and the Washington Class Members performed the same primary job duties: prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders, but were not paid any overtime compensation for any hours worked over eight (8) in a workday or forty (40) in a workweek.

126.    Since at least September 29, 2022, ("the <u>Washington Withheld Tips Class Period</u>"), Plaintiffs Morgan, and Leasure and the Washington Class Members at times earned hundreds of dollars per day in tips/gratuities, such as through to-go orders, catering orders, bartending, and/or serving tables, which Red Robin prohibited them from as keeping pursuant to Red Robin's company-wide policy, pattern, and practice that prohibited any Salary or Hourly Manager retain any tip/gratuity, irrespective of the circumstances under which the tip/gratuity was earned.

127.    Red Robin assigned all of the work performed by Plaintiffs and the Collective Action and Class Members and Red Robin did not and does not keep accurate records of hours worked by Plaintiffs and the Collective Action and Class Members. That is, Plaintiffs' and the Collective Action and Class Members' hours were not and are not accurately recorded on pay stubs, and Plaintiffs' and the Collective Action and Class Members were not and are not required to clock in or out or otherwise record their time.

128.    These duties of prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders required little skill and no capital investment. This work does not include primarily managerial responsibilities or meaningful independent judgment and discretion. This work was integral in the normal course of Defendant's business and is the same as the duties performed by Red Robin's non-exempt, hourly-paid employees.

129.    Plaintiffs and the Collective and Class Action Members performance of manual labor and non-exempt duties occupied the majority of Plaintiffs' and Collective and Class Action Members' time.

130.    Throughout the Collective Action period and the Illinois, Missouri, and Washington Class periods, the primary job duties of the Plaintiffs and the Collective and Class Action Members did not include: hiring, firing, disciplining, or directing the work of other employees, and exercising meaningful independent judgment and discretion.

131.    Upon information and belief, Red Robin did not perform a person-by-person analysis of the job duties of Salaried Managers or considered individual factors such as location, sales volume, or restaurant size when making the decision to classify all Salaried Managers uniformly as exempt from the overtime protections of the FLSA, the IMWL, the MMWL, and the WMWA.

132.    Red Robin's historical business model depends on lean staffing of its restaurants, including by relying on Plaintiffs and the Collective Action and Class Members to spend the majority of their time performing the same duties as non-exempt, hourly-paid workers.

133.    As identified in two (2) other unpaid overtime lawsuits, a nationwide collective action in New York and a statewide class action in California - both of which had class or collective action settlements approved, Red Robin's lean staffing model at its restaurants extracts long hours from salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers, as they spend most of their days performing physically demanding non-exempt work, such as prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders.

134.    Because Red Robin has historically allocated insufficient staff hours to each restaurant, while simultaneously requiring salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers to perform the full gamut of customer service-related tasks, Plaintiffs and Collective and Class Members are misclassified as "exempt" because they are forced to spend the majority of their working time performing the same non-managerial tasks being performed by non-exempt workers.

135.    Red Robin establishes labor budgets to cover labor costs for the restaurants in which the Salaried Managers worked. The wages of Red Robin's hourly employees were deducted from each restaurant's labor budget.

136.    Upon information and belief, these labor budgets are allegedly based on sales from the prior year; however, Red Robin did not include small appetizers, kid's meals, or desserts in their sales accounting. Further, Red Robin did not adjust sales numbers for promotions, such as free milkshakes or $6 burger and fry nights.

137.    Thus, Red Robin did not provide sufficient amounts in labor budgets to cover all

hours needed to complete the necessary manual and non-exempt tasks in each restaurant.

138.    Further, Red Robin would often reduce labor budgets year-over-year, stating that sales were expected to contract in the future, so labor budgets had to be reduced to account for expected decreased sales.

139.    Red Robin did not reduce store hours or adjust weekly labor budgets when sales were consistent or higher than previously projected.

140.    Red Robin implemented extensive electronic systems to allow corporate control over restaurant-level labor budgets in real time, significantly reducing General Managers' control over and time spent creating hourly staff schedules, and increasing corporate control of overtime hours, including: (1) in 2012, Red Robin implemented a new Labor Management System; (2) in 2015, Red Robin implemented the Watson Labor Management System; (3) in 2017, Red Robin implemented the Maestro system; and (4) in 2022, Red Robin implemented the "HotSchedules" platform.

141.    These labor budgets operated electronically in real time, showing the wages of hourly employees as they were deducted from the labor budgets. Thus, at any time, the remaining labor budget for the rest of the week was clear for the restaurant-level General Managers, their assigned Regional Operations Directors, and corporate leadership, and, pursuant to Red Robin's policy, practice, and pattern, overtime was not acceptable.

142.    Red Robin's General Managers filled in a weekly schedule within pre-set parameters set by Red Robin's electronic systems. General Managers would then have to submit their proposed schedule to their assigned Regional Operations Director, who would review and frequently require changes to these schedules before approving such.

143.    Red Robin's Regional Operations Directors would contact their assigned restaurant-level General Managers constantly while the General Managers were cooking and

performing other non-managerial duties, alerting them of their dwindling remaining labor hours for the week and directing them to send hourly employees home so that hourly employees would not incur overtime hours later in the week.

144. Defendant knew or recklessly disregarded the fact that the underfunding of restaurant labor budgets resulted in Plaintiffs and nationwide Salaried Managers working more than 40 hours in a workweek without receiving any additional overtime compensation, which allowed Defendant to avoid paying additional wages (including overtime) to the non-exempt, hourly employees.

145. Red Robin's long-standing policy and practice of requiring salaried Assistant/Service Managers, Assistant General Managers, and Kitchen Managers to replace hourly staff in performing non-exempt work has morphed in recent years to also include Red Robin's salaried General Managers. This company-wide policy and practice is due to numerous factors, exacerbated by the Covid-19 pandemic, that centers around Red Robin's insatiable desire to use the reduction of labor hours/costs as the primary mechanism to remain profitable and pay out millions of dollars in executive and board member compensation, even in the face of rising hourly wage rates and food costs.

146. Since Covid-19, Red Robin's salaried General Managers were also required to spend most of their days performing physically demanding non-exempt work, such as prepping the food line, cooking during dine-in hours, preparing/plating food, washing dishes, bussing tables, hosting/seating customers, speaking with guests, serving drinks, delivering custom checks, processing payments, bartending, cleaning, delivering food, performing general customer service duties, prepping to-go orders, cooking to-go orders, packing to-go orders, prepping catering orders, cooking catering orders, packing to-go orders, and delivering catering orders.

147. Plaintiffs and Collective Action and Class Members consistently spend far less than

half of their working time performing managerial and exempt duties that require meaningful independent judgement and discretion.

148.    Red Robin's Regional Operations Directors saw its Salaried Managers performing primarily manual labor and non-exempt duties. General Managers communicated to Regional Operations Directors, especially through their monthly meetings, that they did not have enough hourly employees to staff the restaurants, requiring them to perform primarily manual labor and non-exempt duties. During and after Covid-19, General Managers' complaints to their Regional Operations Directors regarding staffing hours increased significantly.

149.    Red Robin's Regional Operations Directors directed General Managers to reduce or stop third-party vendor contracts for general maintenance and upkeep; directing General Managers to perform their own snow shoveling, window cleaning, janitorial services, lawncare, power washing, and equipment repair.

150.    Red Robin knew that Plaintiffs and Salaried Managers were performing primarily manual labor and non-exempt duties and based on their actual job duties, Salaried Managers did not fall within any FLSA, IMWL, MMWL, or WMWA exemptions.

151.    Inasmuch as Red Robin is a substantial corporate entity aware of its obligations under the FLSA, IMWL, MMWL, or WMWA, it acted willfully or recklessly in failing to classify Plaintiffs and Salaried Managers as non-exempt employees.

152.    Red Robin's unlawful conduct was willful or reckless in disregard of the FLSA, IMWL, MMWL, and/or WMWA and was accomplished through Red Robin's centralized, company-wide policy, pattern, and practice of attempting to minimize labor costs by violating the FLSA, IMWL, MMWL, and/or WMWA. Red Robin's policy, pattern, and practice has been and is widespread, repeated, and consistent.

153.    Salaried and Hourly Managers earned hundreds of dollars per day in tips/gratuities

in the course of their employment; however, Red Robin's policies and procedures prohibit tips/gratuities earned by and owed to Salaried and Hourly Managers to be paid to those Salaried and Hourly Managers.

154.    Rather, the tips/gratuities earned by Salaried and Hourly Managers were either kept by Red Robin or shifted to the Salaried Manager's hourly co-workers.

155.    Red Robin also failed to reimburse Illinois Salaried and Hourly Managers for their use of their personal vehicle to deliver catering orders or obtain supplies from other restaurant locations.

156.    As a result, Salaried and Hourly Managers were denied tips/gratuities and reimbursement of employee expenses owed to them under the FLSA and the IWPCA.

**Overview of Red Robin's Litigation History and Corporate Control over Restaurant-Level Operations**

157.    A review of Red Robin's Quarterly Sales Calls shows a clear company-wide policy, practice, and pattern since at least 2012 of significant corporate control of restaurant level activities, especially regarding labor hours, budget, and scheduling, in order to consistently squeeze hourly labor in order to maintain profit levels, especially in the "Back of House[8]," and so as to not affect dine-in customer reviews in the "Front of House."

158.    Red Robin consistently uses the terms labor and restaurant "productivity" and "efficiency" to describe its policy, practice, and pattern of performing the same or more physical labor job duties with less hourly employees' hours.

159.    In other words, Red Robin's are restaurants are operating with less hourly staff present, saving Red Robin the labor cost of paying hourly staff.

---

[8] Red Robin would also refer to the "Back of House" as the "Heart of House" in their quarterly earnings calls.

**2012: Red Robin Announces their New Labor Management System**

160.    In 2012, Red Robin CEO Stephen Carley highlighted concerns related to labor costs, noting Red Robin was rolling out a "<u>new labor management system</u> that will help our restaurant teams put the right people in the right place at the right time to deliver a superior guest experience and <u>meet our ideal systemwide labor targets</u>. We expect to have the new system fully implemented in the second half of 2013. Our goal is to maximize profitability and productivity through improved labor forecasting and scheduling that ultimately leads to consistent, best-in-class field execution."

**2013: Red Robin Quarterly Earnings Calls**

161.    In the first quarter of 2013, Red Robin CFO Stuart Brown noted they had hired a full-time "labor engineer to help [it] with labor management."

162.    In the third quarter of 2013, Brown noted their new labor management system should be fully deployed by the end of 2013, but it would "<u>take a few months for our general managers to fully implement the recommended staffing changes</u>, negatively impacting labor productivity into the first quarter of [2014]."

163.    Brown also started expressing concerns about labor costs related to minimum wage increases, stating: "Labor inflation is expected to be more meaningful in the next couple of years, as the $1 minimum wage hikes in California in June 2014 and again in 2015, it is particularly hard with our 69 restaurants. We will obviously try to mitigate a portion of these risks."

164.    When asked if Red Robin would combat these higher labor costs with price increases, Red Robin CEO Stephen Carley answered negatively, instead referencing "other cost savings initiatives" to combat increasing labor costs: "Our pricing strategy has historically been to really for commodity, labor, and utilities, to that extent, offset the dollar inflation with price. Next year, we're going to try to limit the amount of price and try to offset some of that with other cost-

savings initiatives, other mix initiatives that we can try to do that and try to limit the amount of price we take."

165.    In the fourth quarter of 2013, Carley noted their "new labor management system" was "designed to enhance our service by assuring that each restaurant has a labor schedule unique to that restaurant's guest traffic pattern and product mix. … It will help our managers to put the right people at the right time, in the right places to enhance our guest service."

**First Quarter of 2014: Red Robin Quarterly Earnings Calls**

166.    In the first quarter of 2014, Red Robin CFO Stuart Brown noted: "Our restaurant-level operating margin increased to 22.4% in the first quarter from 21.5% a year ago, as a result of the flow through of the higher average check and underline effective labor management, more than offsetting the increased commodity costs and wage inflation. Our new labor management system .. was adopted by our managers more quickly than we expected, the labor standards that are behind the scheduling provide custom schedules to each restaurant based on their unique mix, and enables us to update those standards in real time for any changes in procedures, recipes, or sales mix."

167.    Brown also noted, again: "The minimum wage in California a state which represents over 20% of our total labor costs increases by $1 or 12.5% on July 1 [2015] and then another $1 on January 1, 2016, for a 25% increase over 18 months.

168.    Red Robin CEO Stephen Carley noted their "Project Blueprint" that allowed corporate controlled operations, especially scheduled labor hours, at the restaurant level: "[P]roject [B]lueprint … if you look at what that allows us to do now, so as we change procedures in the restaurant, and we have just gone through and done a study on pre-portioned items in the restaurants as we make those labor changes we can affect that labor model right away. So the tool enables us to continue to identify savings and in flow those through."

**Second Quarter of 2014: Red Robin Quarterly Earnings Calls**

169.    Red Robin CEO Stephen Carley noted: "Restaurant level operating profit as a percentage of restaurant revenue declined to 22.2% from 23.3% a year ago. We had projected a margin decline due to increased labor costs and commodity prices combined with last year having benefited from a $700,000 or 30 basis point one-time favorable Workers' Compensation adjustment. Margins, though were below our expectations due to the deleverage of the lower-than-expected revenue on labor and occupancy costs. … Our new labor management system continues to function effectively, but <u>operationally we should have adjusted labor hours more quickly to the slowing traffic</u>."

170.    Specifically responding to a question regarding their "supervisory structure," Red Robin CEO Stephen Carley stated: "We had a couple of our most seasoned regional vice president with double-digit direct reports. We did that consciously in an effort to see how that would play out. And, well, we were[n't] satisfied with how that worked we found out that the folks reporting to that individual weren't getting the one-on-one attention, <u>the coaching and counseling and the direction that they needed</u>. And as we sat down and evaluated the results of that test we really felt it was important that every regional vice president have somewhere in the neighborhood of six to eight direct reports where the span of control was good and they can spend quality time with their people providing guidance, and coaching and counseling. And so as we reorganized, the operations group we used that as a standard. <u>The expectation being that the [Regional Vice Presidents] will be able to give the [Operations Director], more quality time and feedback and that that flows to a higher quality relationship and communication with the General Manager, which then leads to better execution in the restaurants</u>."

**Third Quarter of 2014: Red Robin Quarterly Earnings Calls**

171.    Red Robin CEO Stephen Carley noted a "stronger performance" due to "positive

traffic, bolstered by better year-over-year labor management." Carley further stated, "Not only did we see an improvement in productivity. We're confident that using our new "right people, right place, right time" scheduling system enabled us to do this without negatively impacting the guest experience, a fact that our guest buy [ph] scores for the quarter support."

172.    Further, Red Robin CFO Stuart Brown stated: "This year, cost of sales increased, with ground beef costs having increased more than we had expected. Meanwhile, labor rates increased due to minimum wage hikes, particularly, with July's increase in California, but this was offset by improved restaurant productivity and other cost productions."

**Fourth Quarter of 2014: Red Robin Quarterly Earnings Calls**

173.    Red Robin CEO Stephen Carley noted: "With this in mind, please note, that our comp sales were once again leveraged at the restaurant level. This was accomplished by leveraging fixed costs and improved labor scheduling and deployment, simply having the right people in the right places at the right time to serve our guests."

**Red Robin Announces the Watson Labor Management System**

174.    Red Robin CMO Denny Post also noted they would implement the Watson Labor Management System in 2015.

175.    When a analyst noted "a number of companies have reported seeing real wage tightening of the labor markets and real wage rate pressure," but "[i]t sounds like [Red Robin is] not seeing that based on the leverage [it] is seeing."

176.    Red Robin CEO Stephen Carley responded: "[W]e are experiencing significant pressure in compression on labor both as the broader economy improves and gives folks an opportunity to move from the heart of the house to go back and installing drywall to government city state and federal government mandated increases in minimum wage in addition to benefit mandates. We're seeing that. We continue to do a better and better job with our labor scheduling

and deployment technology that we put in place, enrolled nationally last year. And that's really where we saw the benefit."

**First Quarter of 2015: Red Robin Quarterly Earnings Calls**

177.    Red Robin CEO Stephen Carley noted: "Let's talk about efficiency for a second. You can see that our operating margins continue to expand. We have savings from repair and maintenance costs as we've consolidated vendors, which will include janitorial and inventory management. Our acquired restaurants are performing well, and we continue to find other opportunities in the business to consolidate vendors and offset inflation. Regarding our Canadian operations, we are developing a labor management system, and we believe we can achieve additional improvement in the middle of the P&L this year in Canada."

**Red Robin Franchisee: Minimum Wage Lawsuit**

178.    An analyst asked about Red Robin's wage and hour litigation: "There was a story out, I guess, a month-and-a-half or so ago about some litigation involving one of your franchisees in a minimum wage lawsuit. Can you give any color? Is that a risk exposure for the company? Is that franchise-related principally or how should we think about that?"

179.    Red Robin CFO Stuart Brown stated, "Yeah. If you look at it, it's some former employees of one of our franchisees, our franchisee in Pennsylvania suing that franchise group. It's litigation that they're involved in, it's not something that we're involved in, and so completely inappropriate for us to comment.

**Second Quarter of 2015: Red Robin Quarterly Earnings Calls**

180.    Red Robin CFO Stuart Brown noted, "Our outlook for general and administrative expenses has increased a bit due to higher incentive compensation, as well as team member hiring and training costs. Similar to many of our peers, we are experiencing an increase in team member turnover as the labor market tightens from significant industry hiring. Selling, general and

administrative cost, together as a percentage of revenue, is expected to be around 11% in the third

quarter and 10% in the fourth quarter."

**Third Quarter of 2015: Red Robin Quarterly Earnings Calls**

181.    For the third quarter of 2015, an analyst noted Red Robin's labor line seemed to be

decreasing, while others in the industry are seeing an increase: "<u>So just a last question on your

labor line, it's going the opposite way a lot of what others are seeing in the industry</u>. That is to say,

you're seeing favorable year-over-year on the labor. What is your underlying labor inflation? How

much of that benefit, therefore, is the acquisitions getting better? Can you maybe tease those pieces

apart, please?"

182.    Red Robin CFO Stuart Brown responded: "Yeah. I mean, the acquisitions definitely

play a part of it. I mean, our overall labor inflation for the year is about 3%. We've been holding

that pretty well. Probably next year – with California minimum wages going up, next year, it will

be higher than that. But so far this year, about 3%. So it's been <u>productivity improvements</u> and

really leveraging the sales growth on the fixed costs, and there has been some improvement to the

acquisitions and the NROs are doing well also."

183.    Another analyst followed up: "Shifting over just to labor costs. You alluded to sort

of potential productivity and speed of service benefits with some new tools next year. Hoping you

can provide a little more color on sort of where you see the opportunity there? I mean, obviously,

we've seen others implement some new kitchen equipment that improves the consistency and

quality of the food, maybe also provide some hourly labor savings in the back of the house. But is

this the type of savings we're talking about or is there also opportunities maybe to free up managers

or any color you could provide there would be really helpful as we think about the 2016 labor

dynamic?"

184.    Red Robin CEO Stephen Carley responded, "Brian, we're right in the process of

putting all our plans to bed for 2016. I think you hit on number of the key benefits and we're looking across the board at the same things. And as I said before, we're going to give you a much better understanding of what we're doing and what we expect the impact to be when we get back in February."

**Fourth Quarter of 2015: Red Robin Quarterly Earnings Calls**

185.    Red Robin CFO Stuart Brown noted: "Total revenues are expected to increase between 8.5% and 9.5%, comprise of comparable restaurant revenue growth in the low-single digits and the remainder from operating week growth. Restaurant level margins are expected to increase modestly as lower cost of goods is mostly offset by higher labor rates, particularly from California's minimum wage increase."

186.    Red Robin CEO Stephen Carley noted: "The device [Ziosk] has also eliminated some non-value-added labor such as running back and forth, clearing checks at a remote POS terminal. The presence of this technology in our restaurants gives us a significant increase in our ability to effectively manage rising labor costs with creative staffing models that preserve our speed of service and maintain and enhance our guest satisfaction."

**Red Robin Introduces Electronic Inventory Management System**

187.    Red Robin CEO Stephen Carley also noted:

One of our projects for 2016 is to pilot our new supply chain management software, which will replace our antiquated, manual, and time-consuming current system. This project alone represents a 30 basis point opportunity in margin improvement starting in 2017, yielding improved control of waste and cost of goods, while significantly reducing inventory levels at the restaurants.

As important as the P&L benefits are, we expect this new system to free up 80,000 hours per year per restaurant for our general managers who will now be able to spend time interacting with our guests and coaching and training our team members. Our guest insight work reveals that one of the key drivers of loyalty is

the presence of a manager on the floor of the restaurant, and this is where they're going to be instead of manually filling out forms in the back office. With the successful national rollout of the Ziosk or Robin, as we call it at Red Robin, we've addressed the number one pain point of casual dining, being held hostage by your check. Red Robin guests appreciate the ability to pay at the table, and our team members get to spend more time engaging with them.

The device has also eliminated some non-value-added labor such as running back and forth, clearing checks at a remote POS terminal. The presence of this technology in our restaurants gives us a significant increase in our ability to effectively manage rising labor costs with creative staffing models that preserve our speed of service and maintain and enhance our guest satisfaction.

**First Quarter of 2016: Red Robin Quarterly Earnings Calls**

188.    Red Robin CEO Stephen Carley noted $4.7 million in charges for litigation contingencies.

189.    Red Robin announced Carin Stutz as its new COO.

**Second Quarter of 2016: Red Robin Quarterly Earnings Calls**

190.    Red Robin announced Denny Post as its new CEO.

191.    Red Robin announced Terry Harryman as Interim CFO.

192.    Red Robin CEO Denny Post noted: "Over the past five years, we've had to catch up on fundamental systems and technology after a decade of zero investment. We have prioritized non-guest-facing foundational systems such as labor scheduling, human capital management, Kitchen Display and table management. The new food cost and supply chain management team is now in a single store pilot, and is the last key fundamental investment. All of these tools, all of them, are critical to streamlining the daily workload for our restaurant managers, so we can get them out of the office and on to the floor, where they can interact positively with guests and coach team members real-time.

**Red Robin Introduces New Kitchen Display and Food Cost Systems**

193.    Red Robin Interim CFO Terry Harryman noted high labor costs affecting Red Robin's profits: "We expect restaurant operating profit margins to be around 21% for the year, primarily due to continued pressure in labor, due to increasing wage rates and training to support restaurant initiatives. Labor cost as a percentage of restaurant revenue should peak in the third quarter as we invest in training to deploy our Kitchen Display and table management systems and pilot our new food cost system. We're also planning for increases in other operating costs as we invest in local restaurant marketing. We continue to believe that the benefit we've seen from commodity deflation, particularly ground beef, will moderate and become inflationary as we cycle over the large decrease in prices at the end of Q3 last year."

194.    Red Robin CEO Denny Post noted: "We began investing in <u>incremental labor</u> in Q2, and we will continue to do so in Q3 to lift peak-hour performance on high-volume weekend days. … The Kitchen Display rollout will be complete by the end of August. We saw dramatic improvements in speed to table in our pilot locations, and we are targeting and expecting similar improvement nationally. While it's hardly sexy, I cannot reiterate enough how important this system is to speed of service, order ahead, carry out, catering and delivery down the road."

195.    Regarding speed of service, an analyst asked: "First, just on the speed-of-service question, one of the core equities of the brand over the years was this notion of the gift of time. What happened to that, has the speed-of-service gotten slower or have the peers gotten better? And if it's gotten slower, is it a source – has the source been sort of menu expansion or how do you identify what's happened with speed-of-service?"

196.    Red Robin CEO Denny Post responded: "No, the peers have not gotten better, we've got slower. And this is something that we're keenly aware of. … We in expanding the barbell to things that cooked faster and cooked longer, <u>we put a lot of pressure on the Heart of</u>

House to be able to deliver those all at the table in the same period of time and we've suffered for that. We also, as Ted mentioned, have looked at some strategic investments in terms of bringing some labor back into the restaurants to make sure that we're able to get those things out to the guests promptly, but the key here is the Kitchen Display System. I can tell you that in pilot, we went from four in 10 of our items being delivered over 16 minutes to zero – 0% over 16 minutes. So Kitchen Display is a key to our – getting our speed back.

197.    Regarding labor, an analyst asked: "And as a quick follow-up here on the comment on labor, are you able to quantify the labor investments that you've already made or will be making and what that might look like on an annualized basis?"

198.    Red Robin Senior Director of Planning Ted Watson responded, "As far as the labor investments are concerned, we've had a particular emphasis on focusing on investing in the weekend to making sure we're providing the service there. From a dollar standpoint, you're probably looking in the neighborhood of a couple hundred thousand dollars a quarter, give or take."

199.    Regarding labor, another analyst asked: "And then, just last question on labor, how is your labor turnover recently versus historical? Have you seen an increase in labor turnover?"

200.    Red Robin Red Robin Senior Director of Planning Ted Watson responded: "I'm sure you've heard it through others in the industry, but certainly a tight labor market. We have seen turnover tick-up a little bit. And we've talked about labor pressure of being 5%, some of that is due to overtime hours and staffing. So, the short answer is yes."

**Third Quarter of 2016: Red Robin Quarterly Earnings Calls**

201.    Red Robin CEO Denny Post noted: "Earlier this year, we used the data to isolate the times of the week when we were underperforming our guest expectations. Each location has visibility to their performance and field leadership works with the teams to course correct, coaching teams and investing in incremental labor where warranted."

202.    Post further stated, "Now that we have [Kitchen Display System] in place and our underline{kitchens can handle higher peak volumes, we are set to move forward on <u>growing our off-premise business via carry-out, delivery and catering</u>. We are moving quickly on multiple fronts here. We are expanding our online ordering pilot to 36 locations next week. We have two promising tests underway in 20 locations with third-party delivery systems. We have new packaging in tests, we have a large party carry-out and catering menu developed and ready to selectively implement."

203.    Red Robin Interim CFO Ted Harryman noted, "Our third quarter restaurant-level operating margins were 18.6%, compared to 21.6% in the prior-year, driven by higher labor and other operating costs, partially offset by lower ground beef costs. Labor increased 180 basis points mostly due to minimum wage increases and to a lesser extent, sales deleverage. We also invested in incremental labor to rollout our Kitchen Display System, which was completed by the end of the quarter."

**Fourth Quarter of 2016: Red Robin Quarterly Earnings Calls**

204.    Red Robin announced Guy Constant as their new CFO.

205.    Red Robin CEO Denny Post again emphasized the goal of reducing labor hours: "[Red Robin's Chief Operating Officer] is also focused on <u>optimizing our labor investment</u>. At a time of tremendous demand volatility, <u>nimble scheduling</u> can make a world of difference. Our productivity has always been superior. And I'm confident our team will continue to find ways to fine-tune that model in the coming months."

206.    Red Robin CFO Guy Constant noted labor costs were significantly increasing: "Fourth quarter restaurant level operating margins were 19%, down 290 basis points versus a year ago, driven by the following factors. Cost of sales improved 90 basis points to 22.8%, driven primarily by deflation in ground beef costs. <u>Restaurant labor costs increased</u> 190 basis points to 35.1%, driven mostly by <u>minimum wage increases</u> and sales deleverage. Other operating costs

increased 160 basis points to 14.4%, due primarily to <u>higher repair and maintenance costs</u>, higher local restaurant marketing expense and sales deleverage. Occupancy costs were up 30 basis points due to sales deleverage. Depreciation and amortization increased 110 basis points to 7.6%, related to new restaurant openings and the remodels associated with the Brand Transformation Initiative."

207. Constant further noted: "<u>Restaurant labor costs are projected to increase</u> 25 basis points to 75 basis points, driven by <u>ongoing minimum wage increases in more highly penetrated markets, higher benefit costs and restaurant manager bonuses</u> planned at target levels. This will be <u>offset</u> somewhat by the effect of pricing and <u>improvements in labor productivity</u>."

208. An analyst asked: "I wanted to also circle back on the key ops and potential cost savings initiatives in 2017. I noticed the guidance referenced, I think it was menu optimization and labor productivity. Can you provide some more color on each of those?"

209. Red Robin COO Carin Stutz responded, "We're going to comment more on that in our May meeting that's coming up. Our teams have several things they just started testing right now. And we'll be excited to share what we think works best at that time."

**<u>First Quarter of 2017: Red Robin Quarterly Earnings Calls</u>**

210. Red Robin CEO Denny Post noted additional corporate control of restaurant-level activities: "For my part, I want to give a shout-out to <u>Carin Stutz and our operating team</u> -- today is Carin's one year anniversary by the way -- who have made <u>sustainable progress on reducing managerial labor costs, food waste, and generally tightening margin control at the restaurant level</u>. I am confident we will continue to see progress as they work through the elements they control with <u>even greater GM awareness and incentive to manage costs</u>.  While we have had the benefit of lower cost of goods for some time now, we know <u>this will not sustain and the hourly labor cost growth remains a major headwind</u>. That said, when the wind is not at your back, you better get out of paddle. And I can assure you that Carin carries a very big paddle. What makes me most proud

is that the frontline team is continuing to improve the guest experience as measured by our net promoter score and speed to table. … All in all, I'd sum up Q1 as a solid start and characterize our prospects for the year as achievable. No doubt, the sales environment and rapid changes in consumer demand make it challenging week to week but we are determined to be nimble and capture what we can in upside while controlling what we can in costs to achieve our goals. I look forward to sharing more about our progress as we move through the year."

211.    An analyst noted: "And lastly on the labor model, I know you guys mentioned the pressure you're seeing as well as everyone else in the industry. Does it make sense to think about a complete revamping of how you're doing things, maybe moving toward a shared services model or something similar, or there are simple tweaks here and there that make more sense and any sort of insight into what you're working on there to make that line more efficient, that would be helpful."

**Red Robin Simplifies their Menu and Back of House Operations to Reduce Labor**

212.    Red Robin COO Carin Stutz responded: "This is Carin. We are working on really several front of the house tests that we're going to talk about at the analyst meeting next week. Look, we're watching this trajectory of this line and we know that it's just not sustainable to see these rates of increases. Where I will give credit is to the teams in the restaurant they are managing productivity, I mean just really I can't ask for more from them with the labor model that we have. Our labor model is fairly sophisticated, connectivity based labor model. So everything that our teams do is really accounted for. So I think a couple of things, if you're looking at this escalation of wage rates especially at the hourly level right now, that's where Jonathan Muhtar and I really team together to think about is menu simplification, prep simplification and those type of things that are ultimately going to make a difference, because the real pressures are in the heart of the house. And that's where I think we still have opportunity throughout the year to try to make a

greater impact."

**Second Quarter of 2017: Red Robin Quarterly Earnings Calls**

**Red Robin Introduces Maestro System and Removal of Hourly Expeditor Role**

213.    Red Robin CEO Denny Post began discussed how hourly employees' duties were

being assumed by restaurant-level management at the direction of Red Robin corporate:

> In summary, the team's thorough tested responses to the four issues we identified
> way back in 2015, speed, value, advertising breakthrough and off-premise
> shortfalls have us back on the upswing. As gratifying as that is, the underline(top-line and
> traffic growth momentum is still not enough with labor cost rising 6% or more). We
> must control what we can control, and our priority for margin improvement is on
> rethinking how we invest in labor.
>
> The field leadership team implemented six labor pilots of varying impacts back in
> Q1. We quickly eliminated the three least promising and are continuing to optimize
> the others, one of which will be deployed nationally in the coming months. Dubbed
> Maestro and it eliminates the expeditor role on the line in favor of supervision by
> one of the managers on duty, who conducts, thus the Maestro name, the heart of
> house pace and the servers who now select and trade the food themselves.
>
> We are encouraged that guest scores on hot food, speed of service and server
> knowledge went up in even the busiest locations who piloted Maestro. It appears to
> be a true win-win. We have identified further labor savings for the fourth quarter
> of this year as we shift to-go accountability from the bar area to the designated
> podium by the host stand, freeing up the bartender to take tables in the bar. Both
> Maestro and the to-go accountability shift will be phased in with investment and
> training over the next few months,  and will be completely rolled out by November.
> This reduces total labor hours by about 12 or so daily depending on the site.

214.    Post also noted that Red Robin wanted to reduce labor costs that were forward-

facing, and thus would not affect dine-in customers: ie, the Back of House:

> Of the other labor models we are testing, one is teed up for the second phase launch

in early 2018, and the other, which is technology dependent, will take a bit more time. Setting aside continuing improvements in the existing model for a moment, with the wage environment expected to be a significant headwind in the future, we know we cannot rely only on traditional levers. We cannot price ourselves to prosperity. The guests will not bear the rising cost of labor with menu price increases. They will seek other options if we price ourselves out of consideration.

Real and more radical innovation on guests service models will be required in the future and we are on the case investing to ensure we find new solutions that work for us. The goal for future innovation is to take what has become a larger and larger investment in labor and reduce it in those areas that matter least to guests. Guests have already shown their eagerness to control payment, what else can we put in their control? By reducing investment where it doesn't matter as much, we can continue to deliver high quality burgers with attentive service and speed at an affordable price. We believe that that's the winning formula for Red Robin moving forward.

215.    An analyst followed up: "Just going back to the labor question, Denny, what are the big ideas around labor? I understand the expeditor and that's a piece of it. But is it the whole labor flat in an inflationary environment, is it to drive labor lower? And do you think about this as just a reinvestment opportunity so as you save in one place, you need to put money back in another as you had this quarter or next quarter when you think about training and staffing up for some of the new initiatives?"

216.    Red Robin CFO Guy Constant responded:

I think we believe that there is an opportunity to make absolute progress on labor savings in the restaurant, not just sort of try to offset inflation, although inflation certainly is a big headwind. When you talk about reinvestment, we sort of think about a lot more broadly, John, that – and Denny made this reference in her comments that there is a lot of places in the business where we're making investments, right, in all sorts of lines across the P&L, and some matter more to customers and guests than others do. And so I think what we're really honing in on

<u>is finding out those things that matter less to the guests whether that's labor</u>, food cost or other cost around the P&L, and turn around and invest that back in places that matter more to the guests, and that's how you get the momentum in the positive direction.

And so, look, we're in an environment where we know maybe perhaps the alternative in the past has been to take price to offset some of this cost, and that ability just doesn't exist, probably hasn't in casual dining for a long time. And so now our opportunity is instead of depending on price to do that is hold on for dear life to the value and capitalize on the positive momentum it's given us and <u>look for other ways to fund the opportunity to offset those increases</u>.

**...**

Yeah, I'd say, John, I'm really confident in Carin [Stutz] and the team to continue to be very thoughtful about this, this may not be a one-size-fits-all opportunity. As you know, we have a high degree of exposure to some more expensive Western states. So, there are some things we might try to do in some of those areas, but we'll always keep the guest experience front and center in what we're doing. <u>But I'm confident that we'll find ways to mitigate in the near term, and then we'll starting working on some innovative models that might work in various locations</u>.

217.    An analyst followed up: "And then I wanted to circle back on the labor initiative comment. Denny, you alluded to another phase hitting in early 2018. Can you give some I guess color and perspective on sort of what those changes entail?" Red Robin CEO Denny Post noted: "I'd rather hold off a little bit on that, Brian. I'm expecting that Carin is going to join us on the next call, and she'll be able to do that, so we have a sense of not only what we've rolled out and achieved, but what we've got planned. It's still in test and pilot and kind of being shaken out. So, let's hold off and talk about that next quarter." Red Robin CFO Guy Constant stated: "But then on the flipside, we moved labor range 25 basis points positive based on some of the early traction that Carin and her team are getting on some of the labor savings."

**Third Quarter of 2017: Red Robin Quarterly Earnings Calls**

218.    On July 14, 2017, a class action lawsuit, *Vigueras v. Red Robin*, was filed in California on behalf of servers, hosts, waiters, cooks, kitchen staff, bussers, and bartenders, alleging violations of their meal and rest periods under California state laws.

219.    Red Robin CEO Denny Post stressed the importance of reducing labor costs, especially in Back of House, while simultaneously noting significant increases in to-go and delivery orders: "We have a lot to share today, as we continue to shift our focus away from a traditional approach to growth to a greater emphasis on underlying innovative new service models to meet the rising tide of labor costs and the rapidly changing needs of our guests. … As to Q3 profitability, the top line shortfall created deleverage, somewhat masking our progress on labor cost reduction. Carin will speak to her team's progress and the choice we made to slow down the pace of labor model changes to ensure they land well and do not undermine the progress we have made on guest satisfaction since we launched KDS just over a year ago. As with the Maestro labor initiative which removed expediters, our goal is to make every change a win for team member and guest, not just an improvement in the middle of the P&L. … We are making strides on cost control and know we have to keep testing, learning and advancing the best solutions. As an industry, we are facing clearly some very challenging forces. Minimum wage increases already on the books and some of our most penetrating states are frankly staggering. Guest demand is shifting to off-premise, particularly via home delivery, more rapidly than any of us might have anticipated. … We will still open nine new corporate units in 2018, but will hold beyond that for now. This will give us 18 to 24 months to sort out what models best meet the needs of our changing guest base, allow us to profitably broaden our reach to more guests, all the while reducing construction and labor costs."

220.    Further, Red Robin COO Carin Stutz noted corporate directed significant changes

to Red Robin's labor model, while also starting their catering services, which requires further increased Back of House labor:

> And all of this is occurring while we're making rapid changes in our off-premise business and our labor models. A quick update on both.

> As Denny said, we delivered a 7.6% mix in off-premise in quarter three. We are almost complete in the rollout as of early October, with all company restaurants having online ordering available, and 98% now have call center support.

> We have curbside delivery available at over 50% of our locations, and we see that maxing out into the low-60s due to lease restrictions in the near future. One of the benefits we're quickly realizing with off-premise on our loyalty program is the ability to reach our guests on holidays, where they might not be coming to us to dine in. For the first time that we can remember, we enjoyed positive sales on Halloween.

> …

> On top of this, we launched our first venture into a catering platform with the Red Robin Gourmet Burger Bar. While it's only available for pickup at this time, we are seeing this as a delicious option for offices, home parties, sports teams, and tailgating. Like I referenced before, the Burger Bar has opened us up to participate in what would traditionally be a group gathering at a guest home or office. And while we're just getting started, it's great to have the ability to deliver a large off-premise order. Two recent examples were a call center for 450 guests and an office party for 200. And we've never been in that consideration set for these type of events. We continue to study and learn from our operators and will adapt as we go.

> And recently we began to gather feedback on our off-premise business from our guests as well, which will help us shape future enhancements, including packaging, optimizing prepayment, and pickup areas that streamline the process for both the guests and for our team.

> A top area of focus for us has been managing labor costs. The minimum wage and general regulatory environment is growing at an unprecedented rate, especially on

the West Coast, where we have our strongest and largest footprint. Hourly wages are up again this year in the mid-single digits, and we know there's no appetite by today's consumer to spend more to cover this. Absorbing these increases with higher pricing is not an alternative for us.

The good news is we did complete the rollout of the more efficient Maestro service model. We staggered the rollout beginning in August, and you should now see a 5% drop in labor hours used in quarter four over last year. We attempted to stretch and go for a 7% reduction, but our first markets told us rather quickly that we were moving too aggressively, and we pulled back to get this right. Again, we're making sure that any changes we make lands right and we'll stick to continue to protect the guest experience gains we've achieved. Change lands best when paced properly.

We continue to test the next round of service model improvements, and we'll update you in the future as we're determined to further improve our productivity.

With all this change in our restaurants, our restaurant managers and our elite team members received our highest team member voice scores, which is our measure of engagement. And the company that measures our team member voice tells us our scores are at the top end of all companies they measure. <u>This inspires me and gives me a great level of confidence that our field leaders and general managers understand the why behind the need to change</u>. They truly get it. And our partnership with our home office teams will continue to optimize and simplify operations with call centers, technology solutions, and simplification of prep items are all working together and making us more productive.

221.    Red Robin CFO Guy Constant also noted: "Restaurant labor costs were unfavorable by 50 basis points to 35.3%, driven mostly by higher restaurant incentive compensation and minimum wage increases, offset by reductions in management labor costs, reduced benefits expense, and lower project-related labor costs. This continues the narrowing of the gap that started in Q1. And with the Maestro program now fully implemented as of the end of October, we expect year-over-year labor costs to be favorable as a percent of revenue in Q4, and full-year 2017 labor

expense to be up approximately 50 basis point. <u>This favorability however will not be as great as originally expected as we have stopped the roll-out of labor savings associated with the change in how we handle the off-premise business in our restaurants</u>. This will result in approximately $2 million less in Q4 labor savings than we originally anticipated

222.    An analyst noted: "[I]s the pause in the labor in the Maestro system, is that a one quarter pause in your view and do you think you can get after it fully in 2018?"

223.    Red Robin COO Carin Stutz responded: "John, it's Carin. I'll take the labor question. <u>I'm really proud of the restaurant operators to get 5% of reduction, that's a lot of hours per day and per week</u>. And I honestly believe we could have gotten the whole 7%, if you would look at the workload. I think if we had done that in absence of a lot of other initiatives, at the same time, we could have probably gotten there, but there were some other things that we need to do to roll out, whether it's janitorial or catering or burger bars, a lot of other things that were going on that kind of shifted the focus from being able to get it all. But we're committed and determined to get that next year."

224.    An analyst followed up on this: "And I wonder if I could dig on the comment you mentioned around stopping the labor savings initiatives. I guess, you mentioned possibly it could have been the guest experience or the team member experience being compromised. Could you talk a little bit more about what you saw there and why you stopped the labor savings initiatives? And what that means as we look to 2018 in terms of 2018 labor versus 2017 labor?"

225.    Red Robin CFO Guy Constant responded, emphasizing Red Robin's corporate control of restaurant-level activities in reducing labor hours: "Hey, Will, I know we've talked in the past and I know when I've had this question before and people ask us, what concerns us the most, and I would say what concerns us the most is the amount of heavy-lifting that we're asking our operators to do. <u>When you're making the type of change that we're envisioning in this business,</u>

so much of it hits at the restaurant level and it's incumbent upon our operators or we ask them to take on that burden, and we're asking to do a lot, we just have to be really, really careful about how we pace it out to them, to allow them to absorb that. I have no doubt that they can accomplish what we lay in front of them, including what we have planned for 2018, we just always have to be careful about how quickly we pace it to them."

**Fourth Quarter of 2017: Red Robin Quarterly Earnings Calls**

226.    Red Robin CEO Denny Post stated: "As the first major step in changing our labor model and controlling mounting costs, our restaurant team successfully implemented Maestro in Q4, over-delivering on controls and leveraging the top line growth. This resulted in labor at 34.1% for the quarter, down 100 basis points versus prior year. This is the level of executional precision and collective effort that we will need moving forward to successfully implement other service model solutions that work for our guests, our team members, and our shareholders."

227.    Red Robin CFO Guy Constant noted:

As Denny mentioned, restaurant labor costs decreased 100 basis points to 34.1% driven by decreases in management labor costs, improved hourly labor productivity, and health insurance costs partially offset by an increase in restaurant manager bonus costs.

The Maestro program reached full implementation in Q4 and our restaurant managers delivered on all targets related to the program. Earlier this year, we made significant investments to improve the payout levels of our restaurant manager incentive programs. These improved payouts were predicated on a successful pivot to improve labor productivity and to generate better restaurant level economics while driving improved comp sales. We're happy to say that these changes combined with improved operating results produced full year 2017 restaurant manager bonus payouts that were nearly $8 million higher than in 2016.

Other operating costs decreased 50 basis points to 13.2% primarily due to decreases in repair and maintenance costs and lower utilities, offset partially by higher third-

party delivery costs and restaurant technology expenses.

228.    Red Robin CFO Guy Constant noted: "At the end of 2017, approximately 60% of
our 2018 food costs spend was contracted. Restaurant and labor costs are projected between an
increase of 25 basis points and a decrease of 25 basis points driven by minimum wage increases
in more highly penetrated markets and <u>restaurant manager bonuses planned at target levels offset
by the effects of improvements in labor productivity</u>.

**<u>Red Robin Removes the Hourly Busser Role and Moves to "Team Service" Approach</u>**

229.    It was also noted that Red Robin had removed their hourly bussers, as well, shifting
to a "team service" approach:

Analyst: And then on the labor productivity initiatives, I wanted to ask about just
how the teams have adjusted to removing the bussers, and has that initiative now
been fully rolled out to the system?

Red Robin CFO Guy Constant: So our commenting specifically about what's been
done in quarter, Brian, but the Maestro, as I mentioned on my comments, the
Maestro have gone well, all the targets were hit. So I think there's a lot of
momentum coming off of that. And we did – we made those changes in a quarter
where our comp sales and our traffic were very strong. So I think that's building
confidence in our operators that we can make these kinds of changes and that we're
making them with an eye towards making sure that the guest experience is at least
as good and, in many cases, hopefully better than what we saw before. And getting
momentum on these kinds of changes and seeing that they can work and be a
positive for the guest experience is helpful for us to get other changes done in the
future. The team service approaches is, obviously, an important one for us to get
the year started, but we have other things in the queue as well.

Analyst: Okay. So just to be clear, the team service changes, though, they are going
in during the first quarter as we speak?

Red Robin CFO Guy Constant: <u>Yeah, again, we don't want to give any of the
specifics, Brian, but we are making labor changes</u>. We have – as of the start of the

year, we're seeing productivity improvements continue.

Analyst: Okay. And then just one last one on that. Can you quantify – as you think about your labor outlook for 2018, can you quantify the labor savings between the Maestro and other initiatives that are embedded in that guidance? Or have you just embedded the Maestro at this point and there could be potentially more to come? Can you give us some perspective there?

Red Robin CFO Guy Constant: No, no, we have other changes embedded in the guidance, because the Maestro is worth about $8 million, you'll recall, Brian, and we started that in the fourth quarter. So call it three quarters of that benefit or $6 million of the improvement will come from Maestro. And for us to offset mid single-digit inflation on our labor basket, we obviously need a lot more than the Maestro program in order to get to that down 25 to up 25 on labor as percent of revenue. So we are definitely assuming some other changes in that guidance, yeah.

**First Quarter of 2018: Red Robin Quarterly Earnings Calls**

230.    Red Robin CFO Guy Constant noted the establishment of a litigation reserve associated with employment related claims, but did not provide a specific amount.

231.    Red Robin CFO Guy Constant noted:

First quarter restaurant level operating margin was 20%, down 130 basis points versus a year ago, driven by the following factors; cost of sales increased 90 basis points to 23.8%, driven primarily by the higher tavern mix and lower non-alcoholic beverage mix mentioned earlier, and the higher cost of steak fries and ground beef; the impact of mix was a slightly higher driver of the increase in cost of sales than was commodity inflation; restaurant labor costs improved 70 basis points to 34.5%, driven by significant improvements in hourly labor productivity, offset partially by the increases in restaurant manager bonus expense and a small increase in manager labor cost.

In 2017, we made significant investments to improve the payout levels of our restaurant manager incentive programs. These improved payouts were predicated on a successful pivot to improve labor productivity and to generate better restaurant

level economics, while driving improved comp sales. These changes have helped drive the improved labor productivity that we were seeking, and great credit should go to our restaurant leasers who have so effectively managed through the recent months of significant change.

**Red Robin Notes To-Go Orders Most Profitable Because of Lack of Front of House Labor**

232.     Red Robin CFO Guy Constant also first mentions to-go orders not being touched by front of house labor: "So the most profitable transaction we have is in online order where the guests picks it up in the restaurant, because we save the front of the house labor and we don't incur the commission charge that we would pay the aggregator … the vast majority of people are calling in are placing an online order and coming and picking it up in the restaurant. And in those instances, it's margin accretive.

233.     An analyst asked: "So lot of labor cost efforts and I am just curious in terms of your ability to essentially track your customers in terms of satisfaction or even operation quality scores, how happy your employees are? How have these cost control efforts on the labor side impacted all of those parties?"

234.     Red Robin CEO Denny Post responded: "We're keeping our ear to the ground very closely on this, and it's a regular topic of conversation. First, we continue to use net promoter score as a way of measuring impacts, and have not seen any change there. We do track other elements. And as we said regularly, can you talk with and touch-base with our field operators to understand where we have opportunities. As by reference in my script, there is some time and in fact takes a while to get the change affected the way you want it to do that's natural, some people take things more readily than others. And we're continuing to work that through with them. But again, what we're implementing is not new to the world in terms of our team service model it's just new to Red Robin. So I'm confident we'll get a good return."

235.     When an analyst asked for clarification of how Red Robin was decreasing their

labor costs, Red Robin CFO Guy Constant refused to provide specifics, stating: "I don't know that we provide a whole lot more color right now, Brian. <u>Obviously, we've made some pretty significant improvements in our productivity</u>. I think we made a reference in the supplemental materials that our productivity on a year-over-year basis has improved about 10%. So a pretty significant move there. <u>And so while we do anticipate that there are other opportunities, nothing specific that we're willing to share at this time</u>.

**Second Quarter of 2018: Red Robin Quarterly Earnings Calls**

236.    Red Robin CEO Denny Post emphasized controlling labor costs was their greatest priority, even while recognizing their growing catering demands:

> <u>In order to remain affordable, we have to control labor costs.</u> We derive a disproportionate amount of sales volume from five western states that have aggressive minimum wage laws planned through 2020. In order for us to not just maintain but actually improve the profitability of our business as we face this high labor inflation, it's critically important for us to find ways to increase productivity using technology and by further simplifying our menu and associated in-house food preparation. <u>We are currently running multiple new service model and menu simplification pilots.</u> Our urgency to address this for the states where the labor cost are rising the fastest will obviously also have great benefit for locations in the rest of the country, where labor cost remained for now lower.
>
> And to go where the guest is going in off-premise consumption, we are actively working on new guest facing technology to make customizing orders seamless. We are engaging with our call center to provide automated and voice-to-voice support, and we are building catering sales team to leverage our large value reputation through delivered burgers bars. All of these new ways of serving the guest will expand our reach and grow sales overtime, and they all leverage our known enforced strengths. But while we believe Red Robin has the brand equity, team capability and guest loyalty to transition from primarily dine and destination to both the destination and a source. We have recognized that we only earn the right to invest and realize those opportunities by delivering our short-term commitments.

That is what made our Q2 results and our reduced outlook for 2018 so profoundly and personally disappointing.

237.    Post further noted: The first and primary issue facing us today is, as I have said, the decline of dine-in traffic. Analysis of hourly sales data points to declining performance during peak time period, disproportionate decline particularly on the weekend. The growing complexity of our business has put pressure on our host to handle dine-in and carryout guests. In our hosting was traditionally an entry level position where your primary role was to greet and seat. Today, these hosts are asked to do much more as our check-out and third-party delivery businesses grow. We are moving rapidly forward with required new host training and improved selection criteria.

**Red Robin Increased Corporate Control over Restaurant-Level Team Service Model**

238.    Post also noted:

We must also improve our ticket times as measured by the kitchen display systems we invested in two years ago, and we also have an opportunity to improve table turns by readying them immediately to seat new guests. We went to a theme service style model earlier this year requiring servers to buss as they go. Unfortunately, we did not execute this well at all. And it impacted us most during peak periods. So learning from this led us to restructure our learning development, training and operations excellent functions into one team, reporting us through HR and under the leadership of one of our most respected operators who has seen what it takes for us to be successful in the field.

The first and most pressing charge for this new unified team is to reset expectations around standards and service performance as well as to provide tools for faster table turns and cleaner dining room. We estimate that 75% of our loss in dine-in traffic came from those peak hours far more than they represented total volume, which is a blinking red light for all of us. We were lulled into complacency by net promoter scores, which remain high and now vacant by a surge in guest complaints. The issues we saw there were corroborated by our extended guest for its research and in restaurant measures that were frankly not receiving the attention they should

have gotten. We have seen both our wait time and the number of people walking
away without being seated increase year-over-year.

Our operations teams are now fully looked to the issues and they have narrowed
their focus to improving those fix times and table turns day-by-day, week-by-week
through year-end. We will be measuring progress weekly. We are also making
targeted investments in peak hour labor to capture the unmet demand we see in our
restaurant lobbies. And while this is a small investment, compared to the
productivity improvements we have made over the past 12 months, this added labor
support will help reduce wait times and improve those peak our sales.

…

To sum-up our momentum recovery plans for the end of the year, we are moving
urgently to improve table times, reduce wait times and capture peak time traffic
particularly on weekends. Catering sales continue to grow and we are leaning into
that success with more focus and resources, emphasizing our mall locations and our
catering engines.

239.    Red Robin CFO Guy Constant noted: "Restaurant labor costs improved 40 basis
points to 34.3% driven by improvements in hourly labor productivity offset partially by
management expense and increased trading costs.

240.    Acknowledging the issues cutting hourly employees and moving to a "team
service" style, Red Robin stated:

Analyst: It seems like some of the messaging from your prepared remarks is around
reinvestments in labor and then also even on the host and kind of maybe leading to
sort of up the qualities necessary there. I guess going forward, are we going to see
net savings or net investments over the next couple years on the labor line? Is there
any change to sort of your philosophy in terms of that line being maybe the source
of margin opportunity that you can reinvest all for?

Red Robin CEO Denny Post: Our focus is particularly on the peak hours this is
what we are talking about, which is a relative very limited number of hours in our
building that are disproportionately valuable to us. So, don't think of it is across the

board but really focused on those peaks. Guy you want to talk about it?

Red Robin CFO Guy Constant: Yes, I was just going to say over the long-term, Greg, as you know as we've discussed many times previously, it's still the fastest growing expense line on the P&L and just given our geographic footprint is aligned and we expect to continue to provide pressure that's moving forward. So we're not dissuaded from our approach to try and gain a labor productivity where we can, I just think as to repeat comments I made previously as well as that **you always have to be careful when you make changes at the restaurant level** to look at those changes through the lens of valid impacts to guest experience and be prepared to tweak were necessary. But as Denny said in her prepared remarks, the targeted ads were making here are small in comparison to the productivity gains that we made year-to-date.

Analyst: I want to ask on labor as well. Should we take these results as indicative that maybe we went a little bit too far with labor, and I guess maybe focusing a little bit more on the peak periods than the broader day. So did we take that too far? And then I guess secondarily maybe why this didn't show up in some of the customer feedback before now because it seemed like the feedback was actually a little bit more positive and yet now we're seeing that maybe the impact was little bit more negative

Red Robin CEO Denny Post: So I'll start-off and welcome Guy's perspective as well. I would say it's not much that we went too far, we were at something about how easy it's going to be to pull-off, and we didn't provide the training and the tools that our restaurants really needed to do it well. And that's why I referred to what we're doing with the team and resetting ourselves to be much more effective at rollout going forward. So I think there was a lot of learning about that. Remember, we made one move last fall, which is what we call, maestro, that went in more easily I would say overall more effectively, and this latest remove the change that we made in February going to the team service style effort I think we are just to something about it.

…

Red Robin CFO Guy Constant: Yes, <u>most of the changes that we put in place</u>, we are in place prior to start of the second quarter. <u>So, we didn't really make any incremental changes around labor during the quarter in terms of major changes to the service model</u>. We did identify, we add to some peak hours so had already started to make some of those changes as the quarter went on similar to what Denny just made the reference too. But overall the productivity is still in the high single-digit on a year-over-year basis the improvements and productivity but the wage rate is still running up about 4% to 5% which is consistent with what we have seen year-to-date.

…

Analyst: And then just coming back to the labor investment commentary. Is there any sort of sense on the order of magnitude how big this will be? I mean just trying to understand how you invest and just the peak hours on the labor side and still meet the employees' expectations on number of hours for them to work?

Red Robin CFO Guy Constant: Yes, <u>we would expect we would be able to tap into existing pool of team members that are in the restaurants right now</u>, Peter. And as you know in our business, it can be a lot of when people come in and when people leave. <u>And specifically what tasks we have from the focus on well while that they are doing the peak</u>. And so as I mentioned before in terms of the level investment, I view it as quite small compared to what we've done already. And now, it includes some of the hours that we already added back in the second quarter.

So I would expect that we would continue to see productivity levels, and as we've mentioned before, <u>we do believe we have other ideas that we can introduce that can also allows us to impact productivity in the future as well</u>. But I would view this as we said in the prepared remarks small as compared to the productivity gains we've seen today.

Yes, I think the other thing Peter is anytime you call out some of our misses, it sounds that we're obtaining everybody with same brush. And there are some restaurants who continue to do very well who pick the picks as they should, and we can learn from them as well and that is so much about necessarily incremental

investment in labor as it is about scheduling the way they need to schedule and showing they've got the staffing and making sure they've got the folks and know what they're doing and keeping the managers present on the floor to coach.

So we're leaning into a lot of those fundamentals as well and it may feel like blocking and tackling and not a sexy silver bullet like I got one LTO that's it's going to solve everything. But it's the fundamental things that will make our tactics work harder for us going forward. So, we have some good learning as well from those who have continued to be successful that we can apply with others who have a desire to be, but just don't have the same skill set.

…

Red Robin CEO Denny Post: And then the second is about the sustainable growth model, and the piece there is really for us to find that balance between putting the human where it matters most, finding the technology that can complement their efforts, and <u>not being such a heavily labor dependent model that we can't be profitable for the future because obviously we're going to see increases in labor across the board</u>. So while we are seeking to maintain our affordability and drive our frequency of guest usage, we're also looking to find ways to make that sustainable by making a lower cost model to run.

241.    Red Robin CEO Denny Post also noted the increase in to-go orders: "Accelerates pace of change is the rapid pickup on delivery. I don't have the exact statistics at my hands, but everything I'm seeing quarter-over-quarter is the adoption of delivery services, the use of alternates to dine-in is only picking up speed and has moved very rapidly from a primarily urban phenomenon to heavily suburban phenomenon. So that's where I see the biggest change, I don't think this is a novelty, I don't think it's a temporary we have being. I think it's becoming a true new way of guest consuming restaurant food."

**Third Quarter of 2018: Red Robin Quarterly Earnings Calls**

242.    On August 2, 2018, a collective and class action lawsuit, *Outlaw v. Red Robin*, was

filed in New York on behalf of Kitchen Managers and Assistant Managers, alleging unpaid overtime under the FLSA and New York state laws.

243.    For the third quarter of 2018, Red Robin CEO Denny Post again discussed the lengths of corporate control over the day-to-day restaurant level activities, including requiring cutting as many labor hours as possible:

> As mentioned previously, <u>we increased in-store training using our new learning management system</u>. Our servers were trained on the basics of greeting, one-stop ordering and three level bussing. Our hosts are being trained via the new system on dine-in seating and to-go standards. To be both a preferred destination and a source of customizable gourmet burgers, we must be great at dine-in and off-premise service. We are making progress as we revisit standards and training with our frontline teams. We have experienced more dine-in traffic challenges on weekends, which as we shared before, represent both a disproportionate share of our business and an even greater share of the traffic decline. These weekend shifts are where we have seen the greatest number of guests choosing to walk away before being seated due to longer ticket times and slow table turns. As I referenced earlier, adherence to standards is key, and to that end, <u>we pulled together a team of field leaders to identify root causes for our service shortfalls</u>.

> <u>We were fully prepared to add back labor hours, if needed. Instead, they identified that the key need was to hyper-focus on a lining scheduled labor to capture peak traffic and then actively phasing team members off the shift as peak demand</u> subsides. In short, it wasn't about more hours, it was about scheduling them with greater precision and adhering to the standards we set. Peaking the peaks is in our DNA, which is to our benefit as we continue to <u>improve productivity, which is so essential in today's higher labor cost environment</u>.

> The cross-functional team led by some of our most respected operators quickly piloted some new approaches. We chose the most successful ones and brought all our multi-unit leaders to Denver for two meetings over 30 days to retrain them on how to coach our restaurant management teams on using the Watson scheduling

system as a true sales tool. We are encouraged by what we've seen so far. Since we refocused our leaders on peak time scheduling, ticket times, wait times and walkways are down year-over-year and guest satisfaction is up as measured by decreased guest complaints. <u>We will remain hyper-focused on improvement shift-over-shift, day-over-day, week-over-week at each individual restaurant</u>.

**Fourth Quarter of 2018: Red Robin Quarterly Earnings Calls**

244.    Red Robin announced Guy Constant had transitioned from CFO to COO.

245.    Red Robin announced Lynn Schweinfurth as their new CFO.

246.    Red Robin CFO Lynn Schweinfurth noted $21.7 million in charges primarily related to asset impairments, small wares disposal, and litigation contingencies.

247.    Red Robin CEO, Denny Post, stated: "Top line growth driven by stabilizing dine-in and incremental off-premise offers the potential for significant leverage as we have been actively addressing, raising, <u>rising labor costs through higher productivity to improve the middle of the P&L</u>. We're continuing to invest in tools, which will make it possible for servers to care for more guests. Prioritizing the roll out of handheld ordering devices in Q2 to the highest cost labor market. <u>We're also testing further menu simplification to improve Heart of House productivity</u> and accuracy. A rapidly growing catering program which has been very well received and successfully implemented by our operators as a nice layer of relatively high margin sales. We grew this business from just $1 million in 2017 to $11 million in 2018 and expect it to at least double in just 2019. … We expect to see it all come together in the back half of the year. <u>None of this can be accomplished without strong operating team</u> and a clear focus on quality service that delivers the gift of time to our guest at our restaurants, <u>that requires the right staffing, scheduling and focus</u>.

**Red Robin Describes Five Areas of Focus for "Turnaround"**

248.    Red Robin's new COO Guy Constant stated:

All very positive initial first steps in the <u>turnaround of our restaurant execution and</u>

done while generation some of the best restaurant labor productivity numbers we've seen with overall 2018 hourly labor productivity improving approximately 9% versus what we saw in 2017. But there's still a great deal of work to do. While we made some progress we're still not where we want to be.

So as we get into 2019, our efforts are focused in five areas. First; the staffing while this remains a challenging labor environment in some market. The shrinking unemployment and a tighter labor pool. We have improved our staffing situation versus where it was six months ago at both the hourly and manager levels. This is the first critical plank in the foundation. If we can't get enough people on staff, it will be difficult to continue to make progress. Second is scheduling; once staffed we're then able to schedule more proactively to ensure we have the right number of team members in place during peak hours to capture all of the business it's available while more aggressively managing shoulder and non-peak hours so that we don't waste more expensive labor cost that can otherwise be used to capture peak traffic.

Third is simplification; 2019 will feature a number of steps that will be less about new things for operations to learn and more about taking the things already implemented and making them easier to execute with excellence. This emphasis will have us work on doing fewer things excellently as oppose to more things adequately. Our operations team has seen a lot of change over the past year. In 2019, we will bring them the tools to help them take that change and turn it into much better execution and performance.

Fourth is standards; in order to observe the significant change they experienced last year. The operators were sometimes forced to get creative to try and deliver on our promise to the guests. By putting them in this position we drifted away from the consistency and standards that are the hallmark of high performing, operations driven organizations. By putting all new initiatives through a filter that places operational excellence first, we will return to a culture that values standard as the foundation of operational execution and performance.

And fifth is training; in the more challenging labor environment that I discussed

earlier we're operating today with managers and team members that are less tenured and less experienced. <u>Both of which require a more disciplined approach to training</u>. As we look at our training and development programs, we're not necessarily looking to increase our investment, but rather reprioritize our current spend towards trainings on the basics on restaurant execution for our team members and the fundamentals of restaurant leadership for our managers. Whether that is training our host and off-premise specialist on managing the new dynamic of the multiple revenue streams of the front door or reinforcing the new skill sets needed for our servers or helping our Heart of House team members to adapt to the improvements we will introduce to our kitchens or <u>teaching our managers to lead and coach to the new standards, training will be a key component of our operational turnaround</u>.

249.    Red Robin's new CFO, Lynn Schweinfurth, noted: "Restaurant labor cost of 34.7% were unfavorable 60 basis points versus a year ago, as higher wage rates and sales deleverage were partially offset by <u>favorable productivity and lower manager bonuses</u>.

**First Quarter 2019: Red Robin Quarterly Earnings Calls**

250.    Pattye Moore announced she was serving as Interim CEO of Red Robin.

251.    Red Robin's COO Guy Constant stated:

First is <u>hire, train and retain</u>. Improving the experience starts with hiring the right people, training them properly and being fully staffed as well as reducing turnover, particularly at the General Manager level. <u>Our operations leadership team is making real progress against these objectives</u>. While broader industry turnover and staffing challenges have increased in Q1 overall, Red Robin experienced reductions in our hourly Manager and General Manager turnover from Q4 of 2018 to Q1 this year. And all are at better levels than the average for the casual dining industry. In fact, our Manager and General Manager turnover levels are closer to best-in-class than they are even to the average. We have also been able to bring our Manager staffing levels to 96.8%, a meaningful improvement over where we ended 2018. Having

better staffed restaurants and stable management teams is a very important part of any sustainable improvement in operational execution.

Next is <u>Manager Front of House engagement</u>. We know we can improve the overall guest experience, shorten wait times, reduce walkways, have cleaner dining rooms and effectively identify and resolve potential issues by continuously getting our managers on the dining room floor and at the host end during peak hours and our efforts are delivering results. Overall satisfaction scores improved throughout the first quarter reversing a trend that saw a decline throughout 2018 to a low point at the end of Q4.Year-over-year walkways are down 4.2%, wait times are shorter, guest complaints on cleanliness and wait times have declined meaningfully and guests have told us that they have seen marked improvements in problem resolution when there is an issue.

Next is <u>managing the shoulders to peak the peaks</u>. By shifting the labor investment from overstaffed shoulder hours during the day to understaffed peak hours we are able to improve throughput on our busiest shifts thereby capturing the greater sales opportunity that is available during those peak times without having to make incremental investment in labor expense. Our continued focus on staffing has yielded improved guest scores for our taste of food, temperature of food, speed of service and execution of our bottomless promise during the first quarter.

And last is delivering on the promise of <u>Maestro</u>. This effort focuses our kitchen managers on the active coordination of the fast and accurate delivery of high-quality food at the proper temperature. And as an added benefit, ticket times have shown continuous improvement benefiting speed of service. We have also started to reduce our menu complexity, while still providing guests the options they desire and we have narrowed our culinary focus to concentrate on improving the consistency and quality of our core menu products. These include of course our gourmet burgers, chicken, buns and of course, our signature bottomless steak fries. We look forward to updating all of you on the continued progress on these key priorities and their impact on operational execution over the coming weeks and months.

252.    Red Robin's CEO Pattye Moore noted Red Robin was focused on growing to-go and catering orders:

> Our second area of focus is to continue building off-premise and catering. Our total off-premise business is now mixing at 11.6% of total revenues, with a growth rate of 20.6% year-over-year at the end of the first quarter. We are also focused on continuing to improve the to-go experience by implementing improved operational processes and tools and we are looking to increase our reach with additional third-party delivery partners.

> Catering now represents 1.2% of company sales through the first quarter of 2019 or growth of 220% compared to last year. We believe catering continues to represent a big opportunity for us essentially all incremental. We also believe it increases brand awareness and relevancy. In 2018, we built a strong foundation for catering that included building out our strategic leadership and infrastructure. We began adding sales team members supported by targeted marketing. In 2019, we are building on that momentum from the back half of 2018. We are continuing to enhance our sales team and focusing on building both local and national accounts.

253.    Red Robin's CEO Pattye Moore stated: "Speaking of technology, our fourth priority is implementing digital platforms and technology solutions. We completed the rollout of headsets to our restaurants this month to enhance communication among our managers and certain team members. While this may seem like a minor point to some, it has allowed our operators to turntables faster and to stay more engaged during a busy shift.

254.    Red Robin's CFO Lynne Schweinfurth described the negative effects on profit of full staffing their restaurants: "Restaurant labor costs of 35.7% were unfavorable 120 basis points versus a year ago, due primarily to higher wage rates, increased management headcount associated with our focus on being fully staffed to provide quality execution and sales de-leverage. Other operating costs increased 60 basis points to 13.9%, due primarily to increases in third-party delivery fees and equipment repairs and maintenance. … In addition to the pacing of field

initiative, we are expecting a continuation of higher wage inflation than what we originally expected and are proactively addressing these cost pressures through programs to reduce turnover and better manage wages at a market level to mitigate the impact of a competitive labor environment.

255.    Red Robin described increasing their managers as they struggled with hourly staffing levels:

> Analyst: Okay, fair enough. And then, can you give us some color on what changes were the most impactful in terms of improving staffing levels and retention?

> Red Robin's COO Guy Constant: Well, staffing is something that you always hear restaurant companies talk about. It's a constant battle that you're working on, especially in this tougher labor environment to deal with staffing. But what we said is that, it's not a problem that we want to see continue. And so, we have to make a conscious effort to make a change in how we approach it. And it comes on a lot of different levels. But starting by getting your managers staffed as we have is certainly benefiting that. But giving real prescriptive tools to our managers to help them to get to higher staffing level, peaking the peaks is, of course, driving them to higher staffing levels because you need more people to peak out those peak hours and then, obviously, that gives you more people available to staff the remainder of the shifts during the week.

> But we basically said that it's going to be very hard for us to execute on what we're doing in the restaurant, particularly at the very good productivity we have versus most of casual dining. If we're not able to get us fully staffed as we are. And so, it was a conscious change, a conscious difference in how we approach staffing to make sure that we bent the curve and made a real difference in where we've been for some time.

**Second Quarter 2019: Red Robin Quarterly Earnings Calls**

256.    For the second quarter of 2019, Red Robin's CEO Pattye Moore noted: "Our third area of focus is to continue building our to-go and catering. These are components of our off-

premise business which now comprises 12.5% of sales … ."

257.    Red Robin's COO Guy Constant stated:

As Pattye mentioned our first and foremost priority is stabilizing and strengthening the dine-in business. In order to do so, we are focused on four key areas for operations that we communicate consistently and measure religiously. First is hire, training and retainment. As we discussed last quarter improving the dine-in guest experience starts with hiring the right people, training them properly and being fully staffed, particularly at the General Manager level. Our operations leadership and HR teams have made real progress against these objectives.

At the outset of 2019, we were short over 100 managers across our system. At the end of the second quarter, our manager staffing level was 99.4%. We were short approximately 30 managers and our manager turnover numbers continue to improve and are approaching best in class levels. With stable and more fully staffed management teams comes a better experience for our team numbers and this has been apparent in the progress we've made in our hourly turnover numbers, which have improved throughout 2019. This is in sharp contrast to the continued deterioration in industry turnover and staffing metrics. Our hourly turnover numbers ended the second quarter better than casual dining industry averages and have continued to improve into the third quarter. These important leading indicators are critical to building the engagement of our team members, a key component of any sustained improvement in operational execution.

…

The only way to sustainably rebuild our dine-in business and deliver predictable sales improvement is to consistently execute on the basics in our restaurants every day. We're thankful for the efforts of our operators and recognize their progress. While we know there is a great deal of work to do, the initial pieces have been put in place and the leading indicators of manager staffing, hourly turnover and guest satisfaction are all trending positively. I look forward to discussing further progress again with you next quarter.

Next is <u>managing the shoulders to peak to peaks</u>. <u>By shifting the labor investment from overstaffed shoulder hours to understaffed peak hours, we are able to improve through out on our busiest shifts,</u> thereby capturing the greater sales opportunity that is available during those times. Our continued focus on staffing has yielded steady improvement in guest ratings for our speed of service, food temperature, the execution of our bottomless promise and for restaurant cleanliness during the first half of 2019.This area of focus is a key part of delivering a great guest experience, while maintaining strong labor productivity.

258.    Red Robin's CFO Lynn Schweinfurth stated: "Restaurant labor cost of 35.2% were unfavorable 90 basis points versus a year ago, due primarily to higher wage rates, increased management headcount to allow our restaurants to become fully staffed in support of our focus on operational execution and sales to leverage.

**<u>Third Quarter 2019: Red Robin Quarterly Earnings Calls</u>**

259.    For the third quarter of 2019, Paul Murphy was announced as Red Robin's new CEO.

260.    Red Robin's COO Guy Constant stated:

Next is managing the shoulders to peak to peaks. <u>We continue to focus on shifting the labor investment from overstaffed shoulder hours to understaffed peak hours,</u> allowing us to improve throughput on our busiest shifts thereby capturing the greater sales opportunity that is available during those times. Our continued focus on staffing has yielded improvement again in Q3 on guest ratings for our speed of service food temperature the execution of our bottomless promise and restaurant cleanliness. This area of focus is a key part of delivering a great guest experience while maintaining strong labor productivity. And in Q4, to support our fast growing off-premise channel, <u>we'll be adding labor hours during our busiest shifts</u>; a decision that will provide residual benefit to our dining experience as well.

261.    Red Robin CFO Lynn Schweinfurth stated: "Restaurant labor costs of 36.2% were unfavorable 90 basis points versus a year ago, due primarily to higher average wage rates and

higher manager staffing levels within the restaurant.

**Fourth Quarter 2019: Red Robin Quarterly Earnings Calls**

262.    Red Robin CEO Paul Murphy noted Red Robin was testing the addition of Donato's Pizza to Red Robin restaurants.

263.    Red Robin CEO Paul Murphy noted: "Importantly, these are all actionable items which we are emphasizing to our general managers and field leadership must be delivered to our guests. When these items are executed consistently at a high level, our guests become our strongest brand advocates and in turn, increase their frequency of dining at Red Robin. In delivering the brand promise and moments of connection, we are implementing a new service model in 2020, which is designed to improve the functionality of our service, while elevating our hospitality. SAMs, the handheld POS terminals, are a foundational element of the new service model. In combination with the new service model, we are receiving positive feedback from our operators in test locations, including a reduction in ticket times and increasing our top line sales performance.

**Red Robin Notes To-Go Order, Catering, and Donatos Pizza are Key to Profits**

264.    Red Robin further noted that sales profitability depended on increasing to-go and catering orders, as well as the addition of Donato's Pizza: "Accelerating profitable sales growth represents the fourth and final part of our plan. We will accomplish this through several means beginning with growing our off-premise business, including to-go, catering, third-party marketplaces with delivery services and Red Robin delivery. Red Robin delivery was rolled out nationally in January to the majority of our company-operated restaurants."

265.    Red Robin's CFO Lynn Schweinfurth stated: "Restaurant labor costs of 34.5% were favorable 20 basis points versus a year ago due primarily to lower group insurance costs in Q4 partially offset by higher average wage rates of approximately 5% and higher manager staffing levels within the restaurants."

**First Quarter 2020: Red Robin Quarterly Earnings Calls**

266.    Red Robin noted they recognized $4.5 million related to litigation contingencies.

267.    Red Robin CEO Paul Murphy noted: "Following the onset of the COVID-19 pandemic and the shutdown of dining rooms, we quickly pivoted to an off-premise driven operating model and are emboldened by the continued strong growth in off-premise sales since the onset of COVID-19. In addition, as dining rooms have begun to reopen, the early trends are very encouraging, and volumes have been building over the past several weeks at our reopened dining rooms. As of June 7, we have reopened 270 dining rooms with limited occupancy and operating hours. These represent 65% of our currently opened company-operated restaurants with more re-openings to come week by week as state by state reopening thresholds are achieved. We attribute our traction in navigating through the pandemic to our ability to adapt and successfully pivot operations, while simultaneously raising the bar on our dine-out and dine-in execution."

**Red Robin Introduces New Hospitality Model: Total Guest Experience (TGX)**

268.    Red Robin CEO Paul Murphy noted Red Robin's new hospitality model, TGX: "Note that, reopened dining rooms feature our new hospitality model, total guest experience, or TGX, as discussed in our last call that we were planning to implement to veer the course of this year. This new service orientation offers elevated levels of hospitality with servers dedicating more time in the dining room attending to and engaging with guests.

269.    Red Robin CFO Lynn Schweinfurth stated: "General and administrative costs were $26.7 million, a decrease versus the prior year of $3.4 million, primarily driven by lower team member benefits and lower travel and entertainment and professional costs due to cost reduction initiatives post COVID-19,partially offset by higher team member salaries and wages associated with merit increases implemented prior to the initiation of our <u>aggressive cost-control measures</u>.

**Second Quarter 2020: Red Robin Quarterly Earnings Calls**

270.    Red Robin CEO Paul Murphy noted: "Following the initial outbreak of COVID, we set the following priorities for our business: one, secure the long-term viability of Red Robin through increased liquidity; two, ensure the health and safety of all team members and guests; three, leverage our off-premise channel to drive sales and opportunistically reopen our dining rooms; four, reduce expenses and improve flow-through on lower sales; and five, position Red Robin for recovery and future growth.

271.    Paul Murphy noted Red Robin Corporate significantly reduced spending at the restaurant level: "Preserving liquidity and the long-term viability of Red Robin included several immediate, and in some cases, difficult actions. Reducing salaries, eliminating a material number of corporate positions, <u>significantly reducing spending at both the restaurant and corporate levels</u>, renegotiating our credit agreement, raising approximately $30 million in capital through our at-the-market equity offering and within the next 12 months, generating significant cash tax refunds. As a result, as of August 9, we have substantially improved our liquidity since last quarter to more than $103 million between cash and cash equivalents and available borrowing capacity. I am confident that we have the liquidity capacity to emerge from this period a stronger, more profitable enterprise."

272.    Further, Paul Murphy noted that Red Robin's changes resulted in significant cost reductions at the restaurant level: "<u>Cost reductions at both the corporate and restaurant levels are providing immediate benefits to our P&L, with positive restaurant-level profitability in the second quarter. This positions our business for long-term sustainable cost reductions.</u>"

273.    An analyst asked, "[W]hat is the profitability at the restaurant?" And Lynn Schweinfurth stated, "I mean, as you can see from our second quarter results, we did generate operating profit of $3.2 million at the restaurant level. I think we'll be in the mid single to low

double digit margin as we move forward. And that's with an increase in terms of comp store sales as we continue to expand our seating capacity. <u>The areas where we're expecting some savings from a permanent standpoint include some areas within our labor line item that we found some ways to be more efficient</u>. Our occupancy costs, as we continue to work with our landlords, as it relates to restructuring our leases and then we're continuing to dive into other operating costs to see what other opportunities we may have."

274.     An analyst asked: "I wanted to ask on labor. It's been a lot more variable than we would have expected. And you mentioned the shifting labor mix in support of off-premise. I was wondering if you could just address what's changing on that front and how much is due to the new operating model versus something we might not be aware of."

275.     Red Robin CEO Paul Murphy noted higher hourly wage costs associated with to-go and catering orders, as those are primarily Back of House, where there are fewer tipped employees who make a lower hourly wage rate: "I think that the majority of the variability that you've seen is really the move from the increase in the off-premise sales. And so, especially with the number of restaurants that the dining room is still closed and the number of tipped employees who obviously are at a lower wage rate, that has shifted to a higher average – hourly wage rate, not only in the restaurants that have no dine-in right now, but also in the restaurants that do have dine-in just because we continue to have strong off-prem sales as the dining rooms have reopened at the 50% capacity. <u>So it's really just a shift in from tip to non-tip labor inside of the restaurants and the percentage of business that's associated with that</u>."

276.     When an analyst asked: <u>"[W]hat are the biggest changes that you've made as a result of COVID that you expect will stick</u> even as we come out on the other side and consumer dine-in confidence sort of normalizes?" Red Robin CEO Paul Murphy stated it was changes in the labor line and the management structure at the restaurant level:

I think some of the biggest changes, I mean, as Lynn mentioned, <u>we have made
some changes in terms of the labor line, in terms of the management structure at
the restaurant level</u> and how we see that moving forward. Also with the new TGX
model, we're seeing some efficiencies as the dining rooms reopen in terms of the
front-of-the-house labor.

And then frankly, as in the menu reduction that we did at the – taking 33% of the
menu out, we've seen efficiencies also in the back of the house and the menu
reduction that we've had has really been able to drive both quality and ticket times
and things like that. So we feel good about it. We are – there may be some items
brought back to the menu over time, but we see that being a more of a permanent
structure, so whether it's the management structure in the front of the house or the
back of the house, we see ongoing savings really in all three areas.

**Third Quarter 2020: Red Robin Quarterly Earnings Calls**

277.    On June 19, 2020, Red Robin moved for court approval of an $8.5 million
settlement for class members in *Vigueras v. Red Robin*.

**Outlaw v. Red Robin: Notice Recommended for Putative Collective Action Members**

278.    On July 7, 2020, a magistrate judge in *Outlaw v. Red Robin* recommended notice
be provided to the putative collective action members, finding:

 a. Red Robin "maintains uniform job descriptions for all kitchen managers and
  assistant managers throughout its restaurants;"

 b. "But even more significant is the evidence that [Red Robin] has a company-wide
  policy of limiting overtime work, a standardized training regimen, centralized
  accounting, payroll and human resources/personnel systems that allows [Red
  Robin] to maintain consistency and uniformity throughout its locations and track
  each restaurant's record;"

 c. "Plaintiff has also identified [Red Robin's] centralized system of staffing all its

restaurant manager[2] positions using a single online platform and utilizing corporate talent recruiters to track, maintain, and make restaurant manager staffing recommendations, rather than at the level of individual restaurants;" and

d. "Lastly, the individual declarations of Plaintiff and the six opt-in Plaintiffs cover the practice of unpaid overtime work in restaurants located in six different states. … While the additional declarations from 12 individuals reflect the same practice in restaurants spanning nine additional states."

*See* Ex. I, (*Magistrate Report Recommending Conditional Certification and Notice*).

279.    Those states were Illinois, Pennsylvania, Washington, Virginia, Wisconsin, California, Texas, Georgia, Minnesota, Tennessee, Idaho, and New Mexico.

280.    Between October 30, 2020 and March 18, 2021, hundreds of individuals opted into the *Outlaw v. Red Robin* lawsuit; each was paid individually by offer of judgment for their FLSA claims.

281.    Red Robin CEO Paul Murphy noted Red Robin's new management structure: "Actions such as a new restaurant management structure, significant menu reductions, renegotiation of leases and the streamlining of corporate overhead have improved the cost structure of both the restaurant and enterprise levels.

282.    Red Robin CFO Lynn Schweinfurth stated: "So in a normalized sales environment, probably beyond 2021, we are currently modeling 25% off-premise. And in terms of particular P&L line items, we do believe administration on the labor line will be better based on our new management structure. We do anticipate higher wages and that's a combination of certainly wage inflation and the mix in terms of non-tip credit hours being applied with higher off-premise volumes. We are anticipating better occupancy costs and better G&A."

**Fourth Quarter 2020: Red Robin Quarterly Earnings Calls**

283.    Red Robin CFO Lynn Schweinfurth noted $1.9 million in charges related to litigation contingencies, as well as a one-time $8.5 million payment related to the settlement in *Vigueras v. Red Robin*. Schweinfurth further noted: "Excluding the impact of this one-time legal settlement payment, we had positive cash flow in the first eight weeks of fiscal 2021 of approximately $2.5 million. COVID 19 meant less workers and higher wages."

**Red Robin Saved $14M Per Year By Replacing Salaried Managers with Hourly Managers**

284.    Red Robin CEO Paul Murphy noted:

2020 was an unprecedented year, and while the pandemic brought forth complex challenges it enabled us to intensely focus on improving our operating and financial model. The material improvements we made to our business will enable us to resume our transformation strategy in an even stronger position, and deliver our brand promise, recapture the soul of Red Robin effectively, tell our story, and accelerate profitable growth. Part of our transformation strategy to deliver our brand promise included improving our guest service model. The pandemic created an opportunity to accelerate the implementation of our Total Guests Experience or TGX hospitality model as dining rooms reopened.

TGX combines technology and improved service coverage to deliver an elevated and more attentive guest experience, enabling our servers to stay in their section the majority of the time. Improving our speed of service, including decreased ticket in window wait times, and improving cleanliness scores. We also restructured our management-labor model to provide increased flexibility and better supervisory coverage during peak times. This new model is beneficial for both our guests and our team members as it supports our TGX hospitality model while also creating a structured and clear career path for team members.

**The flexibility of moving two salary manager positions to one to three hourly shift supervisors also allows us to convert historically fixed labor costs and generate annual savings of approximately $14 million.** Both the TGX service

model and our new management-labor model are contributing to our highest ever guest satisfaction scores. The pandemic also allowed us to focus on improving our enterprise business model with meaningful operational efficiencies and permanent cost reductions. <u>We simplified our menu</u>, which reduced over one-third of our offerings and **enhanced operations resulting in over $2 million of annual savings in terms of back of house labor,** and reduced waste.

…

With Donatos performance during the pandemic, our conviction has strengthened that it represents a substantial catalyst for growth. We believe Donatos will generate annual company pizza sales of more than $60 million in the profitability of more than $25 million by 2023 when we have completed our rollout to approximately 400 company-owned locations. In 2021, we are planning to add Donatos to approximately 120restaurants, bringing the total number of company restaurants that offer Donatos to approximately 200 by the end of the year. Donatos provides significant growth opportunities beyond the addition of new restaurants, including an opportunity for growth in catering as we expand this category post-pandemic.

Our off-premise model has been a tremendous growth driver for Red Robin, and we expect to retain a higher portion of off-premise sales than our approximately 14% pre-pandemic mix. While also improving margin within the channel in restaurants that are operating over 50% capacity, we have sustained offering the sales of more than twice pre-pandemic levels.

285.    Red Robin CFO Lynn Schweinfurth noted: "General and administrative costs were $16.4 million, a decrease versus the prior year of $2.9 million, primarily driven by <u>lower team member salaries and wages</u>, lower travel and entertainment expenses, and lower professional service fees due to cost reduction initiatives partially offset by increased team member benefit cost."

**First Quarter 2021: Red Robin Quarterly Earnings Calls**

286.    Red Robin CFO Lynn Schweinfurth noted $1.1 million in charges related to

litigation contingency.

287.    Red Robin CEO Paul Murphy noted:

Of course, our ability to fully participate in a recovery or in the environment is only possible with the highest quality of operational execution, both dine-in and off-premises. We continue to maintain a disciplined focus on execution, so our guests can trust Red Robin to deliver a consistent quality experience each and every time they visit.

We are sustaining high guest satisfaction scores as we scale our operations up with the recovery, achieved through a combination of our TGX hospitality program, off-premises enhancements and our new management labor model.

As of the end of fiscal year 2020, we were well positioned for a post-pandemic operating environment. With 99% restaurant manager staffing, restaurant team member turnover rates approaching industry best-in-class levels and a prescriptive ready set reopen guide addressing best practices for resuming operations at 100% capacity.

As the Company has continued our reopening plan throughout the first fiscal quarter, we have adjusted our ready set reopen playbook to account for staffing headwinds driven by COVID-19 and associated macroeconomic factors. We have implemented technology enhancements to streamline the application process, which significantly reduces time to higher.

We also further modularized our kitchen training program to assess new team members in achieving competency and a handful of impactful tests more quickly, flattening the learning curve and setting them up to make a meaningful contribution to the shift while providing valuable assistance to our legacy team members.

Over the course of subsequent weeks, the new team members are certified in additional positions, one back of the house station at a time. Additionally, we have recently implemented a wage progression program that targets improving retention in the critical first six months of a new team member's onboarding, including automatic wage increases over the course of the first 24 months on the team.

Our teams are doing a great job of hiring and training, and we are on track to be fully staffed by early summer. Let's now discuss our continued progress with respect to our transformation strategy, including the results that we are seeing from our key growth initiatives. Our restaurants offering Donatos Pizza continue to outperform other restaurants by approximately 300 basis points.

…

You may recall that in March, we announced the launch of three new virtual brands to build on our off-premises business. These new brands feature a mix of our high-quality menu items for which Red Robin is not typically known as well as offering new menu items that are variations on core products, enabling our team members to execute on these items without additional operational complexity.

All three brands are live on our largest delivery service partner, DoorDash, as well as additional national and regional partners, and reflect the latest in our expansion into off-premises dining, which began three years ago when we successfully launched our partnership with Donatos. As part of that partnership, we have been featuring Donatos as a stand-alone delivery brand in third-party marketplaces for over a year.

…

Recall that our cost restructuring work in 2020 represents permanent savings, and we are maintaining active fiscal diligence and measuring ourselves against the savings initiatives put in place last year, excluding natural inflation and future growth initiatives.

…

Looking ahead, we have every reason to be confident in our future. Moving through 2021 and beyond, we have a number of levers we can bring to bear on the business over the next several years. The strategic initiatives we have in place are achievable and will provide meaningful impact to Red Robin and our shareholders.

These include: one, continued off-premises growth through operational and technology improvements. We will maintain our off-premises stickiness by

continuing to implement modifications to our processes, staffing, floor plans and technology, enabling our team members to execute more effectively, thus delivering a more elevated amuses experience.

288.    Red Robin CFO Lynn Schweinfurth noted: "Restaurant-level operating profit as a percentage of restaurant revenue was 15.7%, an improvement of 690 basis points compared to 2020, primarily due to the following: restaurant revenue increased by 5.7% due to favorable guest counts, pricing and sales mix; cost of goods sold decreased by 170 basis points, primarily driven by favorable commodity costs and rebates; labor costs decreased by 430 basis points, primarily driven by a more efficient management labor structure, staffing shortages and simplifying our menu, resulting in reduced kitchen labor hours partially offset by higher wage rates."

289.    An analyst commented: "And just one last on the virtual brands themselves. Does that extend operating hours for the stores at all? Or are they still within the same existing operating hours for the stores today?"

290.    Red Robin CEO Paul Murphy responded: "Presently, they're within the same operating hours, kind of an interesting fact out of the virtual brands is, we see them playing really well at least two of the three brands actually playing stronger in the lunch time slide. So if you look at the Fresh Set and the Chicken Sammy's have been more in the lunch, which we are pleased about. The Wing Department does play a little bit more in the late night. So we haven't had to make our adjustment to the restaurant store hours."

**Second Quarter 2021: Red Robin Quarterly Earnings Calls**

291.    Red Robin CFO Lynn Schweinfurth noted $0.1 million in charges related to litigation contingencies.

292.    Red Robin CEO Paul Murphy noted:

To ensure a quality guest experience and to build loyalty beyond the pandemic, we have been operating at reduced hours due to staffing shortages. This disciplined

approach was taken to also support team member and restaurant management retention. Staffing is our #1 priority, and our plan is to achieve staffing levels above 2019, supporting elevated demand compared to 2019. As we make progress and achieve those targets, the results are strong. By the end of the second fiscal quarter, restaurants that were able to operate at 100% indoor dining capacity and with full hours delivered a comparable restaurant revenue increase of 7% compared to 2019 and restaurant margin of 19.5%, representing an increase of 1.8% compared to 2019.

We have supported our staffing efforts through technology enhancements to the application and hiring process, held 2 national hiring days and deployed internal and external resources to augment recruiting, hiring and training efforts. These efforts enabled us to hire approximately 1,900 hourly team members. Additionally, supply chain and inflation were highly topical issues in the current environment. The challenges in hiring and retention have also affected our suppliers, resulting in some intermittent product and distribution shortages.

293.    Red Robin CFO Lynn Schweinfurth noted: "Restaurant level operating profit as a percentage of restaurant revenue was 15.7%, an improvement of 13.7 percentage points compared to 2020, primarily due to the following: Restaurant revenue increased by $112 million, primarily driven by increased guest traffic due to the continued lifting of jurisdictional restrictions; cost of goods sold decreased by 140 basis points, primarily driven by pricing, favorable mix shifts and discounts, partially offset by commodity inflation; labor costs decreased by 280 basis points, primarily driven by staffing shortages and sales leverage, partially offset by higher wage rates and staffing costs and increased restaurant management compensation costs; $1.6 million of incremental labor costs were incurred due to increased hiring adds, incremental hiring and training resources and retention and sign-on bonuses to support our staffing initiative; other operating expenses decreased by 440 basis points, primarily driven by lower supplies, third-party delivery fees due to lower off-premises sales volumes and sales leverage; and occupancy costs decreased

by 510 basis points, primarily driven by savings from permanently closed restaurants and restructuring of lease payments, rent concessions and sales leverage."

**Third Quarter 2021: Red Robin Quarterly Earnings Calls**

294.    Red Robin CFO Lynn Schweinfurth noted $0.2 million in charges related to litigation contingencies.

295.    Red Robin CFO Lynn Schweinfurth noted: "<u>Labor costs decreased by 80 basis points, primarily driven by staffing challenges and sales leverage, partially offset by higher wage rates, staffing costs and increased restaurant management compensation costs in 2021</u>. Other operating expenses decreased by 10 basis points, primarily driven by lower utilities and lower supplies, due to lower off-premises sales mix, partially offset by increased hiring costs and janitorial and maintenance expenses. … $3.1 million of transitory labor and other operating costs were incurred due to staffing challenges, including hiring and training costs temporarily outsourced janitorial costs, one time bonuses, and overtime pay."

**Fourth Quarter 2021: Red Robin Quarterly Earnings Calls**

296.    Red Robin CEO Paul Murphy noted Red Robin's Corporate control on hiring and staffing at restaurant levels:

> <u>We have worked closely with our operators to determine a par staffing level by individual restaurant staffing requirements</u>. Our staffing focus begins with being properly staffed at the restaurant management level, and we are making meaningful progress in 2022, hiring approximately 15 management team members per week through the end of our second fiscal period.
>
> The ongoing demand for Red Robin is very strong. What we are solving is a staffing issue, which is limiting our throughput, not a brand issue. Our period 2 sales trends demonstrate that margin will continue to improve as we improve our staffing and restrictions having receded with the trajectory of Omicron in our most significant

markets, enabling us to provide the occasion our guests expect from their visit to our restaurants.

We recently hired Wayne Davis as our Chief People Officer, a respected executive who brings robust experience from multiple industries to Red Robin. Wayne is already leading proven initiatives to support individual restaurants and driving applicant flow, including the use of outsourced recruiting assistance to amplify internal resources.

Given the competitiveness of the market with respect to compensation, we are constantly monitoring our compensation policies to ensure that we attract and retain talent. We are also engaging with our workforce to understand and improve our team member value proposition because compensation alone is not sufficient to ensure a happy workforce.

In fact, we have completed a discovery initiative to better understand what matters to our team members and how we can improve their quality of life and create a sense of belonging, and we will be incorporating these learnings into our culture to further improve these important relationships.

At the end of 2021, we were 93% staffed in salaried manager positions and 96% staffed in the general manager role. Currently, we are staffed at approximately 85% of overall par levels. As the company approaches full staffing in our management positions, we expect overall restaurant staffing improvement to accelerate.

297.    Murphy further noted increased to-go order, catering, and Donatos pizza sales: "During Q4, we sustained an off-premises sales mix of 31.4%, which represents the seventh consecutive quarter of sales that are more than 2x pre-pandemic levels of approximately 14%."

298.    Red Robin CFO Lynn Schweinfurth noted: "Restaurant level operating profit as a percentage of restaurant revenue was 13%, an improvement of 6.8 percentage points compared to 2020, primarily due to the following: restaurant revenue increased $81.1 million, primarily driven by favorable guest count, menu mix, pricing and discounting; cost of goods sold increased by 220 basis points, primarily driven by commodity inflation and timing of certain rebates; and substitute

products, partially offset by menu pricing and favorable mix shift; <u>labor costs decreased by 350</u> <u>basis points, primarily driven by sales leverage, partially offset by restaurant labor, cost inflation,</u> <u>staffing and training costs;</u> other operating expenses decreased by 170 basis points, primarily driven by sales leverage, partially offset by increased third-party commissions, higher off-premises packaging costs and increased hiring costs; and occupancy costs decreased by 380 basis points, primarily driven by sales leverage, savings from permanently-closed restaurants and restructured lease payments."

**First Quarter 2022: Red Robin Quarterly Earnings Calls**

299.    Red Robin CFO Lynn Schweinfurth noted $1.7 million in charges related to litigation contingencies.

300.    Red Robin CEO Paul Murphy noted:

The action plan we are executing with regards to people is focused on three key areas. One, restaurant leadership, connecting with team members, quality training and execution and running great shifts. Two, wages, we are addressing at the local level to remain competitive. And three, <u>scheduling and flexibility, accommodating</u> <u>scheduling needs of team members, and we are also in the process of implementing</u> <u>and improved scheduling tool to provide more scheduling flexibility.</u>

301.    Red Robin noted more labor savings than anticipated, even with more operating hours:

Red Robin CFO Lynn Schweinfurth: <u>But we did adjust some labor expectations</u> <u>associated with transactions that we're seeing from a trending perspective, which</u> <u>did take down expenses a little bit.</u>

Analyst: And then 2 quick ones, if I could, on the labor front. Paul, I think you mentioned that operating hours improved in the first quarter versus the fourth quarter. I guess could you help quantify the degree of improvement that you've seen? And to what degree that is still constraining your recent sales volumes?

Schweinfurth: I'll jump in on that one. I mean, <u>we have certainly improved our
operating hours by quite a bit</u>. So we don't expect that, that will have a meaningful
impact on a go-forward basis, and it didn't have as much impact in this first quarter
compared to fourth quarter.

**Second Quarter 2022: Red Robin Quarterly Earnings Calls**

302.    On April 27, 2022, a class action lawsuit, *Miller v. Red Robin*, was filed in
California on behalf of Kitchen Managers, Assistant Managers, and Assistant General Managers
alleging unpaid overtime under California state laws.

303.    Red Robin CFO Lynn Schweinfurth noted $1.8 million in charges related to
litigation contingencies.

**Red Robin Implements "HotSchedules" Platform**

304.    Red Robin CEO Paul Murphy noted:

In the big picture, <u>we have a focused action plan to address a few key areas. Starting
with connection conversations between restaurant leaders and team members to not
only help refine and improve our team member experience, and run great shifts, but
also provide quality training with a focus on back to the basics execution</u>. We are
also offering more competitive wages at the local level and far greater scheduling
flexibility, <u>including the implementation of the HotSchedules platform, which is in
process</u>. We believe the combination of these items will lead to higher job
satisfaction, while optimizing the guest experience, as we seek an ongoing two way
conversation to understand, refine and further improve.

305.    Red Robin CFO Lynn Schweinfurth noted:

Restaurant level operating profit as a percentage of restaurant revenue was 13.6%,
a decrease of 2.1 percentage points compared to 2021, primarily due to the
following: Restaurant revenue increased by $16.5 million, primarily driven by
increased pricing and favorable menu mix shift, partially offset by declining
category traffic. Cost of goods sold increased by 240 basis points, primarily driven
by commodity inflation, partially offset by pricing and rebates. Commodity

inflation was approximately 19% in Q2. <u>Labor costs decreased by 120 basis points, primarily driven by sales leverage and lower group insurance and management incentive compensation costs, partially offset by wage rate inflation.</u> Wage rate inflation was approximately 7.5% in Q2.

…

General and administrative costs were $18.7 million, an increase versus the prior year of $1 million, primarily driven by increased stock-based compensation expense, merit increases, and <u>higher manager-in-training costs partially offset by lower incentive compensation costs.</u>

**Third Quarter 2022: Red Robin Quarterly Earnings Calls**

306.    On July 5, 2022, Red Robin moved for court approval of a $2.95 million settlement for state law class members in *Outlaw v. Red Robin*. This settlement amount was in addition to the offers of judgment previously paid to the hundreds of FLSA opt-in collective action members

307.    Red Robin announced G.J. Hart as Red Robin's new CEO.

308.    Red Robin announced Todd Wilson would be taking over as CFO.

309.    Red Robin announced Sarah Mussetter would be returning to Red Robin as CLO.

310.    Red Robin CFO Lynn Schweinfurth noted $0.1 million in charges related to litigation contingencies.

**Red Robin Announces "North Star" Operations Plan with Corporate Focus on Operations**

311.    Red Robin G.J. Hart noted:

I've spent my initial eight weeks meeting the team, visiting restaurants, digging into the business and learning as much as I can and as quickly as I can. People have always been a key priority for me in building a successful culture in business, and I really have been impressed by the team members I have encountered, both inside the restaurants and at the restaurant support center. My attention is urgently focused on delivering on our brand promise, starting with building an extraordinary restaurant experience and being more relevant to our guests.

New initiatives that we are pursuing to capture the opportunities include, among others, strengthening the restaurant management structure and service model, improving food quality, optimizing the menu with some new items and creating a playful environment that allows our guests to enjoy connecting with friends over a great meal.

After all, this is what Red Robin was built upon. Red Robin will be an operations-driven brand with a maniacal focus on quality execution and being of service to our operators.

We are also looking at how we can improve the efficiency and effectiveness for how we operate our business overall. Our intention is to prioritize capital spending on refreshing our restaurant base.

…

Our implementation of the HotSchedules platform will provide greater scheduling flexibility, which is very important to team members and gives time back to the managers. Our focus will remain on setting our general managers and team members up for success.

While commodity and other operating costs were higher than expected, we do believe that restaurant margins will improve in the fourth quarter and beyond. Lynn will provide more detail summarizing what we are doing to address this.

We are also piloting a refresh program that touches external and internal elements and we will complete a handful of projects in Q4. We will then collect guests and team member feedback and track results to refine the go-forward scope of the work.

I look forward to sharing our North Star vision and strategy, including new initiatives and our 2023 outlook at the upcoming ICR Conference in January.

312.    Red Robin CFO Lynn Schweinfurth noted: "As a result of higher operating costs, we will implement additional pricing during the fourth quarter of approximately 1.5 percentage points starting in November. Importantly, we expect restaurant margins to improve sequentially in the fourth quarter related to incremental price, lower utility usage and lower maintenance costs as

we re-implement internal cleaning and janitorial services now that we have stabilized staffing, which will enable us to improve our margins as we enter 2023."

**Red Robin Anticipates Significant Improvement on Overtime Spending**

313.    When asked about profitability and labor, Red Robin stated:

Analyst: Okay, great. And then secondly, and I'm just trying to put the pieces together as far as what does the profitability model look like for Red Robin as we get to 2023 at the restaurant level. Hearing about improved quality and signature items, and I don't know how much additional that costs on the food cost side to get you where you want to be, improved staffing, including salaried managers.

I guess if you're looking at the recovery in restaurant level margins, importance of maybe investing in labor and food cost for a couple of your key initiatives versus maybe trying to harvest quick wins on restaurant-level operating profit as we're looking out to fiscal 2023? Is it more of an investment year to cement the programs that you've identified?

Red Robin CEO G.J. Hart: Well, listen, as we -- we're not going to -- not to go into some of these initiatives without testing them and understanding what the ramifications and/or investment dollars are. If you take, as an example, the management complement there is significant, in my opinion, there **will be significant improvement on** how we train employees in terms of how we hire employees, the turnover in the restaurants, **the amount of overtime that we're currently spending**.

So, all those factors will be offset by the investment -- the additional investment. In addition, when you're paying more attention to guests and you're allowing our management teams to work with our teams to continue to coach them and be on the floor and be present when we're open, then I believe that we will grow sales.

We're going to learn all that. So, it's not just pure investment dollars. We believe there's a return, and we will definitely look at what those returns will be, and we'll share some of that information as we go forward. So, it's -- I wouldn't say it's a total investment year.

We recognize that we're going into a challenging economic environment. <u>But I also believe that some of these things are necessary for this brand to get back in the direction that we all wanted to from where we've been in some of the decisions of the past, we have to correct those in my opinion</u>.

**Fourth Quarter 2022: Red Robin Quarterly Earnings Calls**

314.    Red Robin noted Rod Jones had joined Red Robin as COO.

315.    Red Robin CEO G.J. Hart noted:

In January, at the ICR conference, we announced our North Star, a [5-point] plan that we expect will enhance our competitive positioning, drive sustainable growth, and build long-term shareholder value. In developing this plan, we reviewed the full history of Red Robin from the parts of the brand and execution that made Red Robin great to any missteps along the way. This plan is a blueprint for the comeback of an iconic brand.

Number 1, to transform us to an operations focused restaurant company. First and foremost, we are going to be operations driven. This means that frontline operators will be involved in all key decisions. They have a voice, their voice matters, and we will listen. We will look to compensate our restaurant leaders as partners by creating a similar program to other companies that I have led.

<u>Under this program, the management team at each restaurant will be compensated every month based on the profits of their restaurant. This will instill a real sense of ownership and drive real time accountability and rewards for performance</u>. We expect to share more communication with the team soon and deploy this compensation model later in 2023.

**<u>We have also restructured both our restaurant support center and operations leadership. These changes are designed to better support our single unit operators by removing bureaucracy and speeding decision making.</u>**

Number 2, elevating the guest experience. <u>In December, we began adding back bussers, hosts, and bartenders, which were removed in the past</u>**.** We will progress with a phased implementation to shift our service model back to a more traditional

service standard where servers have fewer tables and are supported with busser assistance.

…

Number 3, remove costs and complexity. The investments in the guest experience are needed and opportunities to thoughtfully reduce costs provide the funding for those investments in the near term. While the guests felt many of the cost saving efforts in Red Robin's past, we are now focused on changes that uphold the commitment to quality and do not negatively impact the guest experience.

…

We are working to eliminate redundant or unnecessary third-party contracts. We right-sided to support team structure to align with the priorities of the North Star plan. We are utilizing technology and analytics to identify further opportunities and reduce costs.

316.    Red Robin CFO Todd Wilson noted "higher repair and maintenance costs" and stated: "Our guidance for 2023 is as follows: total revenue of approximately $1.3 billion, restaurant level operating profit of at least 13% inclusive of investments in the guest experience, primarily in labor. Selling and general and administrative expense from $120 million to $125 million. Capital expenditures from $35 million to $40 million. Adjusted EBITDA from $62.5 million to $72.5 million."

317.    When an analyst asked, "And just one final one, I wanted to touch on the restaurant level margin guidance and just trying to think through the cadence through the year getting that 13%. I guess the investments that you're making upfront on the labor piece and I guess just trying to think through how that's going to flow as we move through the year and any other cost efficiency initiatives that you might have planned out?"

318.    Red Robin CFO Todd Wilson responded: "Yes, absolutely. The cost efficiencies, we already have implemented some of those. They'll continue to be implemented, but we know

exactly what we're going to do there, just a matter of getting the execution complete, so that will ramp through the year. I think broadly what I may say is, the proof points that we're going to be looking for that confirm to us that we're on the right track are sequential improvements in guest traffic, sequential improvements in guest satisfaction scores, which we're seeing by the way, and sequential improvements in restaurant level operating profit."

319. Red Robin CEO G.J. Hart noted: "One additional Todd, one additional thing that we're doing is, as I mentioned in when we met at ICR, the management complement and going to having a more traditional sense with a managing partner, a kitchen manager and assistant managers that move [fast][ph] going out as well." Red Robin CFO Todd Wilson noted, "The changes that we're talking about really will kick in or have kicked in at the start of the year hereon labor … ."

**First Quarter 2023: Red Robin Quarterly Earnings Calls**

320. Red Robin CEO G.J. Hart noted:

We also celebrated over 700 new sales records established in the first quarter. These are hourly, daily and weekly high watermarks per restaurant. In a brand that is nearly 50 years old, to set more than 700 new records is a testament to the incredible work of our restaurant teams and the overall direction of our company.

Lastly, we printed a meaningful first step to restore restaurant level profitability to historical levels and significant gains in adjusted EBITDA. As I initially shared in January, our blueprint for the comeback of this iconic brand is our Five-Point North StarPlan. The changes we are implementing are designed to cement our competitive positioning, drive sustainable growth and build long-term shareholder value.

Now I will share updates on each pillar of the North Star plan. Number one, we are transforming to an operations-focused restaurant company. This change is well underway as we are involving our frontline operators in all key decisions. With the start of the second quarter, we launched our market partner program to all multiunit operators. This program changes the compensation structure for these partners to reward them based on the profits of the restaurants they oversee. By making this

<u>change, these leaders are incentivized and rewarded for driving and delivering
results.</u> We are learning from the rollout of this multiunit operator program and will
incorporate this learning into our single-unit operator program, which we expect to
launch with the start of 2024.

Number two, elevating the guest experience. Our top 2 investment priorities related
to the guest experience are: number one, staffing at hospitality levels; and number
two, food quality enhancements and breadth of menu options. <u>Our hospitality
model changes and investments represent a return to an industry standard staffing
model and the staffing model Red Robin used for many years to generate great
success. Key changes add back bussers, hosts, bartenders and expo roles that were
eliminated or reduced in Red Robins past and reverting back to our more traditional
hospitality standard where servers have fewer tables and do not rely as heavily on
server assistance.</u> We made significant progress in the first quarter and are more
than 50%complete with these additions. We expect to be substantially complete by
the end of the second quarter.

…

Red Robin has historically presented its burgers wrapped in wax paper, which fit at
the time the brand was developed. With an upgraded burger patty and the best and
fresh ingredients we can source, we think the time has come to showcase the beauty
and deliciousness of our truly Gourmet Burger. Later this year, we will move away
from the wax paper wrapping to introduce new plate wear allowing each burger to
stand tall on its own, next to the plentiful serving of our bottomless fries and other
sides.

…

Number three, removing costs and complexity. In order to help support our guest-
facing investments, we have been hard at work identifying areas where we can
thoughtfully reduce or remove costs that do not impede the guest experience or
detract from our commitment to quality. Our supply chain team has done a great
job identifying and now capturing opportunities that provide our guests a parity or
better product at a reduced cost. In addition, many vendors have partnered with us

to restructure contracts that provide more favorable rates and the opportunity for both sides to benefit as our business grows.

321.    Red Robin CFO Todd Wilson noted, "Restaurant-level operating profit as a percentage of restaurant revenue was 14.7%, an increase of approximately 70 basis points compared to the first quarter of 2022 and a 330 basis point sequential increase from 11.4% in the fourth quarter of 2022. While we experienced cost inflation across many categories, we were able to grow restaurant-level operating profit margin through the growth in comparable restaurant revenue and the initial implementation of cost savings measures."

322.    Further, Wilson noted that despite bringing back bussers, hosts, and bartenders at the end of 2022, and increasing spending on incentive compensation, Red Robin still spent less in labor costs: "In labor expenses, hourly wage inflation was approximately 6%. We also invested approximately $3 million in the quarter to add staffing in the operational roles G.J. mentioned earlier. Additionally, incentive compensation expense for our restaurant management teams increased over $1 million versus the first quarter of 2022 due to the significant gains in sales and profit performance the restaurant teams produced. While these are added costs we see real evidence of the benefits of these investments in guest satisfaction, sales and profit results. Even with these investments, total labor costs declined 60 basis points as compared to the first quarter of 2022, led by leverage from the sales gains.

323.    "In other operating expenses, we experienced lower third-party sales commissions resulting from lower third-party sales mix, which was generally offset by higher repair and maintenance costs. General and administrative costs were $26.8 million, an increase versus the prior year of approximately $2.5 million. The increase is led by accrual of higher incentive compensation expenses and legal and professional fees associated with the sale leaseback and franchise acquisition transactions, partially offset by reductions in staffing levels."

**Second Quarter 2023: Red Robin Quarterly Earnings Calls**

324.    Red Robin CEO G.J. Hart stated:

The simple changes we have already made provide our operators greater ownership
and control of their businesses, and they continue to break sales records. In the first
half of 2023, we have now broken over 900 hourly, daily, weekly and period sales
records. This is an amazing accomplishment for a 50-year-old brand.

…

Now let me provide some brief updates on each of our 5 points of our North Star
plan. First, we are transforming into an operations-focused restaurant company.
Our frontline operators are the most influential people in ensuring our continued
success. This is why we are keeping them front and center in every decision we
make.

They are the ones closest to the action, and so this is paying dividends as we roll
out our guest experience improvements. We want to make sure the goals of our
operators are the same as the goals of our support center and shareholders. As
announced previously at the start of the second quarter, we launched our revamped
market partner compensation program, which rewards our multiunit operators by
allowing them to share in the profitability of the restaurants they oversee. This
incentivizes strong financial results and helps us hire and retain the best of talent
available. We are learning from the multiunit operator rollout, which has been well
received to date and we are developing a single-unit operator program, which we
expect to launch in early 2024.

Second, we are elevating the guest experience. As I mentioned earlier, we are
seeing traction amongst our guest base evidenced by increases to our overall
satisfaction. This is a direct result of the people, food and hospitality investments
we have made to improve their experience. We are focused on the quality of staffing
and delivering on our promise of unbridled hospitality. We have returned our
overall hospitality model to what it was during Red Robin's long and successful
history, beginning with service being responsible for fewer tables so they can
deliver a great experience to each guest while minimizing the false waits that have

occurred in the past.

Other staffing improvements include adding back busters, which has driven increases in cleanliness ratings, staffing at the host stand, which has improved wait times and bringing back the dedicated expo, who is responsible for the in-restaurant execution of every order. The additions we targeted for all of these roles are now substantially complete. Finally, we know having the right management complement in place at each restaurant is paramount to ensuring consistent execution.

So far this year, we've added over 200 dedicated kitchen managers and expect to substantially complete our management complement investments by year-end.

…

Third, removing costs and complexity. To fund our guest-facing investments, we identified a number of non guest-facing cost savings opportunities. Our supply chain team has done a fantastic job collaborating with our vendor partners finding smart cost savings levers and recurrent products at the same or better quality at a lower cost. Year-to-date, we have saved approximately $3 million and expect the savings rate to accelerate in the remainder of 2023.

325.    Red Robin CFO Todd Wilson noted a severe increase in catering orders: "Catering generated approximately $23 million of revenue in fiscal 2022 and has grown 44% in the first half of 2023 and as compared to last year. The team has done fantastic work building and growing this business, and we believe plenty of opportunity remains."

326.    Wilson further noted: "Restaurant-level operating profit as a percentage of restaurant revenue was 12.6%, a decrease of approximately 100 basis points compared to the second quarter of 2022. Directionally, this change was expected, as we said on our last conference call, and the actual result was better than our internal target. The reduction was driven by inflation across all cost categories and our intentional investments back into the guest experience through both food quality and staffing levels."

327.    Wilson noted: "We invested approximately $5 million in the quarter to add staffing across the different roles G.J. reviewed earlier. This amount substantially represents the quarterly run rate of our people investments and increased total labor to approximately 37% of restaurant revenue in the second quarter. We anticipate a lag effect from the time that we make investments like this until we see the return in the form of increases in guest traffic. Intime, we expect these added resources to gain mastery of their role and build efficiency. In addition, we expect traffic growth to leverage our fixed costs. Together, we anticipate these levers can drive total labor as a percentage of restaurant revenue back to Red Robin's historical run rate of approximately 35%."

**Third Quarter 2023: Red Robin Quarterly Earnings Calls**

328.    Red Robin CEO G.J. Hart noted Red Robin had removed their "virtual brands" due to their complexity: "Additionally, we made the decision to discontinue the virtual brands that were added in2020. While this type of offering had its place during the depths of COVID, multiple brands, products and procedures created unnecessary complexity for our operators and distracted the focus of executing a great Red Robin experience."

329.    Regarding the "North Star" plan, Red Robin CEO G.J. Hart noted:

First, we are transforming into an operations focused company. Our success rests on the success of our operating partners and restaurant leadership teams. They are leaders of their restaurant and make the Red Robin experience come to light for their guests and team members. Our operations leaders now have expanded decision making authority and are actively involved in our entire decision making process. They will then share in the rewards of the positive impact of these decisions as they're made.

It has now been two full quarters since we revamped our market partner compensation program for multi-unit operators. They now rightfully see themselves as owners of the restaurants they oversee and are rewarded based on their profits. They're incentivized to deliver strong financial results like never before and have unlimited upside earnings potential. This helps to recruit and to

retain the best talent available. The multi-unit operator rollout has gone exceedingly well and we are currently preparing to launch the single unit operator managing partner program in early 2024.

…

Finally, <u>we have added more than 250 dedicated kitchen managers</u> and expect to substantially complete our manager complement investments by year end.

…

Third, we are removing costs and complexity. <u>To help fund our investments back int othe guest experience, we have been identifying and then capturing numerous non guest facing savings opportunity</u>. These efforts have been centered in the fantastic work of our supply chain team who have found smart saving levers and have been able to produce products from our vendors of the same or better quality at a lower cost.

…

Fifth, driving growth in comparable restaurant revenue and unit-level profitability to deliver financial commitments. We are taking a holistic approach to our decision-making engineering the comeback of Red Robin to create a healthy, sustainable, and growing business for the long term. <u>While comparable restaurant revenue declined in the third quarter</u>, we expected that outcome and the decisions that led to it, as I discussed earlier, are the absolute right decisions to set Red Robin up for long-term success.

330.    Hart also emphasized Red Robin's new menu, which significantly increased the operational complexity of the Back of House:

In early October, we took our commitment to returning our burgers to true gourmet status to the next level, unveiling new and improved recipes for each one of our more than 20 gourmet burgers now prepared with higher quality and more flavorful ingredients to deliver on our guest promise and a competitive elevated burger experience.

We began communicating these improvements to guests under the banner of Turn Up the YUMMM that builds on the tremendous consumer recognition of our long-term YUMMM tagline. In addition to our relaunch burger lineup, we introduced new entrees, appetizers, beverages, and seasonal additions to delight our guests with new innovation and provide optionality within the key menu categories that help build check.

With this launch, we have now upgraded ingredients including mayonnaise, vine-ripened tomatoes, buns, pickles, fresh pineapples, our sauces, and many other items. In total, we have made enhancements to 85% of our menu. The new menu includes the first executions of our strategy to broaden both the offerings of menu items and the price points under our barbell pricing strategy. And we have added new proteins with the Tsunami Shrimp and the Whiskey River Barbecue Ribs. Our culinary has also developed an amazing Barbecue Burnt Ends Bacon Burger, smashed avocado and Bacon Burger, and we returned a fan-favorite burning love. While only in place for a few weeks, we have seen great trial on these new and premium price items.

Additionally, the appetizers we added are driving incremental incidents of appetizer purchases. As part of our regular practices, we regularly survey our loyalty database and amongst the most dedicated guests who have dined with us over the last quarter, we're seeing positive sentiment.

331.    Red Robin CFO Todd Wilson noted, despite making bonuses based on restaurant level operating profits, that such continued to decline: "Within off-premise, catering remains a bright spot increasing 27% as compared to the third quarter of 2022. Catering is a fast growing segment and the team is doing great work to capture this opportunity. Restaurant level operating profit as a percentage of restaurant revenue was 11.1%, a decrease of approximately 150 basis points compared to the third quarter of 2022. The reduction was driven by our intentional investments back into the guest experience through both staffing levels and food quality and the deleveraging impact of the comparable restaurant sales decline."

332.    Further Wilson noted: "**The investment includes additional restaurant level**

**management which is fixed in nature** and therefore deleverages with the lower sales in the third quarter, increased hourly team number staffing levels in both the front and the back of the house, food quality upgrades, and finally improved execution by our operational teams to our operating standards. Inflationary pressure continues to moderate. While inflation is present, we see what we consider to be much more normalized levels."

333.    When asked about labor, Red Robin CEO G.J. Hart was clear Red Robin's profits correlated with decreased overtime:

> The labor side itself, we've been 37% to 38% between Q2 and Q3. And I think in the near term, that's a fair way to think about our near-term run rate. In time, we certainly expect that to get back to the 35% to 36% range in part with traffic growth and leveraging those sales. <u>But quite frankly, there's near-term opportunities there. One, we've brought on a number of new team members as they gain experience and mastery of their jobs. We certainly expect that there would be efficiency there.</u>
>
> And two, we're looking at things like <u>overtime</u> where we want our restaurants to have the right amount of labor. And so it's not an hour reduction. <u>But saving that halftime of pay is a meaningful number for us.</u> And so there are things that we can do in the near term to manage that number appropriately while still giving a great guest experience on our way back to that 35% or 36%.

**Fourth Quarter 2023: Red Robin Quarterly Earnings Calls**

334.    On December 1, 2023, Red Robin moved for court approval of a $3.2 million settlement for class members in *Miller v. Red Robin*.

335.    Red Robin G.J. Hart noted that Back of House would now have to hand-bread fresh chicken breast, while also stating that Red Robin had removed complexity: "Third, we removed cost and complexity. To help fund investments in guest experience, we continually identify and capture numerous non-guest-facing savings opportunities. These efforts have been centered around the fantastic work of our supply chain team, who have found smart saving levers and have been

able to procure products from our vendors of the same or better quality at a lower cost. For example, in the fourth quarter, we changed from previously using a frozen pre-vetted chicken breast to now freshly hand battering in the restaurant. This change alone accounts for nearly $5 million annual savings and delivers a tremendous quality, flavor and helpful improvement for our guests. This type of change illustrates how we think about cost savings as changes that are beneficial to both our guests and to Red Robin."

336.    Hart also noted significant savings: "Finally, we plan to continue removing cost and complexity to strengthen our financial model. In addition to the rollover benefit of approximately $8 million from initiatives started in 2023, we expect to generate an additional $11 million of cost savings from new initiatives that we plan to launch in 2024 for a total of $19 million in targeted incremental cost savings. We continue to see opportunities in our supply chain, and we have launched initiatives to support our operators through upgrades to tools like theoretical food costs and hourly labor and overtime management."

337.    Red Robin CFO Todd Wilson noted, after multiple quarters of decreased restaurant level operating profit: "Restaurant level operating profit as a percentage of restaurant revenue was 12.2%, an increase of approximately 90 basis points compared to the fourth quarter of 2022. The improvement was driven by cost-saving initiatives and cost of goods and other operating expenses, menu price increases and reduced discounting. Additionally, the inflation environment continues to improve. The rate of inflation across all major cost categories, including commodities, wages and operating expenses, was in line with or reduced from levels experienced during the third quarter."

**First Quarter 2024: Red Robin Quarterly Earnings Calls**

338.    Red Robin CEO G.J. Hart stated:

Starting with operations, service is the backbone to our turnaround efforts as we

work to ensure every guest has a great experience in our restaurants, rain or shine. As we have spoken to previously, we spent much of 2023 improving our operations. We did this through labor investments, including adding servers, so they can focus their effort on fewer tables, adding back bussers, adding a dedicated expo and bringing back more than 250 dedicated kitchen managers. We also made investments in our food, including flat top grills, which deliver a thicker, juicier and more flavorful burger, unveiled more than 20 improved gourmet burgers prepared with higher quality and more flavorful ingredients, <u>expanded our bottomless menu</u> and upgraded our bar menu to include higher quality brands that our guests know and love.

Additionally, as part of our operations improvements, <u>we launched the partner compensation program for our single unit operators at the start of 2024</u>. Through this program, the operators now see themselves as owners of the restaurants that they oversee and are rewarded based on their profits. The feedback has been positive, and we are thrilled to align the entire organization around the unified goal of driving traffic and ultimately profit dollars.

339.   Red Robin CFO Todd Wilson stated, after one quarter of restaurant-level profits, that such had again decreased: "Restaurant level operating profit as a percentage of restaurant revenue was 11%, a decrease of 370 basis points compared to the first quarter of 2023. The decline was mostly driven by our strategic investments in labor and food quality to support hospitality and the guest experience. This investment is the foundation for improved financial performance as we expect it to drive guests back into our restaurants and increase profitability."

340.   Wilson further noted corporate control over restaurant-level staffing: "<u>We made the decision to maintain labor levels</u> in the January and February periods despite adverse weather events that make it difficult to project sales and guest counts to ensure our guests receive a great experience when they choose to visit our restaurants. While this created near-term margin pressure, we see the benefit of that decision in our guest satisfaction scores and believe all of the investments

we have made to date are beginning to pay dividends as evidenced by our positive comparable restaurant sales increase of 0.3% in the first five weeks of the second quarter as compared to the same weeks in 2023.

**Second Quarter 2024: Red Robin Quarterly Earnings Calls**

341.    Red Robin CEO G.J. Hart emphasized Red Robin Corporate's tracking of restaurant-level reviews:

> Importantly, the improvement in guest satisfaction is showing up through many different sources, including dine-in overall guest satisfaction scores have increased 6%, BlackBox social net sentiment is up 17% and negative guest complaints are at an all-time low, declining 29% versus the second quarter last year.

> Providing a great guest experience to our guests remains the single most important element to improving the performance of our business and is the largest contributing factor to deliver growth in guest traffic counts.

> It requires a relentless pursuit of executing the fundamentals at every level, which our teams are dedicated to pushing toward every day on every shift for every guest, and we are truly proud of the significant progress that we are making on this front.

342.    Red Robin CFO Todd Wilson noted: "First, our newer leaders and team members are working to build mastery and efficiency in their roles, resulting in a near-term increase in labor costs that we expect to normalize in time." … "We expect G&A expenses will be approximately $81 million in 2024, reduced from our initial expectations due to <u>anticipated lower incentive compensation expenses and other cost savings measures</u>."

343.    Red Robin CEO G.J. Hart noted: "<u>From a labor perspective, as you know, we've added a lot of investment back into labor. Well, getting those folks from **managers** all the way down to hourly team members, both front and back, getting them trained, **getting them used to executing at the level that we require** and get more proficient at it, that's going to help drive our overall labor costs to be more efficient and it will drive labor costs down</u>. And so we feel like

we're better staffed than we've been in a long, long time. We feel like we've got much better quality staff and that, that will also pay dividends into 2025."

344.    An analyst asked: "I follow-up I want to follow-up to the labor question. And let me just ask, I mean, you staffed up and trained up and yet as the industry environment guests aren't coming to the degree you expected. So how do you kind of philosophically think about taking care of the financials for company as levered as you guys are and making sure you don't kind of backslide on labor? Because I think it's clearly obviously things change in the environment, so I assume you're tightening up labor a little. But to your point, you're now got some trained people who can actually deliver what you want to the guests. So just wondering how you your puts and takes on that and how much risk you're willing to take on losing good staff versus the financial side of things?"

345.    Red Robin CEO G.J. Hart responded: "Yes, sure. I'll give a shot at that as best as I can here. When I said that we fully expect 25% to get better because our folks are trained, remember one thing, this industry still has 100% plus turnover. Even though our turnover continues to come down and we're doing I think really well against the industry from a turnover perspective, you're constantly training. So it's really incumbent upon our training teams, our trade team center restaurants as well as our managers. And the managers, all that we put in place, remember, there's over 300 kitchen managers in 2023 and now into 2024 that we've added on. It takes a while before they get up to speed and that's really where we're going to start to see that leverage. I've been at this a long time and I'll just tell you that at the end of the day you have to deliver on the promise to our guests on food quality and execution on hospitality. It takes a certain amount of investment to do that and the company had really, as you know, and we've talked about had declined on both of those and that investment we've put back in."

**Third Quarter 2024: Red Robin Quarterly Earnings Calls**

346.    Red Robin CEO G.J. Hart noted food promotions, which do not contribute to a restaurant's labor budget, on mid-week days, which Red Robin staffed more leanly than the weekend days:

> During the first half of 2024, we are also prepared and tested other tactics beyond traditional marketing spending to drive guest visits. First is our successful loyalty relaunch that I'll talk about more in a moment. Second, is what we like to call appointment dining. These are selective and targeted promotional offers and currently include Monster Monday, where we serve Monster size items at reduced prices, including a $2 Monster burger patty upgrade, a $4 Monster Milkshake and $5 margaritas. On Tuesdays, guests can enjoy a $10 gourmet cheeseburger with a bottomless side. And on Wednesdays, kids meals are 50% off and include entree bottomless side and a drink.
>
> You'll quickly notice that these promotions have a few things in common. First, the promotion targets, days of the week that are less busy and we can drive incremental traffic. Second, the promotions target our ability to up-sell additional items to drive average check and introduce new favorites. And third, and most importantly, the promotions are largely dine-in only.

347.    Red Robin CFO Todd Wilson discussed Red Robin's relaunch of the Hot Schedules labor management tool, and emphasized the need for "labor efficiencies:"

> Our team continues to do great work pursuing and capturing thoughtful cost savings that maintain our commitment of parity or better for the guest experience. Cost savings in 2023 and 2024 to date have been primarily captured through our efforts to optimize the supply chain. While we continue to see further opportunity in that area, in addition, we are now actively pursuing operating efficiencies to drive an increase in restaurant level profitability. We expect these efficiencies to come from the reboot of our actual versus theoretical food cost measurements and reporting that we launched earlier this year and a similar relaunch of our Hot Schedules labor management tool in the third quarter.

While the North Star plan included an intentional investment in labor that has successfully elevated the guest experience, achieving our objectives requires that we deliver these efficiencies. <u>We are encouraged with the initial traction our operators have demonstrated over the past several weeks, delivering on both more efficient labor and maintaining our elevated guest satisfaction scores</u>.

348.     Red Robin CEO G.J. Hart noted the Regional Operations Directors' role in restaurant-level staffing: "So well, first and foremost, driving positive traffic is going to improve sales. So that's first and foremost. We're continuing to -- we make comments around our <u>productivity relative to labor</u>, and <u>we are very optimistic with our relaunch of hot schedules with the teams and the operating teams really drilling down</u>, getting more trained from where we were on a lot of the hiring and the investments we made over the last 18 months. So we're happy with those trends. So we'll continue to see improvement there."

349.     Red Robin CFO Todd Wilson stated: "We've talked about the actual versus theoretical food cost launch that I'm sure you know typical in the industry there and really just measuring on a dollar basis and percentage basis, what would the recipe have called for and then what did we use. <u>And in terms of the labor management that we addressed, hot schedule is, again, an industry leader in terms of helping restaurants manage labor that really isn't hours driven, right</u>? Given the frequency or the pattern of guests coming in, how many hours would you expect to use and then how many hours do you use, right? There's good learning and teaching that comes on a restaurant-by-restaurant basis with that. But I think it's -- to some degree, it's all of the above, right? <u>GJ said, we're looking at every line item, and that's our commitment to this business is to help our operators succeed</u>."

350.     Red Robin CEO G.J. Hart further commented on that, "The other thing that we're doing, too, Andy, is taking a look at like-for-like restaurants, so the cohorts and how they're performing within each of those line items, specifically around labor and making sure that you tie

that together with the scheduling and the proformas and making sure that everyone is understanding where they sit against the other and then sharing best practices amongst each other. So that's another good way that we're doing it. And lastly, we're taking a long, hard look. We have a heavy concentration of restaurants on the West Coast. And so as you -- as everyone certainly knows that labor costs on the West Coast are significantly higher than they are in the rest of the country. And then what's the ability for us just to continue to improve that productivity, as well as taking a look at our pricing consistently against others, as well as the market in general to making sure that we're keeping pace because that is the biggest difference that we have on the West Coast. So, all those kind of things that we're measuring and really taking a long hard look at and have better metrics than we've ever had to be able to make adjustments and improvements."

**Fourth Quarter 2024: Red Robin Quarterly Earnings Calls**

351.    Red Robin CEO G.J. Hart described continued corporate control of restaurant-level operations, stressing the important of cutting labor costs through "labor efficiency:"

> Finally, in 2024, we successfully launched our Managing Partner Compensation Program, empowering our operators to function as a partner and owner of the restaurants that they oversee.

> Now, that every operator in our system is under this compensation program, we have aligned the entire organization around a unified goal of driving growth in both traffic and profit dollars and we're expecting to see continued benefits from the program as we move through 2025.

> …

> While we're pleased with the progress we've made under the North Star plan, we have two key priorities in 2025 to continue our comeback. First, further improve our traffic trends. Second, gain efficiency in our operations to deliver growth in restaurant and corporate level profitability.

> …

Throughout 2024, we put our resources behind arming our restaurant teams with information and the tools needed to drive everyday efficiency. We launched new dashboards and scorecards to inform our teams. We reconstructed and relaunched actual versus theoretical food cost measurement and reporting in the second quarter and we rebooted the Hot Schedules labor management tool in the third quarter.

While these tools now are in the hands of operators, the data used to drive these programs along with our team's efficiency in using them improves by the day and we expect we will continue to benefit in 2025.

As we go forward, our focus will be to maintain our improved hospitality and guest experience, while creating efficiencies throughout our P&L to drive growth in restaurant level and corporate profitability. This is showcased in our margin guidance with gains of at least 120 basis points in 2025.

In 2025, we expect to become much more efficient with our labor costs and this is the primary driver of our expected increase in restaurant level operating profit. We were pleased to recapture our base level of expected labor efficiency in the fourth quarter on the back of the Hot Schedules implementation.

Maintaining this fourth quarter level of efficiency would result in approximately $6 million or approximately 50 basis points of savings through the first three quarters of 2025.

During the first quarter of 2025, we are also streamlining our opening and closing procedures to further reduce our cost structure as we have other efficiency measures in test that we are very optimistic will deliver additional benefits.

…

Increasing the profitability of our restaurants requires dedication to both delivering a great guest experience to grow guest traffic and the diligence to manage the cost side of the business. We are committed to both and I am confident we are on the right track to deliver our targets in 2025.

352.    Red Robin CEO G.J. Hart described the continued changes and increase in

complexity surrounding Red Robin's new menu:

> Turning to the menu, we expect ongoing new menu items and innovation
> throughout the year, starting with the launch of our Hot Honey platform in March.
> The platform will include a Hot Honey Crispy Chicken sandwich, wings, and pizza
> offering. We are excited to launch these great menu items and I would note the Hot
> Honey pizza is the most successful LTO our partners at Donatos have ever
> launched.

> We'll share more as the year progresses, but we expect to introduce additional items
> over the course of the year, including great salad options and LTOs for the summer.
> Classic Red Robin burgers our guests have loved over the years and we may
> introduce a new flavor profile or two from around the globe to deliver our guests
> the amazing flavors that they can only get at Red Robin.

> We expect to continue to prioritize everyday value as a means to grow visits with
> our current guests and drive new guest trial of our quality and experience upgrades.
> This includes maintaining our successful Monster Mondays, $10 Cheeseburger
> Tuesdays, and Kids Night Wednesday promotions.

> $10 Cheeseburger Tuesday as an example has continued to prove successful in
> driving double-digit traffic growth and incremental visitation on a typically quieter
> day of the week.

353.    Red Robin CFO Todd Wilson stated: "Turning to 2025, our three financial priorities
for the year are; first, deliver our 2025 financial guidance commitments; second, drive continued
gains in traffic and **aggressively capture operating cost efficiency, particularly in labor**; third,
position ourselves to be able to refinance our debt."

354.    Red Robin CEO G.J. Hart noted: "You have to remember that during this whole
comeback process and journey, we've had we've hired 800 managers. We've had to train those
folks. We've had to retrain every single person in the company on not only what we're doing and
its expectations from a hospitality perspective, but how do we cook product and all of that. And

so it carries --so all that work's been done over the last couple of years and so we believe we can get a ton of efficiency, particularly in the labor line as we go through 2025. … We're at the point now where we can definitely start to ramp up the pressure that we put in terms of the expectations on financial performance."

355.    An analyst asked: "And then let's just come back to some of the initiatives here on driving restaurant level margin. So, kind of roughly 100, maybe 200 basis points during the year. And it sounds like you have some great labor initiatives going on. I wanted to get a sense for of that range of improvement from the 10.8% that you saw in 2024. What portion of that do you expect to come from labor versus COGS or other line items? **Regional managers started directing and controlling restaurant level decision making?**"

356.    Red Robin CEO G.J. Hart responded, "<u>Yes, the vast majority, Jeremy, will come from labor.</u> Our COGS generally are at a point, they're pretty low in the first place. So, I don't expect a lot of it to come from there. The majority will come from labor."

**First Quarter 2025: Red Robin Quarterly Earnings Calls**

357.    Red Robin introduced Dave Pace as Red Robin's new CEO.

358.    Red Robin's former CEO G.J. Hart noted, "First, we took steps to make Red Robin an operations focused company through our managing partner program, which incentivizes our restaurant leaders to deliver strong and balanced financial results. … And lastly, we drove growth in comparable restaurant revenue and unit level profitability in both the fourth quarter of 2024 and the first quarter of 2025. On our last call in February, I shared that in 2025, <u>we expect to become meaningfully more efficient and productive with our labor costs</u>. Todd will expand on this in a moment, but I'm proud of the work the team accomplished to deliver on this goal in the first quarter and I'm confident it will continue from here."

359.    Red Robin CFO Todd Wilson noted restaurant-level profits had returned to positive

after a decline: "Restaurant level operating profit as a percentage of restaurant revenue was 14.3%, an increase of 330 basis points compared to the first quarter of 2024. If you recall, <u>one of our focus areas for 2025 is to become meaningfully more efficient with our labor costs</u>. We're pleased with our results in the first quarter as our operators delivered traction faster than we expected. … Adjusted EBITDA increased due to cost efficiency gains throughout the P&L and particularly in labor and the benefit of menu price increases."

360.     Wilson further noted: "One, we were really encouraged in Q1 and that's part of the way that we beat it. It's frankly the primary way that we beat our profit expectation in Q1. <u>Our team really got after labor quickly and we saw a lot of fast progress there, faster than we expected</u>."

361.     Red Robin CEO Dave Pace noted: "I also spent some time in restaurants in the first few weeks and those are some of the things that I heard operators want -- they want -- give them the tools to be successful. The tools to be successful included the things that they've been given, which are getting the labor and the hospitality right and getting the food right. Giving me the technology that I need to run my restaurants, give me a good looking restaurant that I'm proud to bring people into and figure out how to connect with our consumers with compelling messaging and offers that drive traffic. That's what operators want. They want to be successful. And I think the other thing on that is to build on that is I think the output of the partner program that was put in place is that they'll be rewarded for that, they'll get the benefit of success if we give them the tools to be successful."

**Second Quarter 2025: Red Robin Quarterly Earnings Calls**

362.     On August 13, 2025, Red Robin held their second quarter of 2025 quarterly earnings call. <u>Red Robin CEO Dave Pace noted that "[s]ince stepping in as CEO in early Q2, challenges facing our business have come further into focus</u>."

**Red Robin Introduces its New "First Choice" Plan**

363.    Pace introduced Red Robin's new plan: "To quickly recap, our "First Choice" Plan consists of the following: first, Hold Serve, protect and build on the foundations established under the North Star plan; second, Drive Traffic, creatively engaged with guests and inspire  visitation; third, Find Money, manage profits, expenses and assets to reduce debt and allow for critical reinvestments; fourth, Fix Restaurants, invest in the physical estate to improve the overall dining experience; and fifth, Win Together, create a high-performance environment that attracts and retains the best talent in the industry."

364.    Again, Red Robin's new plan centers on reducing labor costs through increased efficiency. Red Robin CEO Dave Pace stated: "First, let's talk about Hold Serve. As we spoke to on our last call, we were very pleased with both level of labor efficiency our operators achieved in the first quarter and how fast they achieved it, given that we expected it to accelerate more gradually through 2025. As we formulated the "First Choice" Plan, <u>we made Hold Serve first pillar in the plan to focus our operators on maintaining this level of execution going forward</u>. The great news is that in Q2, our operators continue to do what they do best, run great restaurants and deliver great food and service. The increased efficiency they achieved in the second quarter drove a 270 basis point improvement year-over-year in restaurant level operating profit margin entirely driven by 300 basis points of labor improvements."

365.    Page continued, describing Red Robin's significant deferred maintenance: "Next, I want to touch on our Fix Restaurants effort. Investments and upgrades we've made over the past 2 years in food and hospitality have elevated the guest experience. The next leg of this journey is to fix our restaurants to better align the atmosphere with modern- day standards and achieve parity or better with the broader casual dining industry. To achieve this, we plan to invest in critical deferred maintenance, including flooring [ updates ], internal finishings, furniture repairs and

external improvements like paint, lighting and landscaping that directly impact guest perceptions and their experience. The pathway to address the entire system will take time but we're taking a strategic approach to piloting refreshes across approximately 20 restaurants in 4markets ahead of our "First Choice" marketing launch later this year. This will allow us to understand the impact of these packages and fine-tune where to invest additional capital ahead of a more fulsome company-wide rollout. While we're in the very early stages of this initiative, I'm pleased with the image that our refreshed restaurants will present and believe it will set a more inviting foundation to complement our traffic growth objectives and actions."

366.    Pace also commented on the important of continued "operational efficiency;" "Lastly, I want to talk about the Win Together plank of our strategy. As I've visited restaurants over the last 3 months, I heard team members tell me that they knew what we needed to do, but they needed help to do it. They wanted a value offering to be able to compete in the marketplace. They wanted to be able to fix their restaurants to address long-standing maintenance and repair issues, and they wanted technology and tools within the restaurant to help them execute more efficiently to deliver the improved operating performance that they are being asked to deliver. As we drive our guest-centric culture, we looked at each of these problems through the lens of our guest perceptions and we've committed to giving our operators the tools and environment that they need to be successful. During the last 2 quarters, we completed multiple new technology implementations with more to come. By taking this approach and listening closely to the input from our restaurant teams, our operators see that we're in this together, and we're working by their sides to support them and give them the tools that they need to win and deliver the results that we are asking for. With that in mind, I want to extend a heartfelt thank you to the more than 20,000 team members we have across the country. Your dedication to outstanding hospitality every day is what drives our success and will be key to driving our future results. We're very pleased with

the profitability performance of the business in the second quarter, and I look forward to winning together as we continue to work to drive the comeback of this iconic brand."

367.    Red Robin CFO Todd Wilson noted restaurant profits due to "labor efficiency:" "Restaurant-level operating profit as a percentage of restaurant revenue was 14.5%, an increase of 270 basis points compared to the second quarter of 2024. **This was primarily driven by the continued success of our operations team delivering significant gains in labor efficiency**. … Adjusted EBITDA increased due to cost efficiency gains, particularly in labor, the benefit of menu price increases and reduced selling expenses."

368.    Regarding Red Robin's "labor efficiency," Red Robin stated:

Analyst: Wanted to explore this kind of journey to labor efficiency that your teams have been delivering against so strongly in the first half year. Where are we in that process, if you're setting kind of an optimal level that they're striving towards and maintaining the customer experience, which you obviously are to date, how much more meat is left on that bone? And as we look to the guidance for full year restaurant level operating margin being maintained at 12% to 13%. Can you decompose how much of that is the incremental value mix expectations with Big Yummm? And how much of that pressure comes from the higher commodity outlook, it sounds like you have for the second half?

Red Robin CEO Dave Pace: Yes. Thanks, Todd. It's Dave. I'll address the first half, and I'll let Todd talk about the construct of the balance of the year**. I think, look, our operators have become much more disciplined in managing through a labor matrix.** That involves being confident and more accurate in their forecasting and then scheduling against their forecasting, which they've done effectively. I would tell you that, that number has continued to come down consistently. It hasn't been choppy. It's kind of been steadily, although less accelerated than it was in the early part of the year, in declining. And so I think they're continuing to improve their ability to manage to that matrix. We haven't kind of articulated a specific target that we're trying to get to because we don't want

to compromise the guest experience. <u>If we see compromises in the guest experience, then we'll consider backing off a little bit</u>. But Jesse and the team have done a terrific job, and we look for that to continue as long as they can.

Red Robin CFO Todd Wilson: Todd, I'll add in on as it relates to Big Yummm and the restaurant level margin guidance being maintained for the year, you heard it in the prepared remarks, both from Dave in terms of reinvesting over delivery as well as in some of my comments. But I'd say at a headline, what's embedded in our guidance for Big Yummm, we think it's about a 1% drag on restaurant level profitability in the balance of the year. That's obviously a trade-off that we're making to incent guests to come in and obviously then in turn, come back in future quarters and future years. But in the near term, that near-term investment that I talked about, we think it's about a 1% drag in the balance of the year. <u>Call it roughly half of that is in labor</u>. The other half is spread throughout the P&L, but that's the way we see it developing (emphasis added).

369.    On August 13, 2025, Red Robin held their second quarter of 2025 quarterly earnings call; they were represented by CEO Dave Pace and CFO Todd Wilson. On September 10, 2025, the undersigned attorney filed a collective and class action lawsuit in the Southern District of Illinois seeking a nationwide collective action and Illinois and Missouri class actions in. *See* Ex. J, (*Complaint in Lemasters et al v. Red Robin International, Inc, 3:25-cv-1762)*.

370.    On October 1, 2025, a Tolling Agreement was entered into in *Lemasters et al v. Red Robin International, Inc*.; that agreement tolled the statute of limitations until January 17, 2026. *See* Ex. K, (*Tolling Agreement in Lemasters et al v. Red Robin International, Inc, 3:25-cv-1762)*.

371.    On November 5, 2025, Red Robin announced the resignation of CFO Todd Wilson. Red Robin also announced Jesse Griffith as Red Robin's new COO.

372.    On November 27, 2025, Red Robin announced Christopher Meyer would serve as Red Robin's interim CFO on a contract basis.

**FIRST CAUSE OF ACTION**
*FLSA Unpaid Overtime*
**Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et. seq*.**
**Brought on Behalf of Plaintiffs Clawges, Leach, Mitchell, Brown, Morgan, and All**
**Collective Action Members**

373.    Plaintiffs, on behalf of themselves and all Collective Action Members, re-allege
and incorporate by reference the allegations set forth in paragraphs 1 through 372, as if fully set
forth herein.

374.    At all relevant times, Defendant has been, and continues to be, an employer engaged
in interstate commerce and/or the production of goods for commerce, within the meaning of the
FLSA, 29 U.S.C. §§ 206(a) and 207(a).

375.    At all relevant times, Defendant employed Plaintiffs, and employed or continue to
employ, each of the Collective Action Members within the meaning of the FLSA.

376.    Defendant has engaged in a widespread pattern and practice of violating the FLSA,
as described in this Complaint.

377.    Plaintiffs have consented in writing to be parties to this action, pursuant to 29 U.S.C.
§ 216(b).  *See* Exhibits A through H.

378.    The overtime wage provisions set forth in 29 U.S.C. §§ 201, *et seq*., apply to Red
Robin.

379.    At all relevant times and continuing to the present, Defendant has had a policy,
pattern, and practice of refusing to pay premium overtime compensation to their Salaried Managers
for hours worked in excess of 40 hours per workweek.

380.    As a result of Defendant's willful failure to compensate its employees, including
Plaintiffs and the Collective Action Members, at a rate not less than one and one-half times the
regular rate of pay for work performed in excess of 40 hours in a workweek, Defendant has
violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201, *et seq*., including 29 U.S.C. §§

207(a)(1) and 215(a).

381.    As a result of Defendant's willful failure to record, report, credit, and compensate its employees, including Plaintiffs and the Collective Action Members, Defendant failed to make, keep, and preserve records with respect to each of its employees sufficient to determine the wages, hours and other conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. §§ 211(c) and 215(a).

382.    As a result of Defendant's policy and practice of minimizing labor costs by underfunding labor budgets for its restaurants, Defendant knew or recklessly disregarded the fact that Plaintiffs and the Collective Action Members were primarily performing manual labor and non-exempt tasks.

383.    Due to Defendant's (a) failure to provide enough labor budget funds; (b) failure to take into account the impact of the underfunded labor budgets on the job duties of Plaintiffs and the similarly situated Collective Action Members; (c) actual knowledge, through its Regional Operations Directors that the primary duties of Plaintiffs and the similarly situated Collective Action Members were manual labor and other non-exempt tasks; (d) failure to perform a person-by- person analysis of Plaintiffs' and the Collective Action Members' job duties to ensure that they were performing exempt job duties; and (e) policy and practice that did not allow Plaintiffs and Collective Action Members to record all hours worked, Defendant knew or showed reckless disregard that its conduct was prohibited by the FLSA.  29 U.S.C. § 255(a).

384.    As a result of Defendant's FLSA violations, Plaintiffs, on behalf of themselves and the Collective Action Members, are entitled (a) to recover from Defendant unpaid wages for all of the overtime hours worked, as premium overtime compensation; (b) to recover an additional, equal amount as liquidated damages for Defendant's willful or reckless violations of the FLSA; and (c) recover unreasonably delayed payment of wages, reasonable attorneys' fees, and costs and

disbursements of this action, pursuant to 29 U.S.C. § 216(b).

385.    Red Robin's violations of the FLSA have been willful or reckless, thus a three (3)

year statute of limitations applies, pursuant to 29 U.S.C. § 255.

**SECOND CAUSE OF ACTION**
*FLSA Withheld Tips*
**Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 531 *et. seq.***
**Brought on Behalf of Plaintiffs Clawges, Leach, Mitchell, Brown, Hoffman, Morgan, Taylor,**
**Leasure, Rees, and All Collective Action Members**

386.    Plaintiffs, on behalf of themselves and all Collective Action Members, re-allege

and incorporate by reference all preceding paragraphs as alleged above as if fully set forth herein.

387.    At all relevant times, Defendant has been, and continues to be, an employer engaged

in interstate commerce and/or the production of goods for commerce, within the meaning of the

FLSA, 29 U.S.C. §§ 206(a) and 207(a).

388.    At all relevant times, Defendant employed Plaintiffs, and employed or continue to

employ, each of the Collective Action Members within the meaning of the FLSA.

389.    Defendant has engaged in a widespread pattern and practice of violating the FLSA,

as described in this Complaint.

390.    Plaintiffs have consented in writing to be parties to this action, pursuant to 29 U.S.C.

§ 216(b).  *See* Exhibits A through H.

391.    The tipped employee provisions set forth in 29 U.S.C. §§ 531, *et seq.*, apply to Red

Robin.

392.    At all relevant times and continuing to the present, Defendant has had a policy,

pattern, and practice of prohibiting their Hourly and Salaried Managers from keeping their earned

tips.

393.    At all relevant times and continuing to the present, Defendant has had a policy,

pattern, and practice of controlling their Hourly and Salaried Manager's tips for purposes other

than distributing tips to the employee who received them, requiring employees to share tips with other employees, or facilitating a tip pool by collecting and redistributing employees' tips.

394.    As a result of Defendant's willful failure to record, report, credit, and compensate its employees, including Plaintiffs and the Collective Action Members, Defendant failed to make, keep, and preserve records with respect to each of its employees sufficient to determine all of their earned tips in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. §§ 211(c) and 215(a).

395.    As a result of Defendant's policy, practice, and pattern of prohibiting their Hourly and Salaried Managers from keeping their earned tips, Defendant knew or recklessly disregarded the fact that Plaintiffs and the Collective Action Members were being denied their earned tips under the FLSA.

396.    Due to Defendant's (a) failure to provide enough labor budget funds; (b) failure to take into account the impact of the underfunded labor budgets on the job duties of Plaintiffs and the similarly situated Collective Action Members; (c) actual knowledge, through its Regional Operations Directors, that the primary duties of Plaintiffs and the similarly situated Collective Action Members were manual labor and other non-exempt tasks which earned them tips; (d) failure to perform a person-by- person analysis of Plaintiffs' and the Collective Action Members' job duties to ensure that they were performing exempt job duties and not earning tips; and (e) policy and practice that required Plaintiffs and Collective Action Members to shift tips they had earned to Red Robin or another hourly "Front of House" employee who had not participated in the earning of the tip, Defendant knew or showed reckless disregard that its conduct was prohibited by the FLSA. 29 U.S.C. § 255(a).

397.    As a result of Defendant's FLSA violations, Plaintiffs, on behalf of themselves and the Collective Action Members, are entitled (a) to recover from Defendant unpaid tips; (b) to

recover an additional, equal amount as liquidated damages for Defendant's willful or reckless

violations of the FLSA; and (c) recover unreasonably delayed payment of tips, reasonable

attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

398.    Red Robin's violations of the FLSA have been willful or reckless, thus a three (3)

year statute of limitations applies, pursuant to 29 U.S.C. § 25.

**THIRD CAUSE OF ACTION**
***Illinois Unpaid Overtime***
**Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105, *et seq.***
**Brought by Plaintiff Brown,**
**on Behalf of Himself and all Illinois Class Members**

399.    Plaintiff, on behalf of himself and all Illinois Class Members, re-alleges and

incorporates by reference all preceding paragraphs as alleged above as if fully set forth herein.

400.    At all times relevant herein, Illinois Plaintiff Brown and Illinois Unpaid Overtime

Class Members have been entitled to the rights, protections, and benefits provided under the

IMWL. 820 Ill. Comp. Stat. 105/1, *et seq.*

401.    The IMWL regulates, among other things, the payment of overtime wages by

employers to employees, subject to limited exemptions not applicable herein. *Id.*

402.    At all relevant times, Defendant has been, and continues to be, an employer of the

Illinois Plaintiff and the Illinois Unpaid Overtime Class Members within the meaning of the

IMWL. 820 Ill. Comp. Stat. 105/3(c).

403.    During all times relevant to this action, Illinois Plaintiff and Illinois Unpaid

Overtime Class Members were Defendant's employees within the meaning of the IMWL. 820 Ill.

Comp. Stat. 105/3(d).

404.    Pursuant to the IMWL, during the relevant time period, employees were entitled to

one and one-half times their regular rate of pay for all hours worked in excess of forty (40) hours

in a given work week.

405.     Defendant, pursuant to its policy and practice, violated the IMWL by refusing and failing to pay Illinois Plaintiff and other similarly-situated employees minimum overtime wages for work performed, including payment of minimum overtime wages for time spent working for Defendant, in excess of 40 hours per work week, for which Defendant paid no compensation, or, alternatively, paid less than one and one-half times the employees regular rate of pay.

406.     Illinois Plaintiff and Illinois Unpaid Overtime Class Members are victims of a uniform and employer-based compensation policy. Upon information and belief, this uniform policy, violative of the IMWL, has been applied, and continues to be applied to all Illinois Unpaid Overtime Class Members who are employed or were employed by Defendant.

407.     Illinois Plaintiff and all other similarly situated employees are entitled to damages including treble the amount of underpayments and 5% of the amount of such underpayments for each month following the date of payment during which such underpayments remain unpaid.

408.     Illinois Plaintiff and other similarly situated employees are entitled to an award of pre- and post-judgment interest at the applicable legal rate.

409.     Finally, Defendant is liable for Illinois Plaintiff's costs and attorneys' fees incurred in this action.

## FOURTH CAUSE OF ACTION
### *Illinois Withheld Tips and Reimbursements*
**Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115, *et seq*.**
**Brought by Plaintiffs Taylor and Brown,**
**on Behalf of Themselves and all Illinois Class Members**

410.     Plaintiffs, on behalf of themselves and all Illinois Class Members, re-allege and incorporate by reference all preceding paragraphs as alleged above as if fully set forth herein.

411.     At all times relevant herein, Illinois Plaintiffs Taylor and Brown and Illinois Withheld Tips and Reimbursements Class Members have been entitled to the rights, protections, and benefits provided under the IWPCA. 820 Ill. Comp. Stat. 115/1, *et seq*.

412. The IWPCA regulates, among other things, the payment of tips/gratuities to employees and the reimbursement of employee expenses incurred during employment duties, subject to limited exemptions not applicable herein. *Id*.

413. At all relevant times, Defendant has been, and continues to be, an employer of Illinois Plaintiffs and the Illinois Withheld Tips and Reimbursements Class Members within the meaning of the IWPCA. 820 Ill. Comp. Stat. 115/2.

414. During all times relevant to this action, Illinois Plaintiffs and Illinois Withheld Tips and Reimbursements Class Members were Defendant's employees within the meaning of the IWPCA. 820 Ill. Comp. Stat. 115/2.

415. Pursuant to the IWPCA, during the relevant time period, employees were entitled to tips/gratuities owed to them. IWPCA, 820 Ill. Comp. Stat. 115/4.1.

416. Pursuant to the IWPCA, during the relevant time period, employees were entitled to reimbursement of all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer. IWPCA, 820 Ill. Comp. Stat. 115/9.5.

417. Defendant, pursuant to its policy and practice, violated the IWPCA by refusing and failing to pay Illinois Plaintiffs and other similarly situated employees tips/gratuities earned and owed to them.

418. Defendant, pursuant to its policy and practice, violated the IWPCA by refusing and failing to reimburse Illinois Plaintiffs and other similarly situated employees for employee expenses, including use of their personal vehicles to deliver catering or obtain supplies from other restaurant locations.

419. Illinois Plaintiffs and Illinois Withheld Tips and Reimbursements Class Members are victims of consistent, uniform, and company-wide policies, patterns, and practices. Upon

information and belief, these uniform policies, patterns, and practices, violative of the IWPCA, have been applied, and continue to be applied to all Illinois Withheld Tips and Reimbursements Class Members who are employed or were employed by Defendant.

420.    Illinois Plaintiffs and all other similarly situated employees are entitled to damages including 5% of the amount of such underpayments for each month following the date of payment during which such underpayments remain unpaid.

421.    Finally, Defendant is liable for Illinois Plaintiffs' costs and attorneys' fees incurred in this action.

**FIFTH CAUSE OF ACTION**
***Missouri Unpaid Overtime***
**Missouri Minimum Wage Law, Mo. Rev. Stat. § 290.500, *et seq*.**
**Brought by Plaintiffs Clawges, Leach, and Mitchell,**
**on Behalf of Themselves and all Missouri Class Members**

422.    Plaintiffs, on behalf of themselves and all Missouri Class Members, hereby incorporate all preceding paragraphs as alleged above as if fully set forth herein.

423.    At all times relevant herein Missouri Plaintiffs Clawges, Leach, and Mitchell and the Missouri Unpaid Overtime Class Members have been entitled to the rights, protections, and benefits provided under the MMWL. Mo. Rev. Stat. § 290.500, *et seq*.

424.    The MMWL regulates, among other things, the payment of overtime wages by employers in Missouri, subject to limited exemptions not applicable herein.

425.    At all relevant times, Defendant has been, and continues to be, an employer of Missouri Plaintiffs and the Missouri Unpaid Overtime Class Members within the meaning of the MMWL. Mo. Rev. Stat. § 2910.500(4).

426.    During all times relevant to this action, Missouri Plaintiffs and the Missouri Unpaid Overtime Class Members were Defendant's employees within the meaning of the MMWL. Mo. Rev. Stat. § 290.500(3).

427.    The MMWL exempts certain categories of employees from Missouri's overtime wage and other obligations, none of which apply to Missouri Plaintiffs or Missouri Unpaid Overtime Class Members.

428.    Pursuant to the MMWL, employees have been entitled to one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a given work week.

429.    Defendant, pursuant to its policy and practice, violated the MMWL by refusing and failing to pay Missouri Plaintiffs and other similarly situated employees minimum overtime wages.

430.    Missouri Plaintiffs and Missouri Unpaid Overtime Class Members are victims of a uniform and employer-based compensation policy. Upon information and belief, this uniform policy, violative of the MMWL, has been applied, and continues to be applied to all Missouri Unpaid Overtime Class Members who are employed or were employed by Defendant.

431.    Missouri Plaintiffs and all other similarly-situated employees are entitled to damages including payment of minimum overtime wages for time spent working for Defendant, in excess of 40 hours per work week, for which Defendant paid no compensation, or, alternatively, paid less than one and one-half times the employees regular rate of pay, within the three (3) years preceding the filing of this Complaint. Mo. Rev. Stat. § 290.527.

432.    Missouri Plaintiffs and all other similarly situated employees are entitled to liquidated damages equal to twice the unpaid minimum overtime wages within three (3) years preceding the filing of the Complaint. *Id*.

433.    Missouri Plaintiffs and other similarly situated employees are entitled to an award of pre- and post-judgment interest at the applicable legal rate. *Id*.

434.    Finally, Defendant is liable for Missouri Plaintiffs' costs and attorneys' fees incurred in this action. *Id*.

### SIXTH CAUSE OF ACTION
*Washington Unpaid Overtime*
**Washington Minimum Wage Act ("WMWA"), RCW 49.46, *et seq*.**
**Brought by Plaintiffs Hoffman and Morgan,**
**on Behalf of Themselves and all Washington Class Members**

435.     Plaintiffs, on behalf of themselves and all Washington Class Members, re-allege and incorporate by reference all preceding paragraphs as alleged above as if fully set forth herein.

436.     At all times relevant herein, Washington Plaintiffs Hoffman and Morgan and Washington Unpaid Overtime Class Members have been entitled to the rights, protections, and benefits provided under the WMWA, RCW 49.46, *et seq*.

437.     The WMWA regulates, among other things, the payment of overtime wages by employers to employees, subject to limited exemptions not applicable herein. *Id*.

438.     At all relevant times, Defendant has been, and continues to be, an employer of the Washington Plaintiffs and the Washington Unpaid Overtime Class Members within the meaning of the WMWA. WMWA, RCW 49.46.010(3).

439.     During all times relevant to this action, Washington Plaintiffs and Washington Unpaid Overtime Class Members were Defendant's employees within the meaning of the WMWA. WMWA, RCW 49.46.010(4).

440.     Pursuant to the WMWA, during the relevant time period, employees were entitled to one and one-half times their regular rate of pay for all hours worked in excess of forty (40) hours in a given work week.

441.     Defendant, pursuant to its policy and practice, violated the WMWA by refusing and failing to pay Washington Plaintiffs and other similarly-situated employees minimum overtime wages for work performed, including payment of minimum overtime wages for time spent working for Defendant, in excess of 40 hours per work week, for which Defendant paid no compensation, or, alternatively, paid less than one and one-half times the employees regular rate

of pay.

442.    Washington Plaintiffs and Washington Unpaid Overtime Class Members are victims of a uniform and employer-based compensation policy. Upon information and belief, this uniform policy, violative of the WMWA, has been applied, and continues to be applied to all Washington Unpaid Overtime Class Members who are employed or were employed by Defendant.

443.    Washington Plaintiffs and all other similarly situated employees are entitled to damages including the amount of underpayments.

444.    Finally, Defendant is liable for Washington Plaintiffs' costs and attorneys' fees incurred in this action.

**SEVENTH CAUSE OF ACTION**
***Washington Withheld Tips***
**Washington Minimum Wage Act ("WMWA"), RCW 49.46, *et seq*.**
**Brought by Plaintiffs Hoffman, Morgan, and Leasure,**
**on Behalf of Themselves and all Washington Class Members**

445.    Plaintiffs, on behalf of themselves and all Washington Class Members, re-allege and incorporate by reference all preceding paragraphs as alleged above as if fully set forth herein.

446.    At all times relevant herein, Washington Plaintiffs Hoffman, Morgan, and Leasure and Washington Withheld Tips Class Members have been entitled to the rights, protections, and benefits provided under the WMWA, RCW 49.46, *et seq*.

447.    The WMWA regulates, among other things, the payment of tips/gratuities to employees, subject to limited exemptions not applicable herein. *Id*.

448.    At all relevant times, Defendant has been, and continues to be, an employer of the Washington Plaintiffs and the Washington Withheld Tips Class Members within the meaning of the WMWA. WMWA, RCW 49.46.010(3).

449.    During all times relevant to this action, Washington Plaintiffs and Washington Withheld Tips Class Members were Defendant's employees within the meaning of the WMWA.

WMWA, RCW 49.46.010(4).

450.    Pursuant to the WMWA, during the relevant time period, employees were entitled

to tips owed to them. WMWA, RCW 49.46.020(3).

451.    Defendant, pursuant to its policy and practice, violated the WMWA by refusing

and failing to pay Washington Plaintiffs and other similarly situated employees tips/gratuities

earned and owed to them.

452.    Washington Plaintiffs and Washington Withheld Tips Class Members are victims

of consistent, uniform, and company-wide policies, patterns, and practices. Upon information and

belief, these uniform policies, patterns, and practices, violative of the WMWA, have been applied,

and continue to be applied to all Washington Withheld Tips Class Members who are employed or

were employed by Defendant.

453.    Washington Plaintiffs and all other similarly situated employees are entitled to

damages including the amount of underpayments.

454.    Finally, Defendant is liable for Washington Plaintiffs' costs and attorneys' fees

incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the Collective Action Members, the Illinois Class Members,

the Missouri Class Members, and the Washington Class Members are entitled to and pray for the

following relief:

a.    Designation of this action as an FLSA collective action on behalf of Plaintiffs and

the Collective Action Members and prompt issuance of notice pursuant to 29 U.S.C.

§ 216(b), to all similarly situated members of the Collective Action, apprising them

of the pendency of this action, permitting them to assert timely FLSA claims in this

action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

b.    Certification of the Illinois Unpaid Overtime Class as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), and the appointment of Plaintiff Brown and his counsel to represent the members of the Illinois Unpaid Overtime Class;

c.    Certification of the Illinois Withheld Tips Class as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), and the appointment of Plaintiffs Taylor and Brown and their counsel to represent the members of Illinois Withheld Tips Class;

d.    Certification of the Missouri Unpaid Overtime Class as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), and the appointment of Plaintiffs Clawges, Leach, and Mitchell and their counsel to represent the members of the Missouri Unpaid Overtime Class;

e.    Certification of the Washington Unpaid Overtime Class as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), and the appointment of Plaintiffs Hoffman and Morgan and their counsel to represent the members of the Washington Unpaid Overtime Class;

f.    Certification of the Washington Withheld Tips Class as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3), and the appointment of Plaintiffs Hoffman, Morgan, and Leasure and their counsel to represent the members of Washington Withheld Tips Class;

g.    A permanent injunction requiring Red Robin and its directors, officers, owners, agents, successors, employees, and representatives to cease its unlawful practices under, and comply with the FLSA, Illinois Minimum Wage Law, the Illinois Wage Payment and Collection Act Class, the Missouri Minimum Wage Law, and the Washington Minimum Wage Act;

h.    Issuance of a declaratory judgment that the practices complained of are unlawful

under the FLSA, the Illinois Minimum Wage Law, the Illinois Wage Payment and

Collection Act Class, the Missouri Minimum Wage Law, and the Washington

Minimum Wage Act;

i.     An award of unpaid wages for all hours worked in excess of 40 hours in a

workweek, at a rate of one and one-half times the regular rate of pay under the

FLSA, the Illinois Minimum Wage Law, the Missouri Minimum Wage Law, and

the Washington Minimum Wage Act, using the following common methodology

for calculating damages: ((Annual Salary ÷ 52) ÷ 40) x Total Number of Overtime

Hours Worked x 1.5);

j.     An award of tips/gratuities earned by and owed to Salaried and Hourly Managers

for Plaintiffs and the Collective Action Members pursuant to the FLSAt;

k.     An award of tips/gratuities earned by and owed to Illinois Salaried and Hourly

Managers for Plaintiffs and the Illinois Class Members pursuant to the Illinois

Minimum Wage Payment and Collection Act;

l.     An award of tips/gratuities earned by and owed to Washignton Salaried and Hourly

Managers for Plaintiffs and the Washington Class Members pursuant to the

Washington Minimum Wage Act;

m.     An award of employee expense reimbursement for the use of, but not limited to,

personal vehicles for supply runs and delivering catering orders to Illinois Salaried

and Hourly Managers for Plaintiffs and the Illinois Class Members pursuant to the

Illinois Minimum Wage Payment and Collection Act;

n.     An award for the Plaintiffs and the Collective Class Action Members of liquidated

damages as a result of Red Robin's willful or reckless failure to pay for all hours

worked in excess of 40 hours in a workweek, at a rate of one and one-half times the

regular rate of pay pursuant to 29 U.S.C. § 216;

o.    An award for the Illinois Plaintiffs and the Illinois Minimum Wage Law Members of liquidated damages as a result of Red Robin's failure to pay for all hours worked in excess of 40 hours in a workweek, at a rate of treble the amount of underpayments and 5% of the amount of such underpayments for each month following the date of payment during which such underpayments remain unpaid pursuant to 820 Ill. Comp. Stat. 105/12(a);

p.    An award for the Missouri Plaintiff and the Missouri Minimum Wage Law Members of liquidated damages as a result of Red Robin's failure to pay for all hours worked in excess of 40 hours in a workweek, at a rate twice the amount of unpaid wages pursuant to Mo. Rev. Stat. § 290.527;

q.    An award of prejudgment and post-judgment interest as provided by law;

r.    A reasonable incentive award to compensate Plaintiffs for time spent attempting to recover unpaid wages, unpaid tips/gratuities, employee expense reimbursement, and penalties on behalf of Class Members and for the risks undertaken in doing so;

s.    An award of costs and expenses of this action, together with reasonable attorneys' and expert fees; and

t.    Such other and further relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to FED. R. CIV. P. 38(b), Plaintiffs and the Collective Action and Class Members demand a trial by jury on all questions of fact raised by the Complaint.

DATED: December 19, 2025                Respectfully Submitted,


By: */s/ Diana E. Wise*
**Diana E. Wise**
WISE LAW LLC
1624 Carlyle Ave #800
Belleville, IL 62221
Ph: 217-556-8036
Email: dwise@wiseconsumerlaw.com

*Attorney for Plaintiffs, the Collective Action, and the Proposed Classes*